UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

YIH-SHYAN "WALLY" LIAW, et al.,

Defendant.

26 Cr. 100 (ER)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT YIH-SHYAN "WALLY" LIAW'S PRETRIAL MOTIONS**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Juliana N. Murray
David J. Robles
Kevin T. Sullivan
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 3

I. Summary of Facts .......... 3

II. Procedural History of Arrests .......... 6

III. The Government's Discovery Productions .......... 6

ARGUMENT .......... 7

I. The Defendant's Motion to Dismiss for Improper Venue Should be Denied .......... 7

A. Applicable Law .......... 8

B. Discussion .......... 10

1. The Indictment Sufficiently Alleges Venue .......... 10

2. The Defendant Cannot Rely on the Substantial Contacts Test .......... 15

II. The Defendant's Motion to Dismiss Count Two Should be Denied .......... 17

A. Applicable Law .......... 17

B. Discussion .......... 19

1. The Defendant's Interpretation of 18 U.S.C. § 554(a) Is Incorrect .......... 19

2. Count Two Sufficiently Alleges that the Goods Were Unlawfully Exported from the United States .......... 26

III. The Defendant Is Not Entitled to a Bill of Particulars .......... 27

A. Applicable Law .......... 28

B. Discussion .......... 30

IV. The Defendant's Motion to Suppress Evidence from his Electronic Accounts and Devices Should be Denied .......... 35

A. Applicable Law .......... 35

1. Probable Cause ..... 35

2. Alleged Omissions or Misstatements in a Search Warrant Affidavit ..... 36

B. Discussion ..... 39

1. The Challenged Warrant Applications ..... 39

2. There Were No Material Omissions or Misrepresentations as to Company-1 or the Materials it Provided ..... 42

a. Disclosures Regarding Company-1's VSD and Proffers ..... 42

b. Purported Discrepancies in the Communications Referenced in the Warrant Affidavits ..... 44

c. Purported Undisclosed Redactions ..... 48

3. The Affidavits Did Not Present the Defendant's Communications in a Misleading Way or Omit Critical Context ..... 50

V. The Defendant's Motion to Suppress the Contents of his Cellphones Should be Denied ..... 54

A. Applicable Law ..... 55

B. Discussion ..... 60

VI. The Defendant's Motion to Strike Surplusage is Moot ..... 69

A. Applicable Law ..... 69

B. Discussion ..... 71

VII. The Defendant's Motion to Unseal Grand Jury Records Should be Denied ..... 72

A. Applicable Law ..... 72

B. Discussion ..... 73

CONCLUSION ..... 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berghuis v. Thompkins*,
560 U.S. 370 (2010) .......... 59, 65

*Charlotte E. v. Safir*,
156 F.3d 340 (2d Cir. 1998) .......... 58

*Chavez v. Martinez*,
538 U.S. 760 (2003) .......... 59

*Colorado v. Connelly*,
479 U.S. 157 (1986) .......... 58

*Commonwealth v. Jones*,
117 N.E.3d 702 (Mass. 2019) .......... 61

*Costello v. United States*,
350 U.S. 359 (1956) .......... 17, 26

*D.C. v. Wesby*,
138 S. Ct. 577 (2018) .......... 36

*Davis v. United States*,
512 U.S. 452 (1994) .......... 57

*Edwards v. Arizona*,
451 U.S. 477 (1981) .......... 56

*Fellers v. United States*,
540 U.S. 519 (2004) .......... 56

*Fisher v. United States*,
425 U.S. 391 (1976) .......... 58

*Franks v. Delaware*,
438 U.S. 154 (1978) .......... 36, 37

*Gerstein v. Pugh*,
420 U.S. 103 (1975) .......... 36

*Herring v. United States*,
555 U.S. 135 (2009) .......... 64

*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*,
542 U.S. 177 (2004)........................................................................................... 56

*Illinois v. Gates*,
462 U.S. 213 (1983)........................................................................................... 36, 53

*In re 650 Fifth Ave. & Related Props.*,
830 F.3d 66 (2d Cir. 2016) ................................................................................ 67

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25*,
2011, 670 F.3d 1335 (11th Cir. 2012) ................................................................ 61, 62

*Krantz v. United States*,
No. 98 Civ. 7218 (JG), 1999 WL 557524 (E.D.N.Y. July 27, 1999) ..................................... 18

*Kuhlmann v. Wilson*,
477 U.S. 436 (1986)........................................................................................... 55

*Maine v. Moulton*,
474 U.S. 159 (1985)........................................................................................... 55

*Maryland v. Shatzer*,
559 U.S. 98 (2010)............................................................................................. 56

*Massiah v. United States*,
377 U.S. 201 (1964)........................................................................................... 60

*McNeil v. Wisconsin*,
501 U.S. 171 (1991)........................................................................................... 57

*Michigan v. Harvey*,
494 U.S. 344 (1990)........................................................................................... 55

*Miranda v. Arizona*,
384 U.S. 436 (1966)........................................................................................... 56

*New York v. Tanella*,
374 F.3d 141 (2d Cir. 2004) .............................................................................. 18, 27

*Nix v. Williams*,
467 U.S. 431 (1984)........................................................................................... 59, 67

*Oregon v. Elstad*,
470 U.S. 298 (1985)........................................................................................... 57, 58

*Panetta v. Crowley*,
460 F.3d 388 (2d Cir. 2006) .............................................................................. 38

*People v. Sneed*,
2023 IL 127968 (Ill. 2023) ........................................................................................ 61

*Rhode Island v. Innis*,
446 U.S. 291 (1980)........................................................................................ 56, 61

*Rivera v. United States*,
928 F.2d 592 (2d Cir. 1991) ........................................................................................ 37

*Schneckloth v. Bustamonte*,
412 U.S. 218 (1973)........................................................................................ 59, 64

*State v. Valdez*,
No. 20210175, 2023 WL 8635197 (Utah Dec. 14, 2023) .............................................. 61

*Texas v. Brown*,
460 U.S. 730 (1983)........................................................................................ 36

*United Sates v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ........................................................................................ 31

*United States v. Ahmed*,
No. 10 Cr. 131 (PKC), 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011)............................ 70

*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998) ........................................................................................ 18

*United States v. Almaleh*,
No. 17 Cr. 25 (ER), 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022)............................ passim

*United States v. Anderson*,
929 F.2d 96 (2d Cir. 1991) ........................................................................................ 58

*United States v. Apple MacPro Computer*,
851 F.3d 238 (3d Cir. 2017) ........................................................................................ 61

*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) ........................................................................ 36, 37, 39, 49

*United States v. Bendann*,
180 F.4th 147 (4th Cir. 2026) ........................................................................ 62, 63, 64

*United States v. Bernardino*,
444 F. App’x 73 (5th Cir. 2011)........................................................................................ 22

*United States v. Bezmalinovic*,
962 F. Supp. 435 (S.D.N.Y. 1997) ........................................................................................ 14

*United States v. Booth*,
No. 21 Cr. 652 (JSR), 2022 WL 3139651 (S.D.N.Y. Aug. 4, 2022) ........ 12

*United States v. Booth*,
No., 22-1823, 2024 WL 911854 (2d Cir. Mar. 4, 2024) ........ 12

*United States v. Butler*,
351 F. Supp. 2d 121 (S.D.N.Y. 2004) ........ 18, 70, 71

*United States v. Calk*,
No. 19 Cr. 366 (LGS), 2020 WL 3577903 (S.D.N.Y. Jul. 1, 2020) ........ 38

*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000) ........ 38, 39, 54

*United States v. Cardenas*,
810 F.3d 373 (5th Cir. 2016) ........ 22, 23

*United States v. Cephas*,
937 F.2d 816 (2d Cir. 1991) ........ 29

*United States v. Chalmers,*
410 F. Supp. 2d 278 (S.D.N.Y. Jan. 25, 2006) ........ 30, 35

*United States v. Chen*,
378 F.3d 151 (2d Cir. 2004) ........ 28

*United States v. Chi Tong Kuok*,
671 F.3d 931 (9th Cir. 2012) ........ 21

*United States v. Clerfe*,
186 F.4th 141 (3d Cir. 2026) ........ 25

*United States v. Cohen*,
518 F.2d 727 (2d Cir. 1975) ........ 31, 34

*United States v. Conde*,
309 F. Supp. 2d 510 (S.D.N.Y. 2003) ........ 19

*United States v. Cromitie*,
No. 09 Cr. 558 (CM), 2010 WL 3025670 (S.D.N.Y. July 28, 2010) ........ 38

*United States v. Dupigny,*
No. 18 Cr. 528 (JMF), 2019 WL 2327697 (S.D.N.Y. May 30, 2019) ........ 10, 11

*United States v. Ephron*,
No. 24 Cr. 418 (MMG), 2025 WL 524027 (S.D.N.Y. Feb. 18, 2025) ........ 57

*United States v. Faison*,
393 F. App'x 754 (2d Cir. 2010) ........ 18

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) ........ 37, 39

*United States v. Fama*,
758 F.2d 834 (2d Cir. 1985) ........ 36, 53

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987) ........ 30

*United States v. Garcia*,
554 F. Supp. 3d 421 (E.D.N.Y. 2021) ........ 64

*United States v. Gogic*,
770 F. Supp. 3d 529 (E.D.N.Y. 2025) ........ 63

*United States v. Gotti*,
42 F. Supp. 2d 252 (S.D.N.Y. 1999) ........ 53

*United States v. Gottlieb*,
493 F.2d 987 (2d Cir. 1974) ........ 29

*United States v. Grant*,
No. 07 Cr. 1119 (CM), 2008 WL 2971781 (S.D.N.Y. Aug. 1, 2008) ........ 66

*United States v. Griffith*,
No. 20 Cr. 315 (PKC), 2020 WL 4369650 (S.D.N.Y. July 29, 2020) ........ 10, 11

*United States v. Guzman*,
724 F. Supp. 2d 434 (S.D.N.Y. 2010) ........ 64

*United States v. Haak*,
884 F.3d 400 (2d Cir. 2018) ........ 56, 63, 65

*United States v. Hallford*,
816 F.3d 850 (D.C. Cir. 2016) ........ 59

*United States v. Haygood*,
157 F. App'x 448 (2d Cir. 2005) ........ 66

*United States v. Heath*,
455 F.3d 52 (2d Cir. 2006) ........ 59

*United States v. Henry*,
447 U.S. 264 (1980) ........ 65

*United States v. Hernandez*,
85 F.3d 1023 (2d Cir. 1996) ........ 70

*United States v. Hernandez*,
980 F.2d 868 (2d Cir. 1992) ........ 18

*United States v. Ho*,
984 F.3d 191 (2d Cir. 2020) ........ 12

*United States v. Horvath*,
No. 24 Cr. 401 (DJB), 2025 WL 460032 (D.D.C. Feb. 11, 2025) ........ 32, 33

*United States v. Hubbell*,
530 U.S. 27 (2000) ........ 58

*United States v. Isiofia*,
370 F.3d 226 (2d Cir. 2004) ........ 64

*United States v. Jimenez*,
824 F. Supp. 351 (S.D.N.Y. 1993) ........ 53

*United States v. Johnson*,
No. 21 Cr. 428 (ER), 2023 WL 5632473 n.19 (S.D.N.Y. Aug. 31, 2023) ........ 69, 70, 71

*United States v. Jones*,
164 F.3d 620, 1998 WL 708952 (2d Cir. 1998) ........ 73

*United States v. Kelly*,
91 F. Supp. 2d. 580 (S.D.N.Y. 2000) ........ 17, 26

*United States v. Kim*,
246 F.3d 186 (2d Cir. 2001) ........ 12, 14

*United States v. Kirk Tang Yuk,*
885 F.3d 57 (2d Cir. 2018) ........ 9, 15

*United States v. Klump*,
536 F.3d 113 (2d Cir. 2008) ........ 36

*United States v. Kourani*,
6 F.4th 345 (2d Cir. 201) ........ 56, 64

*United States v. Lahey*,
967 F. Supp. 2d 698 (S.D.N.Y. 2013) ........ 39

*United States v. Lange*,
834 F.3d 58 (2d Cir. 2016) ........ 9, 15, 16

*United States v. Langella*,
776 F.2d 1078 (2d Cir. 1985) ........................................................................................ 70

*United States v. LaSpina*,
299 F.3d 165 (2d Cir. 2002) .......................................................................................... 18

*United States v. Leon*,
468 U.S. 897 (1984)............................................................................................... 54, 67

*United States v. Leonelli*,
428 F. Supp. 880 (S.D.N.Y. 1977) .......................................................................... 28, 29

*United States v. Leung*,
40 F.3d 577 (2d Cir. 1994) ....................................................................................... 73, 74

*United States v. Lira*,
No. 22 Cr. 151 (LGS), 2022 WL 17417129 (S.D.N.Y. Dec. 5, 2022) .............................. 10, 11

*United States v. Lugo–Lopez*,
833 F.3d 453 (5th Cir. 2016) ......................................................................................... 23

*United States v. Ma*,
No. 03 Cr. 734 (DAB), 2006 WL 708559 (S.D.N.Y. Mar. 21, 2006) ............................... 30, 35

*United States v. Mahabub*,
No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014).................................... 28

*United States v. Maisonet*,
No. 12 Cr. 829 (AKH), 2013 WL 12204909 (S.D.N.Y. Mar. 22, 2013)................................. 38

*United States v. Mandell*,
710 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................................................... 37, 38

*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988) .......................................................................................... 69

*United States v. Maxwell*,
534 F. Supp. 3d 299 (S.D.N.Y. 2021) ............................................................................ 71

*United States v. Mayo*,
705 F.2d 62 (2d Cir. 1983) ............................................................................................ 32

*United States v. McCoy*,
407 F. App'x 514 (2d Cir. 2010) ..................................................................................... 66

*United States v. Mechanik*,
475 U.S. 66 (1986).......................................................................................................... 72

*United States v. Melendez*,
No. 16 Cr. 33 (LTS), 2016 WL 4098556 (S.D.N.Y. July 28, 2016) ........................................ 37

*United States v. Mendonca*,
88 F.4th 144 (2d Cir. 2023) ........................................................................................ 56

*United States v. Mills*,
412 F.3d 325 (2d Cir. 2005) ........................................................................................ 55

*United States v. Milton*,
No. 21 Cr. 478 (ER), 2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021) ....................... 9, 10, 11, 15

*United States v. Mitlof*,
165 F. Supp. 2d 558 (S.D.N.Y. 2001) ........................................................................ 29

*United States v. Moore*,
968 F.2d 216 (2d Cir. 1992) ................................................................................... 54, 55

*United States v. Mostafa*,
965 F. Supp. 2d 451 (S.D.N.Y. 2013) ........................................................................ 70

*United States v. Moten*,
582 F.2d 654 (2d Cir. 1978) ............................................................................... 72, 73, 74

*United States v. Mulder*,
273 F.3d 91 (2d Cir. 2001) ................................................................................. 70, 71, 72

*United States v. Muyet*,
945 F. Supp. 586 (S.D.N.Y. 1996) ........................................................................ 28, 29, 34

*United States v. Naranjo*,
14 F.3d 145 (2d Cir. 1994) .......................................................................................... 8

*United States v. Nazemzadeh*,
No. 11 Cr. 5726, 2014 WL 310460 (S.D. Cal. Jan. 28, 2014)................................................. 22

*United States v. Nji*,
159 F.4th 259 (4th Cir. 2025) ........................................................................................ 25

*United States v. Ohle*,
678 F. Supp. 2d 215 (S.D.N.Y. 2010) ........................................................................ 10

*United States v. Ojeikere*,
299 F. Supp. 2d 254 (S.D.N.Y. 2004) ........................................................................ 29

*United States v. Oloyede*,
933 F.3d 302 (4th Cir. 2019) ........................................................................................ 66

*United States v. Ordaz-Gallardo*,
520 F. Supp. 2d 516 (S.D.N.Y. 2007) .......... 72

*United States v. Orena*,
32 F.3d 704 (2d Cir. 1994) .......... 18

*United States v. Patane*,
542 U.S. 630 (2004) .......... 57, 59, 66

*United States v. Perez*,
247 F. Supp. 2d 459 (S.D.N.Y. 2003) .......... 38

*United States v. Peterson*,
357 F. Supp. 2d 748 (S.D.N.Y. 2005) .......... 9, 10

*United States v. Prevezon Holdings, Ltd.*,
251 F. Supp. 3d 684 (S.D.N.Y. 2017) .......... 13

*United States v. Proctor & Gamble Co.*,
356 U.S. 677 (1958) .......... 72

*United States v. R. Enterprises, Inc.*,
498 U.S. 292 (1991) .......... 73

*United States v. Rajaratnam*,
719 F.3d 139 (2d Cir. 2013) .......... 38, 39, 49, 53

*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996) .......... 38

*United States v. Richter*,
796 F.3d 1173 (10th Cir. 2015) .......... 25

*United States v. Rivera*,
750 F. Supp. 614 (S.D.N.Y. 1990) .......... 37

*United States v. Rivero*,
889 F.3d 618 (9th Cir. 2018) .......... 22

*United States v. Rommy*,
506 F.3d 108 (2d Cir. 2007) .......... passim

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993) .......... 55, 60

*United States v. Royer*,
549 F.3d 886 (2d Cir. 2008) .......... 8

*United States v. Sabbeth*,
262 F.3d 207 (2d Cir. 2001) .................................................................................... 18

*United States v. Salazar*,
485 F.2d 1272 (2d Cir. 1973) .................................................................................. 28

*United States v. Sandalo*,
70 F.4th 77 (2d Cir. 2023) ...................................................................................... 37

*United States v. Santiago*,
174 F. Supp. 2d 16 (S.D.N.Y. 2001) ...................................................................... 30

*United States v. Scarpa*,
913 F.2d 993 (2d Cir. 1990) ............................................................................... 69, 70

*United States v. Schwartz*,
535 F.2d 160 (2d Cir. 1976) ...................................................................................... 9

*United States v. Serrano*,
191 F. Supp. 3d 287 (S.D.N.Y. 2016) .................................................................... 19

*United States v. Sharma*,
No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019).................................... 66

*United States v. Shvartsman*,
722 F. Supp. 3d 276 (S.D.N.Y. 2024) ............................................................ 56, 61, 64

*United States v. Singer*,
963 F.3d 1144 (11th Cir. 2020) ........................................................................... 23, 24

*United States v. Singh*,
390 F.3d 168 (2d Cir. 2004) .................................................................................... 36

*United States v. Skyfield*,
No. 23 Cr. 569 (LJL), 2023 WL 8879291 (S.D.N.Y. Dec. 22, 2023) ..................................... 37

*United States v. Smith*,
706 F. Supp. 3d 404 (S.D.N.Y. 2023) .................................................................. 61, 62

*United States v. Smith*,
985 F. Supp. 2d 547 (S.D.N.Y. 2014) .................................................................... 17

*United States v. Stein*,
429 F. Supp. 2d 633 (S.D.N.Y. 2006) .................................................................... 10

*United States v. Stokes*,
733 F.3d 438 (2d Cir. 2013) .................................................................................... 60

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003) .......... 14

*United States v. Szur*,
No. 97 Cr. (JGK), 1998 WL 132942 (S.D.N.Y. Mar. 20, 1998) .......... 10

*United States v. Tomero*,
496 F. Supp. 2d 253 (S.D.N.Y. 2007) .......... 69

*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990) .......... 73

*United States v. Triana-Mateus*,
No. 98 Cr. (SWK), 2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) .......... 28, 29

*United States v. Trippe*,
171 F. Supp. 2d 230 (S.D.N.Y. 2001) .......... 28

*United States v. Tuzman*,
301 F. Supp. 3d 430 (S.D.N.Y. 2017) .......... 70, 71

*United States v. Tzolov*,
642 F.3d 314 (2d Cir. 2011) .......... 8, 12

*United States v. Varlack,*
225 F.2d 665 (2d Cir. 1955) .......... 19

*United States v. Vilar*,
No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007).......... 37

*United States v. Wagner*,
989 F.2d 69 (2d Cir. 1993) .......... 36

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) .......... 18, 28

*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021) .......... 17

*United States v. Williams*,
504 U.S. 36 (1992).......... 73

*United States v. Wilson*,
914 F. Supp. 2d 550 (S.D.N.Y. 2012) .......... 66

*United States v. Ying Lin*,
270 F. Supp. 3d 631 (E.D.N.Y. 2017) .......... 19, 20, 21

*United States v. Zemlyansky*,
945 F. Supp. 2d 438 (S.D.N.Y. 2013) ........................................ 28

*United States v. Al Jaberi*,
97 F.4th 1310 (11th Cir. 2024) ........................................ 24

*United States v. Matheny*,
42 F.4th 837 (8th Cir. 2022) ........................................ 25

*Vega v. Tekoh*,
597 U.S. 134 (2022)........................................ 57

*Wood v. Ercole*,
644 F.3d 83 (2d Cir. 2011) ........................................ 65

**Statutes**

13 U.S.C. § 305(a)(1)........................................ 24

18 U.S.C. § 371........................................ 20, 26

18 U.S.C. § 554(a) ........................................ passim

18 U.S.C. § 922(e) ........................................ 24

50 U.S.C. § 1705........................................ 23

**Rules**

Fed. R. Crim. P. 12(b)(3)(B)(v) ........................................ 17

Fed. R. Crim. P. 6(e)(3)(E)(ii) ........................................ 72

Fed. R. Crim. P. 7(c)........................................ 32

Fed. R. Crim. P. 7(c)(1) ........................................ 17

Fed. R. Crim. P. 7(d)........................................ 69

Fed. R. Crim. P. 7(f) ........................................ 28

**Regulations**

15 C.F.R. § 746.2(a)........................................ 23

**Other Authorities**

Compelled Decryption and the Privilege Against Self-Incrimination,
97 Tex. L. Rev. 767 (2019)........................................ 61

Model Crim. Jury Instr. 9th Cir. 21.2 .......... 24

Pattern Crim. Jury Instr. 5th Cir. 2.26.......... 24

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by defendant Yih-Shyan "Wally" Liaw in the above-captioned case ("Mot."). For the reasons set forth herein, the defendant's motions should be denied in their entirety.

*First*, the defendant's venue challenge is premature and, in any event, meritless. The Indictment alleges that the charged conspiracies occurred, in part, "in the Southern District of New York." That is sufficient to defeat a motion to dismiss for improper venue. To the extent the defendant believes that conduct occurring in this District was not reasonably foreseeable to him, that is an argument for the jury to evaluate at trial. Moreover, as the defendant is aware, he also took steps in furtherance of the charged crimes while he was physically present in this District.

*Second*, the defendant's motion to dismiss Count Two is premised on an incorrect reading of the federal smuggling statute, and, like the defendant's venue challenge, is premature. The Indictment alleges facts sufficient to support the charge. Indeed, the Indictment alleges that certain of the servers integrating controlled Nvidia GPUs were assembled in the United States prior to being diverted to China. That alone is sufficient to defeat his motion. Like venue, to the extent the defendant makes factual assertions intended to undermine the existence of a conspiracy to smuggle controlled items out of the United States, that is a question of fact for the jury to decide.

*Third*, the defendant's motion for a bill of particulars should be denied. The defendant is not entitled to a bill of particulars where, as here, the 21-page speaking Indictment provides the defendant with adequate notice of the charged crimes and the Government has, through its discovery productions and correspondence with counsel, provided the defendant with details about the Government's proof far exceeding that which is required by law. The Government has no obligation to further catalog its anticipated trial proof for the defendant.

*Fourth*, the defendant's motions to suppress the contents of his electronic accounts and devices should be denied. The warrant applications were supported by ample probable cause, including information learned during proffer sessions with the defendant's co-conspirators, numerous incriminating communications between and among the defendant and his co-conspirators, and photographic evidence. In support of his motion, the defendant makes unfounded claims that the applications contained material misrepresentations and omissions. But the defendant's allegations do not withstand scrutiny, and the Court should see them for what they are: baseless attempts to suppress overwhelming evidence of the defendant's guilt. Similarly, the defendant's attempt to suppress the contents of his cellphones on the grounds that his passcodes were unlawfully compelled should be rejected. The defendant was not compelled to provide his passcodes, and, in any event, they would have been discovered in the normal course of the ongoing investigation. The defendant's motions to suppress should therefore be denied without a hearing.

*Finally*, the defendant's motions to strike surplusage from the Indictment and to unseal grand jury materials should be denied as moot. The Government does not intend to provide the jury with the Indictment. Moreover, the defendant's request to unseal grand jury materials—which rests on the defendant's allegations that the warrant applications contained material misrepresentations and omissions—is meritless because there were no such misrepresentations or omissions. Regardless, the Government intends to provide any grand jury materials that fall within its Section 3500 and *Giglio* obligations to the defense in advance of trial, consistent with its disclosure obligations.

Accordingly, and for the reasons set forth below, the defendant's motions should be denied.

## BACKGROUND

### I. Summary of Facts

Until approximately March 2026, the defendant was a board member and senior vice president of business development for a U.S.-based company that designs and builds high-performance computer servers for artificial intelligence and cloud computing applications (the "U.S. Manufacturer"). The U.S. Manufacturer is a publicly traded company headquartered in San Jose, California, with offices and/or facilities in New York, California, Europe, and Asia, including Taiwan and China. The defendant co-founded the U.S. Manufacturer in 1993 and has held various executive positions, including senior vice president of worldwide sales and corporate secretary.

As alleged in the Indictment, between approximately 2024 and March 2026, the defendant and co-defendants Steven Chang (a former sales manager for the U.S. Manufacturer based in Taiwan) and Willy Sun (a former third-party broker and outside contractor for the U.S. Manufacturer also based in Taiwan) worked with executives of a company based in Southeast Asia ("Company-1") and others to unlawfully divert servers assembled by the U.S. Manufacturer containing Nvidia graphics processing units ("GPUs") to China. *See* Dkt. 1 ¶¶ 1-2. During the course of the conspiracy, the defendant and his co-conspirators facilitated the sale of over approximately $2.5 billion worth of the U.S. Manufacturer's servers to Company-1, many of which were manufactured in the United States, knowing and intending that those servers would then be diverted to China through a network of third-party brokers. *See id*. at ¶¶ 2-4.

In general, this scheme involved Company-1 sending purchase orders to the U.S. Manufacturer—at the direction of and in coordination with the defendant, Chang, and Sun—for servers containing Nvidia GPUs that were purportedly going to be used by Company-1 in Southeast Asia, but which instead were used to fulfill orders from third-party brokers with customers in China. *See* Dkt. 1 ¶¶ 10-12. To advance this scheme, the defendant regularly

communicated with Chang, Sun, an executive of Company-1 ("Individual-1"), and third-party brokers with customers in China about orders through Company-1. *See, e.g.*, *id.* at ¶¶ 13, 17-20.

The defendant was well-aware of the unlawful nature of the scheme. On several occasions, he exchanged communications with co-conspirators about law enforcement action taken against individuals for diverting export-controlled technology to China. For example, on or about March 1, 2025, Individual-1 texted the defendant a link to an article about individuals charged with export control violations and said, "I'm very concerned Wally." Dkt. 1 ¶ 19(b). The defendant brushed off Individual-1's concerns, responding that "we have not shipped to them for quite a while" because "they"—*i.e.*, the individuals who were charged—had been questioned by U.S. authorities. *Id.* As another example, on or about August 6, 2025, one of the third-party brokers with whom the defendant was in regular contact sent the defendant a link to a U.S. Department of Justice press release regarding Chinese nationals arrested for diverting controlled technology to China, to which the defendant responded with sobbing emojis. *See id.* at ¶ 22. The defendant also exchanged numerous messages with his co-conspirators making clear that Company-1's orders to the U.S. Manufacturer were not intended for Company-1, but rather, the third-party brokers with whom the defendant and his co-conspirators were in direct and regular communication. *See id.* at ¶¶ 18, 19(b). For example, in or around April 2025, the defendant exchanged text messages with Individual-1 about servers that one of the third-party brokers had ordered through Company-1, including by sending a screenshot of messages that the broker had previously sent to the defendant expressing gratitude for the "hard work and dedication" of Chang and Individual-1. *Id.* at ¶ 18.

To conceal this scheme, the defendant and his co-conspirators also sought to exert influence over the U.S. Manufacturer's compliance processes and to deceive certain members of the U.S. Manufacturer's compliance team and U.S. authorities. For example, the defendant and

Chang regularly pressured the U.S. Manufacturer's compliance team to allow Company-1 to pass internal audits and to lift shipment holds imposed during the pendency of those audits. *See, e.g.*, Dkt. 1 ¶¶ 3, 15. In addition, in 2025, after the U.S. Manufacturer's compliance team requested an audit of servers that had been sold to Company-1 and were purportedly in Southeast Asia—but which had, at the time of the audit, already been diverted to China—Sun and Chang arranged for the purchase and use of thousands of "dummy" servers, *i.e.*, non-working, physical replicas of functional servers. *See id.* at ¶¶ 3, 24, 26. Those dummy servers were later staged at Company-1's warehouse to pass an August 2025 audit conducted by the U.S. Manufacturer. *See id.* at ¶ 24(d). Upon completion of the audit, and the successful concealment of their scheme, Sun sent the defendant numerous photographs and videos of the dummy servers staged at the warehouse. *See id.* at ¶ 24(e). The defendant responded, "That's spectacular!" *Id.*

In December 2025, some of those same dummy servers were used in an attempt to deceive a U.S. Department of Commerce ("DOC") export control officer conducting a post shipment verification ("PSV") inspection of the U.S. Manufacturer's servers that were supposed to be at Company-1's warehouse in Southeast Asia but which also had already been diverted to China. *See* Dkt. 1 ¶ 26. To stage the servers, and as captured on video surveillance, Sun and one of the third-party brokers with whom the defendant maintained regular contact relabeled the dummy servers with the U.S. Manufacturer's serial numbers and placed them in boxes with the U.S. Manufacturer's logo. *See id.* at ¶ 27. During the inspection, Sun pretended to be an assistant from Company-1's local law firm and provided false and misleading responses to questions raised by the U.S. export control officer. *See id.* at ¶ 28. Following the PSV, the defendant texted Individual-1 to ask whether Company-1 had received an "OK letter" from the DOC, to which Individual-1

responded, "Not yet[.] But spoke with Willy [Sun] . . . He said he is optimistic." *Id*. at ¶ 29. The defendant responded, "Great!" *Id*.

## II. Procedural History of Arrests

On March 17, 2026, a grand jury in this District returned an Indictment charging the defendant, Chang, and Sun with (i) conspiracy to violate the Export Control Reform Act ("ECRA") (Count One); (ii) conspiracy to smuggle goods out of the United States (Count Two); and (iii) conspiracy to defraud the United States (Count Three). Two days later, the defendant and Sun (who had traveled to the United States to attend a conference with the defendant) were arrested in California and the Indictment was unsealed. Chang, who resides in Taiwan, remains a fugitive. As described further below, and as relevant here, in connection with the defendant's arrest, law enforcement agents executed a search warrant on the defendant's residence and person, authorizing the seizure of the defendant's electronic devices. On April 1, 2026, the defendant and Sun were arraigned in the Southern District of New York and entered pleas of not guilty. *See* Dkt. 20.

On September 8, 2026, Sun pled guilty to a sealed superseding information charging him with the same three counts in the Indictment and one count for obstruction of justice. Sun's plea and the superseding information were unsealed on October 9, 2026. *See* Dkt. Nos. 60, 61.

Trial is scheduled to begin on March 29, 2026.

## III. The Government's Discovery Productions

The Government has made substantial discovery productions to date. Those productions began in April 2026, when the Government produced, among other things, (i) full extractions of the defendant's electronic devices and accounts; (ii) lengthy search warrant applications outlining much of the Government's proof, including communications between the defendant and co-conspirators, statements made by witnesses about their involvement in the charged conduct alongside the defendant, examples of shipments diverted to China, and photographic evidence;

(iii) communications between the defendant and his co-conspirators, including thousands of encrypted chats between the defendant and Individual-1, Sun, Chang, and brokers described in the Indictment; (iv) communications, banking and shipping records, video surveillance, and other materials provided by Company-1 as part of a voluntary self-disclosure ("VSD") to the Government; (v) DOC records, including license determinations for the controlled items at issue in this case; and (vi) materials provided by third parties pursuant to grand jury subpoenas and voluntary requests, including communications and transaction records.

Over the last several months, the Government has continued to obtain materials as part of its ongoing investigation and has made rolling productions of those materials to the defense. In addition, the Government has made rolling productions of identified data from the numerous electronic devices seized from the defendant and others on the day of the defendant's arrest, and from electronic accounts associated with the defendant and others.

In addition, as described further below, the Government has, on multiple occasions, provided defense counsel with additional requested information, including by directing counsel's attention (by phone and email) to specific communications and items of discovery. On September 4, 2026, the Government sent counsel a detailed letter that included the identities of additional uncharged co-conspirators and other witnesses and identified by Bates number specific communications and documents requested by counsel. *See* Boxer Decl. Ex. E.

## ARGUMENT

### I. The Defendant's Motion to Dismiss for Improper Venue Should be Denied

The defendant moves to dismiss the Indictment for improper venue, arguing both that the Indictment fails to plead "overt acts" in this District and that he would face "substantial hardship" by trying the case here. (Mot. at 6-13). Both arguments fail. The Indictment includes allegations that conduct occurred in this District and elsewhere. That is all that is required to defeat a motion

to dismiss. To the extent the defendant—a co-founder, board member, and vice president of business development of a U.S.-based company that is listed on the Nasdaq and generates billions of dollars in revenue from the sale of servers to overseas parties—wishes to argue, as he does here, that the role of New York correspondent banks in U.S. dollar transactions between foreign counterparties was not reasonably foreseeable to him, he is free to advance that argument to a jury. But it is not ripe for a motion to dismiss. In any event, the evidence at trial will also establish that the defendant himself took steps in furtherance of the charged conspiracies in this District, including by communicating with charged and uncharged co-conspirators while he was in Manhattan. The defendant's venue challenge is therefore meritless.

### A. Applicable Law

When the Government charges a defendant with participating in a conspiracy, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994). Unlike with a substantive charge, for which the evidence establishing venue must form part of an "essential element" of the crime, an overt act establishing venue in a conspiracy "need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *United States v. Tzolov*, 642 F.3d 314, 319-320 (2d Cir. 2011). "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008). Moreover, "the law does not require a defendant to have actual knowledge that an overt act will occur in a particular district to support venue at that location," so long as "the overt act's occurrence in the district of venue [was] reasonably foreseeable to a conspirator." *United States v. Rommy*, 506 F.3d 108, 123 (2d Cir. 2007). In addition, to establish

venue, the Government is "not restricted to the overt acts charged in the indictment" and may rely on proof of any acts offered at trial, regardless of whether such acts were alleged in the indictment. *United States v. Schwartz*, 535 F.2d 160, 165 (2d Cir. 1976).

The Second Circuit has also "occasionally supplemented [its] venue inquiry with a 'substantial contacts' test that takes into account a number of factors including the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the venue for accurate factfinding." *United States v. Kirk Tang Yuk,* 885 F.3d 57, 70 (2d Cir. 2018) (internal quotation marks and alterations omitted). This inquiry is not a "formal constitutional test, but instead is a useful guide to consider whether a chosen venue is unfair or prejudicial to a defendant." *United States v. Lange*, 834 F.3d 58, 71 (2d Cir. 2016) (internal citations and quotation marks omitted). Importantly, however, the Second Circuit has made clear that the substantial contacts test "has no relevance" when "an overt act in furtherance of a criminal conspiracy has been committed in the district." *Kirk Tang Yuk*, 885 F.3d at 70. That is because "[a] defendant who is participating in a conspiracy that is being conducted, in part, in the district of prosecution necessarily has sufficient 'substantial contacts' to justify a finding of venue that is otherwise proper." *Id*. Moreover, as this Court has recognized, this test is "not relevant" at the pre-trial motion to dismiss stage. *See United States v. Milton*, No. 21 Cr. 478 (ER), 2021 WL 5304328, at *4 (S.D.N.Y. Nov. 15, 2021)

Instead, and as relevant here, where a defendant challenges venue on a pre-trial motion to dismiss, "the Government's burden is limited to showing that the indictment alleges facts sufficient to support venue." *Milton*, 2021 WL 5304328, at *3 (quoting *United States v. Peterson*, 357 F. Supp. 2d 748, 751-52 (S.D.N.Y. 2005)). "At this initial stage, the government need only 'allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific

address or other information,' and the question of whether there is sufficient evidence to establish venue is left for trial." *Id.* (quoting *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010)). Thus, "[w]here a defendant challenges venue in a pre-trial motion to dismiss, indictments that allege that the offense occurred 'in the Southern District of New York and elsewhere' are sufficient to defeat the motion." *United States v. Griffith*, No. 20 Cr. 315 (PKC), 2020 WL 4369650, at *2 (S.D.N.Y. July 29, 2020) (quoting *United States v. Szur*, No. 97 Cr. 108 (JGK), 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998)); *see also, e.g.*, *Milton*, 2021 WL 5304328, at *3 (denying motion to dismiss for improper venue where the indictment alleged that "the charged crime occurred 'in the Southern District of New York and elsewhere'"); *United States v. Lira*, No. 22 Cr. 151 (LGS), 2022 WL 17417129, at *2 (S.D.N.Y. Dec. 5, 2022) (same); *United States v. Dupigny,* No. 18 Cr. 528 (JMF), 2019 WL 2327697, at *4 (S.D.N.Y. May 30, 2019) (same). Indeed, "as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied." *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006).

**B. Discussion**

The defendant's motion to dismiss for improper venue should be denied because the Government has sufficiently alleged venue in the Indictment and because the defendant cannot rely upon the "substantial contacts" test to show that he faces substantial hardship or prejudice.

**1. The Indictment Sufficiently Alleges Venue**

The Indictment alleges, for each count, that conduct occurred "in the Southern District of New York, China, Taiwan, and elsewhere." Dkt. 1 ¶¶ 31, 34, 38. As this Court recognized in denying a similar motion to dismiss for improper venue, "[t]hat is all the government needs to allege at this stage in order to sufficiently plead venue." *Milton*, 2021 WL 5304328, at *3. Indeed, courts in this District routinely deny motions to dismiss for improper venue where, as here, the

Indictment does nothing more than include a general allegation that conduct occurred, in part, in "the Southern District of New York." *See, e.g.*, *Dupigny*, 2019 WL 2327697, at *4 ("That general allegation is sufficient to support venue at this stage, as innumerable courts in this District have held."); *Griffith*, 2020 WL 4369650, at *2; *Lira*, 2022 WL 17417129, at *2. The defendant's motion to dismiss should therefore be denied on that basis alone.

The defendant ignores this well-established precedent and argues that the Indictment fails to plead "overt acts" in this District because, according to the defendant, the role of New York-based correspondent banks to facilitate payments for servers at issue in this case was "ancillary and ministerial to the charged offenses" and was not reasonably foreseeable to him. Mot. at 8-10. These arguments are not properly considered on a motion to dismiss. Instead, the defendant's assertions about the role of correspondent banks in the transactions at issue, and whether such acts were reasonably foreseeable to him, are factual determinations to be made by a jury. *See, e.g.*, *Milton*, 2021 WL 5304328, at *3 ("Whether the government will ultimately be able to prove venue by a preponderance of the evidence is a question of fact to be decided by the jury."); *Griffith*, 2020 WL 4369650, at *2 (holding that a defendant's argument "that there is no evidence" that a particular transmission "was received, read, or otherwise acted upon in this District" was "an issue to be decided by the jury from the documentary and testimonial evidence, with the jury permitted to draw reasonable inferences from the facts").

Even if considered on the merits, however, the defendant's arguments would fail. First, in arguing that the use of correspondent banks to process transactions "is not an element of the charged conspiracy counts or their respective uncharged object offenses," the defendant conflates the law on venue for conspiracy and substantive charges. Mot. at 8. As described above, while evidence establishing venue for a substantive charge must form part of an "essential element" of

the substantive offense, venue for a conspiracy can lie in any district in which an overt act in furtherance of the conspiracy occurred, even if the act itself was legal. *See, e.g.*, *Tzolov*, 642 F.3d at 319-320 (finding that travel through the district of prosecution was sufficient to establish venue for a conspiracy). The fact that the elements of the charged conspiracies do not require proving "that any money be exchanged" thus has no bearing on the relevant venue analysis. Mot. at 8. In any event, payment for the servers was integral to the conspiracy's success—indeed, the whole point of the conspiracy was to make money, requiring foreign counterparties transacting in U.S. dollars to rely on U.S. correspondent banks to process those transactions. *See, e.g.*, *United States v. Kim*, 246 F.3d 186, 192-93 (2d Cir. 2001) ("[W]e reject the notion that the very wires which caused the fraud to bear fruit through payment by Chase Manhattan can be characterized as just passing through the Southern District [of New York].").

Second, the defendant is wrong in suggesting that the role of correspondent banks is so "ministerial" as to be insufficient to establish venue. *See* Mot. at 9. In *United States v. Booth*, for example, the Second Circuit rejected a post-trial venue challenge where evidence showing that correspondent banks in Manhattan "served as credit and debit parties" would have permitted the jury to draw the "reasonable inference or conclusion that money involved in the scheme passed through banks in Manhattan." No. 22-1823, 2024 WL 911854, at *1 (2d Cir. Mar. 4, 2024). Relatedly, the Second Circuit has rejected the argument that U.S. correspondent banks are insignificant components of international transactions, finding that such transactions involve a series of discrete and necessary steps on the part of correspondent banks. *See United States v. Ho*, 984 F.3d 191, 205-206 (2d Cir. 2020) (holding that international wire transfers processed through correspondent banks constituted transfers "to" or "from" the United States); *see also United States v. Booth*, No. 21 Cr. 652 (JSR), 2022 WL 3139651, at *1 (S.D.N.Y. Aug. 4, 2022) (noting that *Ho*

"contemplates that transfers of money 'through correspondent banks' may give rise to venue"); *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 693 (S.D.N.Y. 2017) (finding that "international wire transfers do not merely 'ricochet' off of U.S. correspondent banks" and that, in a case involving the transportation of stolen goods, correspondent banks were "indispensable" and "necessary" conduits). The defendant's argument that correspondent banks only serve a ministerial function in U.S. dollar transactions between foreign counterparties thus fails.[1]

Finally, the defendant's argument that he could not have reasonably foreseen the use of New York correspondent banks is one for the jury to decide. *See* Mot. at 9. Nevertheless, as described above, the defendant is a sophisticated businessperson who co-founded a U.S.-based public company that generates billions of dollars in revenue from sales to overseas customers who transact in U.S. dollars and rely on the U.S. financial system to do so.[2] And as reflected in the communications produced to the defense in discovery, the defendant exchanged numerous messages with co-conspirators discussing millions of dollars' worth of server orders for Company-1. Moreover, the Government has produced in discovery (and specifically identified for defense counsel) invoices for server payments, prepared by the defendant's co-conspirators, that included

---

[1] In preparing its response to the defendant's motion, the Government consulted with a New York-based correspondent bank ("Bank-1") that processed transactions between Company-1 and the U.S. Manufacturer's Taiwan subsidiary during the period of the charged offenses. Based on those conversations, the Government learned that the Bank-1 servers that handle sending and receiving wired funds are located outside New York; however, the relevant correspondent accounts held at Bank-1 were opened and are serviced in New York. In addition to Bank-1, other New York-based correspondent banks were also used for U.S. dollar-denominated transactions at issue in this case.

[2] In approximately 2018, the defendant resigned from all his positions at the U.S. Manufacturer, including the board of directors, in connection with charges that were later brought by the U.S. Securities and Exchange Commission against the U.S. Manufacturer and others for accounting violations relating to, among other things, the premature recognition of revenue. The defendant was re-hired by the U.S. Manufacturer as a consultant in 2021. In 2022, he returned to full-time employment at the U.S. Manufacturer as senior vice president of business development. And in 2023, he was once again appointed to the U.S. Manufacturer's board of directors.

U.S. correspondent banks with New York addresses on the invoices. *See* Boxer Decl. Ex. E at 4. The suggestion that the defendant could not have reasonably foreseen that U.S. dollar-denominated transactions between foreign counterparties would involve correspondent banks based in New York thus strains credulity.[3]

In any event, the Government is not limited to establishing venue by relying solely on the facts alleged in the Indictment and intends to offer additional venue evidence at trial. For example, as the defendant is aware, he traveled to New York in late September 2024. As reflected in the discovery produced to the defense, including cellphone location data and encrypted text messages sent by the defendant, while he was in this District, the defendant exchanged messages with Chang and others about an upcoming October 2024 trip to visit Company-1 executives—messages that furthered each of the charged conspiracies because they planned and facilitated the defendant's meetings with his co-conspirators.[4] Venue is thus independently proper on that basis. *See, e.g.*, *Rommy*, 506 F.3d 108 at 113-114, 120 (where calls are made to arrange future meetings between

---

[3] The defendant's reliance on *United States v. Bezmalinovic* for the proposition that "ministerial actions" by a bank cannot establish venue is misplaced. Mot. at 9 (citing 962 F. Supp. 435 (S.D.N.Y. 1997)). That case concerned acts undertaken by a financial institution that "were not alleged" to have been "intended or foreseen by defendant." *Bezmalinovic*, 962 F. Supp. at 437. Here, to the contrary, the Government is alleging that the use of correspondent banks in New York was reasonably foreseeable to the defendant. Courts have distinguished *Bezmalinovic* on similar grounds. *See, e.g.*, *Kim*, 246 F.3d at 192 (affirming venue where payments were processed through a New York bank and explaining that the acts occurring in Manhattan were "both foreseeable to Kim and within his control"); *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003).

[4] Emails produced to the defense show that Chang was also seeking approval to travel with the defendant to visit Company-1 in October 2024. For example, on or about September 24, 2024, Chang requested approval for a business trip to visit a Company-1 data center in advance of an audit conducted by the U.S. Manufacturer and to "arrange [for] Wally," *i.e.*, the defendant, to meet with Individual-1. The defendant and Chang then visited Company-1 shortly thereafter, as reflected in communications and celebratory dinner photographs of the defendant, Chang, Company-1 executives, and others, that were produced in discovery.

participants in different districts, "venue lies in either district as long as the calls further the conspiracy") (internal quotation marks omitted).

Accordingly, the defendant's premature venue challenge should be rejected.

**2. The Defendant Cannot Rely on the Substantial Contacts Test**

The defendant next argues that prosecution in this District would result in "substantial hardship" and "undermine the fairness of his trial." Mot. at 10. In advancing this argument, he urges the Court to apply the "substantial contacts" test, a supplemental inquiry that is occasionally applied when a defendant claims hardship in facing prosecution in a particular district. The defendant's arguments should be rejected.

As an initial matter, as described above, the substantial contacts test is not relevant at the motion to dismiss stage where, as here, the Government has alleged venue in the Indictment. *See, e.g.*, *Milton*, 2021 WL 5304328 (agreeing with the Government's position that the "substantial contacts" test is "not relevant on a motion to dismiss, at which stage the indictment need only allege . . . that the charged crime occurred 'in the Southern District of New York and elsewhere.'"). The Court should thus reject the defendant's invitation to rely on the substantial contacts test.

Even if the Court were to consider the merits of the substantial contacts test at this stage, which it should not, the defendant's arguments fail. The defendant does not meaningfully address binding Second Circuit precedent holding that where, as here, "an overt act in furtherance of a criminal conspiracy has been committed in the district," the substantial contacts test "has no relevance." *Kirk Tang Yuk*, 885 F.3d at 70. As described above, the Government intends to offer evidence at trial of overt acts occurring in this District, including, for example, the defendant's own communications in furtherance of the conspiracies while present in this District. The defendant thus cannot rely on the substantial contacts test. *See, id.*; *see also Lange*, 834 F.3d at 75

(finding that defendants had substantial contacts with E.D.N.Y. based, in part, on the fact that some of their co-conspirators' acts occurred in that district).

The defendant's arguments for applying the substantial contacts test are also unavailing. For example, his argument that the "site of [his] acts" bears "no connection to this District," Mot. at 10, incorrectly assumes that acts in furtherance of the charged conspiracies did not occur in this District. As described above, not only did the conspiracies rely on New York correspondent banks, but the defendant also took steps in furtherance of the conspiracies while present in this District. *See supra* at 14. Similarly, as described above, the defendant's argument that the "alleged wire transfers bear no relationship to the essential elements of the charged conspiracy offenses," Mot. at 12, conflates the law on venue as it pertains to conspiracies, which does not require that the conduct alleged form part of an essential element of the offense. *See supra* 11-12.

Finally, the defendant cannot show either of the harms that the substantial contacts test is intended to protect against: prejudice and unfairness. *See Lange*, 834 F.3d at 71. As to prejudice, the defendant is on bail in California, where he resides, and he has both California and New York counsel with access to all the discovery material in this case, which he can review at any time subject to the provisions of the Protective Order. The defendant also has substantial wealth and is a sophisticated businessman who faces no actual hardship from traveling to New York, whether to meet with his New York counsel in person or to attend court proceedings. In addition, while certain witnesses may be in California and abroad, *see* Mot. at 11, others are not, and there is no reason to believe that the defendant faces any hardship or prejudice in his ability to locate or speak with potential defense witnesses. Moreover, while the defendant makes generalized claims of potential unfairness, *see* Mot. at 11-13, he has not articulated any actual unfairness to the

proceedings that would result from trying the case in this District, nor can he. The defendant thus cannot rely on the substantial contacts test in support of his motion.

## II. The Defendant's Motion to Dismiss Count Two Should be Denied

The defendant also moves to dismiss Count Two of the Indictment, arguing that the allegations are insufficient to state a conspiracy to smuggle goods from the United States. *See* Mot. at 13-19. As set forth below, the defendant's arguments are based on an incorrect reading of the applicable statute and ignore that the Indictment contains allegations supporting the charge.

### A. Applicable Law

Under Rule 12(b) of the Federal Rules of Criminal Procedure, a court may dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). As relevant here, Rule 7(c) sets forth the minimal "notice" pleading standards that apply to indictments and requires only that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It is well settled that "[a]n indictment is sufficient as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (internal quotation marks, alterations, and citations omitted). In light of these minimal standards, "[a] defendant faces a high standard in seeking to dismiss an indictment." *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014); *see also Costello v. United States*, 350 U.S. 359, 408 (1956) (articulating the longstanding rule that an indictment returned by a legally constituted grand jury, "if valid on its face, is enough to call for trial of the charge on the merits"); *United States v. Kelly*, 91 F. Supp. 2d. 580, 583 (S.D.N.Y. 2000) ("[D]efendant may not challenge a facially valid Indictment prior to trial for insufficient evidence [but] must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary

sufficiency"). In deciding such a motion, the court "assume[s] the truth of the allegations in the indictment." *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004); *see also United States v. Butler*, 351 F. Supp. 2d 121, 126 (S.D.N.Y. 2004) ("[I]t is hornbook law that a federal defendant may not challenge a facially-valid indictment . . . on the ground that it is based on insufficient evidence.").

Because the indictment's purpose is to "fairly inform[] a defendant of the charge against which he must defend," *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998), the Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity," *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) (internal quotation marks and citation omitted). When determining whether a count sufficiently alleges an offense, the count should be read "in its entirety." *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992). Moreover, an indictment must be "read . . . 'to include facts which are necessarily implied by the specific allegations' therein." *United States v. Faison*, 393 F. App'x 754, 757 (2d Cir. 2010) (quoting *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002)). "[A]n indictment need not be perfect," and in reading an indictment, "common sense and reason prevail over technicalities." *United States v. Sabbeth*, 262 F.3d 207 (2d Cir. 2001).

The Second Circuit has held that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *Alfonso*, 143 F.3d at 776 (internal quotation marks and citation omitted), and an indictment will be deemed sufficient "unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant was convicted," *United States v. Orena*, 32 F.3d 704, 714 (2d Cir. 1994) (citations and alterations omitted); *see also Krantz v. United States*, No. 98 Civ. 7218 (JG), 1999 WL 557524, at *2-3 (E.D.N.Y. July 27, 1999) ("Regardless of whether the

indictment could have been made more 'definite or certain,' omissions may be challenged only if they 'so completely denude[ ] the charges of so much informative data as to deprive [a defendant] of his right to be apprised of the charge . . . .'" (quoting *United States v. Varlack,* 225 F.2d 665, 670 (2d Cir. 1955)).

Where a court finds that dismissal of a count for failure to plead an element of the offense is necessary, as with most pleading deficiencies, the appropriate remedy is dismissal without prejudice to bringing a superseding indictment. *See, e.g.*, *United States v. Serrano*, 191 F. Supp. 3d 287, 290 (S.D.N.Y. 2016) (dismissal of indictment without prejudice for failure to plead jurisdictional element); *United States v. Conde*, 309 F. Supp. 2d 510, 512 (S.D.N.Y. 2003) (dismissal of indictment without prejudice for pleading logically inconsistent counts).

**B. Discussion**

The defendant argues that the Indictment fails to plead a conspiracy to smuggle goods from the United States because (1) the goods alleged in the Indictment are not themselves "contrary to any law or regulation" of the United States, that is, illegal goods, and (2) he disputes the allegation in the Indictment that such goods were exported from the United States. Mot. at 13-19. Both points are without merit.

**1. The Defendant's Interpretation of 18 U.S.C. § 554(a) Is Incorrect**

The defendant claims that to state an offense under 18 U.S.C. § 554(a), the good that is exported or sent from the United States must itself be "*per se* illegal," and, because "there is nothing otherwise *per se* illegal about a GPU," the unlawful export of, or conspiracy or attempt to unlawfully export, such item does not give rise to a violation of § 554(a). Mot. at 15-17. The defendant's interpretation of § 554(a) is incorrect. He relies on *United States v. Ying Lin*, 270 F. Supp. 3d 631 (E.D.N.Y. 2017) in which the court, citing no precedent, formulated such a reading of § 554(a), expressly contravening caselaw in the Ninth Circuit and ignoring multiple other

circuits which, like the Ninth Circuit, have upheld smuggling convictions under § 554(a) for the unlawful export of otherwise *legal* goods. No other court cites to *Ying Lin*'s interpretation of § 554(a), nor has any other court similarly interpreted § 554(a) to require the goods at issue to be illegal *per se*.

Count Two charges the defendant with conspiracy to smuggle goods from the United States, in violation of 18 U.S.C. § 371. Indictment ¶¶ 33-36. The object of the conspiracy is to commit the offense of "smuggling goods from the United States," in violation of 18 U.S.C. § 554(a), which provides as follows:

> Whoever fraudulently or knowingly *exports or sends* from the United States, *or attempts to export or send* from the United States, any merchandise, article, or object *contrary to any law or regulation of the United States*, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for *exportation contrary to any law or regulation of the United States*, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 554(a) (emphasis added). As the plain language of the statute indicates, the crux of an offense under § 554(a) is that the actual or intended exportation or sending from the United States of the items at issue is "contrary to any law or regulation of the United States." *Id.* The Honorable Dora L. Irizarry, United States District Judge, disagreed, however, in *Ying Lin*, reading into the statute an added requirement that the "merchandise, article, or object" must itself also be "contrary to any law or regulation of the United States." *See Ying Lin*, 270 F. Supp. 3d at 633-35. As explained below, that reading is incorrect and contravenes established precedent in the many circuit courts to sustain a § 554(a) charge or conviction on appeal.[5]

[5] The Second Circuit has not yet had an occasion to opine on this interpretation of § 554(a) or the sufficiency of pleadings to sustain a charge or of evidence to sustain a conviction under it.

In *Ying Lin*, the defendant, an airport baggage handler, was charged with, among other offenses, violating § 554(a) in connection with facilitating the shipment of unaccompanied baggage aboard outbound Air China flights to the People's Republic of China contrary to U.S. laws and regulations, including those that require foreign air carriers to adopt and carry out security programs designed to meet the requirements of the Transportation Safety Administration ("TSA"). *Ying Lin*, 270 F. Supp. at 634-35. In granting the defendant's motion to dismiss, the court held that the Government failed to state an offense for smuggling within the meaning of § 554(a) because § 554(a) only criminalizes smuggling if the defendant exports or attempts to export, "an illegal item," or, "if, prior to exportation, [the defendant] facilitates exportation of an illegal item knowing that it is intended for illegal exportation." *Id.* at 634. Judge Irizarry reasoned that the phrase "contrary to any law or regulation" in the first clause of § 554(a) applies only to the mention of "merchandise, article, or object" preceding it and not the actual sending or export or attempt to export. *Id.* Judge Irizarry expressly rejected the Ninth Circuit's examination of § 554(a) in *United States v. Chi Tong Kuok*, *see id.* at 634 n.1, in which the court concluded "'contrary to any law or regulation of the United States' is an adverbial clause modifying the verbs 'exports' and 'attempts to export,' not an adjectival clause modifying the noun 'merchandise,'" *United States v. Chi Tong Kuok*, 671 F.3d 931, 944-45 (9th Cir. 2012). Based on its reading of § 554(a), the court in *Ying Lin* then concluded that the Government had failed to state an offense under § 554 because, *inter alia*, baggage is not illegal *per se* and the fact that the baggage was "unaccompanied" only "speaks to the method of exportation." *Id.* at 635.

The *Ying Lin* court's reading of § 554(a) to criminalize only the export or sending of items that are illegal *per se* is incorrect and would render the offense only applicable to contraband, a limitation no other court has endorsed. In *United States v. Nazemzadeh*, for example, the defendant

was charged under § 554(a) with the unlicensed export of medical device parts—specifically, coils for MRI machines—to Iran. No. 11 Cr. 5726, 2014 WL 310460, at *1-2 (S.D. Cal. Jan. 28, 2014). The district court, relying on the Ninth Circuit's examination of § 554(a) in *Kuok*, denied the defendant's motion to dismiss the smuggling count under § 554(a), among other counts. *Id.* at 15-16. As relevant here, while there is nothing illegal *per se* about MRI coils, what gave rise to the criminal charges sustained in *Nazemzadeh* was the "illegality of the exportation" of such medical devices—specifically, their unlicensed export to Iran. *Id.* at 4-6.

The Ninth Circuit has also held that "[n]othing in the language of [§ 554(a)] requires knowledge of the nature of the merchandise, article, or object" to be exported. *United States v. Rivero*, 889 F.3d 618, 621-22 (9th Cir. 2018) (affirming § 554(a) smuggling conviction for the unlawful export of ammunition to Mexico contrary to U.S. export controls on munitions). This would include, by extension, knowledge of whether such items are themselves illegal *per se*. *See id.*; *see also id.* at 622 ("[I]nterpreting § 554(a) to require the government to prove that the defendant knew the nature of the 'merchandise, article or object' would lead to the absurd result that individuals could avoid criminal liability simply by being willfully blind to the precise nature of the goods they were unlawfully exporting or attempting to export. We avoid giving such 'absurd or irrational' interpretations.").

The Fifth Circuit has likewise held that "to establish an offense under § 554(a)" as to the item at issue, "the Government is required to prove only that the defendant knew he was dealing with [an item] that was intended for export and that *the exportation was illegal*." *United States v. Cardenas*, 810 F.3d 373, 374 (5th Cir. 2016) (per curiam) (emphasis added) (citing *United States v. Bernardino*, 444 F. App'x 73, 74 (5th Cir. 2011)) (affirming defendant's conviction on two counts under § 554(a) for (1) fraudulently receiving and facilitating the transportation,

concealment, and sale of ammunition prior to exportation and (2) attempting to unlawfully export ammunition from the United States to Mexico); *see also United States v. Lugo–Lopez*, 833 F.3d 453, 457 (5th Cir. 2016) ("[A]n offense under 18 U.S.C. § 554(a) for aiding and abetting the exportation of [an item] from the United States . . . requires proof that 'the defendant knew he was dealing with [an item] that was intended for export and that the exportation was illegal.'" (quoting *Cardenas*, 810 F.3d at 374)).

Other circuits to consider the validity of charges or convictions under § 554(a) have similarly focused on the unlawful nature of the exportation or sending of the item; none have endorsed *Ying Lin*'s interpretation that the item itself must be illegal *per se*. In *United States v. Singer*, for example, the Eleventh Circuit affirmed a defendant's conviction under § 554(a) for, among other offenses, attempting to unlawfully export advanced network modems to Cuba without a required license from the DOC, contrary to the Export Administration Regulations ("EAR") (specifically, 15 C.F.R. § 746.2(a)) and the International Emergency Economic Powers Act ("IEEPA") under 50 U.S.C. § 1705. 963 F.3d 1144, 1149 & n.4, 1156, 1158-59, 1162-63 (11th Cir. 2020). Like the MRI coils in *Nazemzadeh*, or, as relevant here, servers integrating advanced GPUs, modems are not illegal *per se*. The Eleventh Circuit endorsed the district court's jury instructions as given, which contained no requirement that the item for export be illegal *per se*:

> First: That the Defendant knowingly or fraudulently attempted to export or send merchandise, as described in the second superseding indictment, or that the Defendant concealed or facilitated the concealment of such merchandise, prior to exportation, knowing the same to be intended for exportation;
>
> Second: That the Defendant's attempted exportation or sending was contrary to Title 50, United States Code, Section 1705 of Section 746.2(a) of the Export Administration Regulations; and
>
> Third: That the Defendant knew that exportation or sending of the merchandise was contrary to law or regulation.

*Id.* at 1162 (internal quotation marks and citation omitted). The definition of "merchandise" in the instructions also omitted any such requirement as to the item itself: "Merchandise means goods, wares, and chattels *of every description*, and *includes merchandise the exportation of which is prohibited*." *Id.* (emphasis added) (internal quotation marks and citation omitted).[6]

In *United States v. Al Jaberi*, the Eleventh Circuit similarly affirmed a defendant's conviction under § 554(a), among other offenses, where the core offense conduct was the defendant's attempt to unlawfully export firearms from the United States, contrary to U.S. law, specifically, 18 U.S.C. § 922(e)—"by knowingly delivering firearms to a common carrier without giving the carrier written notice that the firearms were being transported or shipped"—and 13 U.S.C. § 305(a)(1)—"by knowingly causing a freight forwarder to submit false and misleading export information." 97 F.4th 1310, 1317-18, 1323-24 (11th Cir. 2024). Absent from the court's review of the sufficiency of the evidence was any inquiry whether the firearms themselves were illegal *per se* (nor was there any allegation or indication they were)—for example, did they have shortened barrels or other unlawful modifications at the time that might render a firearm illegal *per se*—and for good reason: the sanctionable offense under § 554(a) was the illegality of the attempted export of the firearms. *See id.* The defendant had concealed the firearms without disclosing their inclusion in the shipment provided to the common carrier and had further caused the submission of false export documentation in connection with the shipment. *Id.* at 1323.

---

[6] These instructions are substantially similar to those for a § 554(a) offense in the model jury instructions for both the Ninth and Fifth Circuits. *Compare Singer*, 963 F.3d at 1162 *with* Model Crim. Jury Instr. 9th Cir. 21.2 (2026) *and* Pattern Crim. Jury Instr. 5th Cir. 2.26 (2024). Those instructions further define "merchandise" similarly (*i.e.*, "of every description") and also omit any requirement that the merchandise be illegal *per se*. *See* Model Crim. Jury Instr. 9th Cir. 21.2 (2026); Pattern Crim. Jury Instr. 5th Cir. 2.26 (2024).

The Eighth Circuit also sustained a conviction under § 554(a) for the unlawful export of goods that were not illegal *per se*. In *United States v. Matheny*, the circuit court affirmed the defendant's conviction under § 554(a) for mislabeling international packages containing merchandise he sold to foreign buyers on eBay as containing "gifts," contrary to U.S. regulations requiring the accurate designation of the categories of items to be shipped. 42 F.4th 837, 843–44 (8th Cir. 2022). In reviewing whether the evidence established an offense under § 554(a), the Eighth Circuit focused on whether the evidence proved that the shipment of the goods was contrary to U.S. regulations and not whether the goods themselves were illegal *per se*. *See id*. (citing the relevant federal regulations governing the shipments at issue and finding the evidence sufficient to prove that the defendant had knowingly sent the packages in a manner that was contrary to those regulations).

The Fourth and Tenth Circuits, like the Fifth, Eighth, Ninth, and Eleventh Circuits discussed above, have similarly sustained charges or convictions under § 554(a) involving items that are not illegal *per se* but whose export may still be contrary to U.S. laws and regulations. *United States v. Nji*, 159 F.4th 259, 267 (4th Cir. 2025), *cert. denied,* 146 S. Ct. 1812, 224 L. Ed. 2d 289 (2026) (sustaining § 554(a) conviction for unlawful shipment of firearms to Cameroon without an export license); *United States v. Richter*, 796 F.3d 1173, 1182 (10th Cir. 2015) (affirming the validity of and applicable jury instructions for a § 554(a) charge in connection with the unlawful exportation hazardous waste, contrary to applicable export regulations, but ultimately reversing the conviction on other grounds regarding the prejudicial testimony of a witness at trial); *see also id*. (explaining that "the validity of the defendants' convictions for smuggling [under § 554(a)] turns on whether the exportation of the [hazardous waste] in this case violated the requirements for the lawful exportation of hazardous waste"); *cf. United States v. Clerfe*, 186 F.4th

141, 147 (3d Cir. 2026) (rejecting defendant's Second Amendment infringement argument and sustaining conviction for conspiracy to unlawfully export firearms to Haiti under 18 U.S.C. § 371 while underscoring the illegality of the exportation and recognizing, among the multiple laws and regulations that may render such exportation illegal, is § 554(a), which makes it "a crime to export goods contrary to any law or regulation of the United States." (internal quotation marks and citation omitted)); *see also id.* ("[E]xporting arms abroad is not protected by the right to 'keep Arms'").

Based on the foregoing, this Court should reject the defendant's incorrect reading of § 554(a) and, consistent with the prevailing precedent across the above circuits, find that § 554(a) does indeed apply to the unlawful exportation of items that are not illegal *per se*.

**2. Count Two Sufficiently Alleges that the Goods Were Unlawfully Exported from the United States**

The defendant next contends that Count Two fails to state an offense because the Indictment does not sufficiently allege that the U.S. Manufacturer's servers containing Nvidia GPUs were exported from the United States. Mot. at 17-19. That is wrong. The Indictment expressly makes such an allegation. The defendant also disputes that the U.S. Manufacturer integrated GPUs into its servers in the United States before sending them to Company-1 because, according to the defendant, the U.S. Manufacturer "typically" does so in Taiwan for any Asia-based customers. *See id.* at 18. But that argument amounts to nothing more than a challenge to the sufficiency of the Government's evidence and is not appropriate to litigate on a motion to dismiss. *See, e.g.*, *Costello* 350 U.S. at 408; *Kelly*, 91 F. Supp. 2d at 583.

*First*, contrary to what the defendant asserts, the Indictment plainly alleges that the U.S. Manufacturer's servers integrating Nvidia GPUs, which were subject to U.S. export controls, were shipped from the United States. The Indictment expressly states that "as a result of the defendants' scheme, between late April 2025 and mid-May 2025 alone, over approximately $510 million worth

of the U.S. Manufacturer's servers *assembled in the United States with Nvidia GPUs—and subject to U.S. export controls*—were sold to Company-1 *and then diverted to China*." Indictment ¶ 4 (emphasis added). The Indictment further alleges the following: "Between in or around late April 2025 and mid-May 2025 alone, Company-1 purchased at least approximately $510 million worth of *servers assembled in the United States with Nvidia B200 and H200 GPUs* from the U.S. Manufacturer. Those servers were then *diverted to end customers in China* through the defendants' network of brokers." *Id.* ¶ 21 (emphasis added); *see also* ¶ 7 ("Advanced artificial intelligence accelerator chips, such as the Nvidia B200, H100, and H200 GPUs, and servers incorporating such chips, are included on BIS's Commerce Control List as items that are subject to export license requirements for transfers to certain destinations, including China and Hong Kong."). These allegations flatly contradict the defendant's claim that the Indictment "fails to allege that Nvidia GPUs were integrated into the [U.S. Manufacturer's] servers in the United States." Mot. at 18.

*Second*, the defendant claims, based on extrinsic documents attached to his motion, that Nvidia's manufacturing supply chain is concentrated in the Asia-Pacific region and that for Asia-based customers, the U.S. Manufacturer "typically" integrates the GPUs into its servers in Taiwan. That argument is not for the Court's consideration on a motion to dismiss. As the defendant concedes, *see* Mot. at 14, in deciding such a motion, the Court "assume[s] the truth of the allegations in the indictment." *Tanella*, 374 F.3d at 148.

Accordingly, the Indictment sufficiently states an offense under § 554(a) and the defendant's motion to dismiss Count Two should be denied.

## III. The Defendant Is Not Entitled to a Bill of Particulars

The defendant moves under Rule 7(f) of the Federal Rules of Criminal Procedure for the Court to order the Government to provide a bill of particulars with the following: (1) the specific subsections of the EAR that the defendant conspired to violate; (2) identification and details about

every server and GPU that the Government contends was diverted to China as part of the scheme; and (3) the identities of all alleged unindicted co-conspirators. *See* Mot. at 19-25. For the reasons set forth below, the Court should deny the defendant's motion.

**A. Applicable Law**

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to move for a bill of particulars "before or within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f). The purpose of a bill of particulars "is to apprise [the] defendant of the essential facts of a crime," *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and to otherwise "ensure that a defendant has the information necessary to prepare a defense," *United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014). The Second Circuit has "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (quoting *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973)). Therefore, "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks and citation omitted); *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).

A bill of particulars is *not* meant to compel the Government "to turn over all information that would aid the defendant." *Mahabub*, 2014 WL 4243657, at *2; *see United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001). Thus, "[t]he Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed." *Triana-Mateus*, 2002 WL 562649, at *5; *see also United States v. Zemlyansky*, 945 F. Supp. 2d 438, 485 (S.D.N.Y. 2013) (same); *United States v. Muyet*, 945 F.

Supp. 586, 598-99 (S.D.N.Y. 1996) (same). A bill of particulars also "is not an investigative tool for the defendant," *Leonelli*, 428 F. Supp. at 882, and is not to be used as a mechanism to compel a preview of the Government's evidence prior to trial, *see Triana-Mateus*, 2002 WL 562649, at *5 (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)). Indeed, the Government is not required to "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991), or to provide the defendant with a preview of the Government's case or legal theory, *see Muyet*, 945 F. Supp. at 598-99.

Courts in this District routinely deny motions for bills of particulars that are, at bottom, demands for details of the way the offense was committed or how the Government intends to prove its case at trial and where, as here, the charging instruments and discovery provide the defendant with adequate notice. *See, e.g.*, *United States v. Almaleh*, No. 17 Cr. 25 (ER), 2022 WL 602069, at *9 (S.D.N.Y. Feb. 28, 2022) (denying request for a bill of particulars where "[t]he charging instruments, correspondence between the parties, and discovery advised the defendants of the specific properties at issue and the allegedly fraudulent documentation filed in connection therewith"); *United States v. Ojeikere*, 299 F. Supp. 2d 254, 261 (S.D.N.Y. 2004) (denying bill of particulars request where charging instruments and discovery materials provided "sufficient particularity"); *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying request for bill of particulars identifying "each act of 'fraud, neglect, connivance, misconduct, and violation of law' upon which the Government will base its case," and noting that Government may not be compelled to disclose the manner in which it will prove charges, the manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories); *Leonelli*, 428 F. Supp. at 882 (rejecting request for bill of particulars regarding the names, dates, and places for the entire case as "an attempt to discover the minutia of the Government's case").

Moreover, in the context of conspiracies, "courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy." *United States v. Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001) (citing cases). Similarly, courts routinely deny motions for a bill of particulars seeking the identities of uncharged co-conspirators. *See, e.g.*, *United States v. Ma*, No. 03 Cr. 734 (DAB), 2006 WL 708559, at *14 (S.D.N.Y. Mar. 21, 2006) ("Courts also deny bills of particulars seeking the names and identities of unindicted co-conspirators where sufficient discovery has been provided."); *United States v. Chalmers,* 410 F. Supp. 2d 278, 286 (S.D.N.Y. Jan. 25, 2006) (where Government produced extensive discovery, identification of co-conspirators was not necessary). And "since the Government is not required to charge any overt acts in the indictment, [any information of this kind] is, itself, more detailed than defendants have a right to demand with respect to the overt acts enumerated therein." *United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987).

**B. Discussion**

The defendant's motion for a bill of particulars should be denied because he has received ample information that not only provides notice of the charges against him, but also furnishes substantial insight into the Government's case such that he is more than capable of adequately defending against those charges. Further, the defendant's requests call for the Government to catalog and preview its trial evidence and to identify anticipated witnesses and uncharged co-conspirators, all of which is relief that Rule 7(f) does not authorize.

As an initial matter, the 21-page speaking Indictment provides detailed factual allegations that form the basis of the charged conspiracies. The Indictment, standing alone, is thus sufficient to warrant denial of the defendant's request for a bill of particulars. Indeed, "in general, recitation

of the statutory language, along with the approximate date and time of the offense, is sufficient to satisfy [Rule 7(c)'s notice requirement]." *See United Sates v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000). With respect to conspiracies specifically, "[t]he Government need not . . . set out with precision each and every act committed by the conspirators in the furtherance of the conspiracy." *United States v. Cohen*, 518 F.2d 727, 733 (2d Cir. 1975). Here, however, the Indictment does much more than recite the statutory language: it provides substantial detail about the alleged conspiracies spanning from 2024 to March 2026, including descriptions of co-conspirators, overt acts committed in furtherance of the charged crimes, numerous examples of specific communications that the Government will rely upon to prove its case, photographic evidence, and the approximate times and locations where the conduct took place. *See, e.g.*, Dkt. 1 ¶¶ 13, 15, 16, 18-24. Indeed, many of the acts in furtherance of the conspiracies include meetings and communications by and among co-conspirators often involving the defendant himself.

In addition to the allegations in the Indictment, and as described above, *see supra* at 6-7, the defendant has received voluminous Rule 16 discovery in this case, accompanied by cover letters that identify, within each production, the categories of materials produced to the defendant. Thus, the defendant has no basis to argue that, combined with the detailed allegations in the Indictment, he lacks sufficient information to understand the crimes with which he has been charged. Nor does the Government have an obligation to further catalog its proof to aid the defendant in preparing a defense. *See, e.g.*, *Almaleh*, 2022 WL 602069 at *9 ("[I]t is incumbent on the defense to review the discovery for itself to determine its significance; it is not the role of the government to tell the defense everything that is important and why.").

Regardless, on multiple occasions, the Government has specifically directed defense counsel to evidence that the Government intends to offer at trial. For example, on April 20, 2026,

at defense counsel's request, the Government provided the defense with the identities of the anonymized entities and individuals in the Indictment. *See* Boxer Decl. ¶ 3 & Ex. B. The Government subsequently identified for defense counsel specific items and communications produced in discovery that bear directly on the defendant's guilt, including, for example, on June 17, 2026, identifying certain communications between the defendant and co-defendant Willy Sun that evidence the defendant's efforts to conceal and advance the scheme, as well as his knowledge that the servers were being diverted to China. *See* Boxer Decl. Ex. E at 3. And on September 4, 2026, the Government sent defense counsel a 12-page, detailed letter responding to its various requests for particulars and other information, providing additional identities of uncharged co-conspirators and other witnesses, and identifying specific items by Bates number in the various discovery productions that are responsive to the defense's requests for particulars. *See* Boxer Decl. Ex. E. The breadth of the Government's September 4 letter speaks for itself. *See id.* Put simply, the Government has already provided the defense with information far exceeding that which is required under Rule 7.

With respect to the defendant's request for the specific subsections of the EAR that apply to the conspiracy offenses charged in Counts One and Two, the Indictment sets out, in detail, the allegations that form the basis of Counts One and Two. Further, paragraphs 31 and 32 (as to Count One) and 34 and 35 (as to Count Two) track the statutory language of the charged crimes. This is sufficient to satisfy the notice requirements under Fed. R. Crim. P. 7(c). *See, e.g.*, *United States v. Mayo*, 705 F.2d 62, 78 (2d Cir. 1983) (holding that an indictment that tracked the statutory language and stated the time and place of the alleged offense was sufficient, despite no identification of specific provisions that were violated); *United States v. Horvath*, No. 24 Cr. 401 (DJB), 2025 WL 460032, at *4-5 (D.D.C. Feb. 11, 2025) (holding that an indictment charging

violations of export control statutes, which did not identify subsections of those statutes, sufficiently alleged the factual basis for the violations).

Moreover, the Government produced the license determinations by the DOC as to the specific export control regulations that apply to controlled items at issue in the Indictment. *See* Boxer Decl. Ex. E at 8 (referring to the license determinations). And in its September 4 letter to defense counsel, the Government specifically referred counsel to those license determinations. *Id.* Those DOC license determinations include certain of the specific provisions of the Code of Federal Regulations that apply to the export licensing of a controlled item—such as, for example, 15 C.F.R. § 742.6(a)(6)(iii)(A)—as well as the Export Control Classification Number ("ECCN") on the DOC's Commerce Control List ("CCL") under the regulations that applies to the controlled item—such as, for example, ECCNs 5A002.z and 4A090.a—and in particular, the time period in which such ECCNs under the CCL applied to such controlled item. The foregoing materials, combined with the specific allegation in the Indictment that the defendant engaged in a scheme to "export and cause to be exported from the United States to China items controlled under [ECRA]," including items "on the [CCL] . . . without having first obtained a license for such exports from the U.S. Department of Commerce," Dkt. 1 ¶ 32, is more than sufficient to apprise the defendant "as to the conduct of which he stands accused" without leaving him "to guess whether he is accused of scheming to engage in 'license alteration.'" *See* Mot. at 21. Indeed, as the Indictment makes plain, the scheme to export was unlawful because *no license* was obtained for the exports at issue.

With respect to the defendant's itemized requests as to every server and GPU alleged to have been diverted to China, including cataloging specific and detailed location information for shipments and end-users, serial numbers, and purchase orders, *see* Mot. 18-19, 22-23, such requests are far afield of what Rule 7(f) contemplates. As the defendant concedes, the Government

has previously produced records reflecting purchase orders, serial numbers, and shipments in connection with servers shipped to Company-1. *See* Mot. at 22-23 (acknowledging receipt of invoices and shipping records). To the extent the defendant believes that the Rule 16 discovery—including such transaction and shipping records, as well as other materials such as communications between the defendant and his co-conspirators and license determinations—is not sufficiently catalogued for the defendant's review, the Government is under no obligation to satisfy the particular notice requirements requested by a defendant, but rather, to supply sufficient notice as is required by law. Moreover, where, as here, the Government has charged a conspiracy, it is not required to provide notice of, nor does it need to prove, every act in furtherance of the conspiracy, let alone each substantive violation alleged. *See Cohen*, 518 F.2d at 733; *Muyet*, 945 F. Supp. at 599. Nevertheless, in its September 4 letter, the Government directed defense counsel to relevant purchase order and shipment records for servers assembled in the United States and diverted to China that were produced in discovery, as well as to its prior search warrant applications that included several examples of such shipments. *See* Boxer Decl. E at 5-6, 10; *see also* Simons Decl. Ex. 1 ¶ 31 (describing several shipments to China, including by identifying the number of servers, approximate value, third party brokers, and customers in China). Nothing more is required. *See, e.g.*, *Almaleh*, 2022 WL 602069 at *9 (denying request for a bill of particulars where "although the indictments do not specify each mailing or wire transmission, the affidavits contain specific examples of incidents when the defendants used the phone, email, or Internet in furtherance of the alleged fraud").

Finally, with respect to the defendant's request for the identities of all alleged unindicted co-conspirators, the Government has previously disclosed to the defendant the identities of multiple unindicted co-conspirators and related entities, including, among others, "U.S.

Manufacturer," "Company-1," "Individual-1," "Individual-2," "Broker-1," "Broker-2," and "Broker-3," as defined in the Indictment. *See* Boxer Decl. Ex. B; *id.* at Ex. E at 3-7. The Government also has produced substantial discovery that identifies other co-conspirators, including materials from the defendant's own cellphones and electronic accounts. The Government is not required to identify any additional unnamed or uncharged co-conspirators. *See, e.g., Ma*, 2006 WL 708559, at *14; *Chalmers*, 410 F. Supp. 2d at 286.

Based on the foregoing, there is no question that the Indictment, substantial discovery, and other disclosures by the Government at defense counsel's request provide the defendant with sufficient specificity to prepare for trial. The Government will also, of course, make additional pretrial disclosures, in the ordinary course, of exhibits and Jencks Act material. Nothing further is required at this time, and the defendant's motion for a bill of particulars should be denied.

## IV. The Defendant's Motion to Suppress Evidence from his Electronic Accounts and Devices Should be Denied

The defendant challenges two warrants: a warrant for the defendant's electronic cloud and email accounts (the "Liaw SCA Warrant") and a warrant to search the defendant's home and person for electronic devices (the "Liaw Devices Warrant"). The affidavits in support of those warrants presented evidence far exceeding probable cause. For the reasons set forth below, the defendant's attempts to undermine the probable cause in the affidavits, and his baseless allegations that the Government misled the magistrate judges in its warrant applications, should be rejected.

### A. Applicable Law

#### 1. Probable Cause

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a

particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted). It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975). Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Gates*, 462 U.S. at 235 (internal quotation marks omitted). Moreover, "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985). Put simply, "[p]robable cause is not a high bar." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018).

**2. Alleged Omissions or Misstatements in a Search Warrant Affidavit**

A search warrant affidavit is presumed reliable. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). The task of the reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Almaleh*, 2022 WL 602069, at *11 (quoting *Gates*, 462 U.S. at 214). Moreover, "[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *Id.* (quoting *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional

misstatements or omissions in the search warrant affidavit and that those misstatements or omissions were material. *See Awadallah*, 349 F.3d at 64.

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). Indeed, to secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155, 170) (emphasis added). Because the burden to obtain a *Franks* hearing is itself a heavy one, such hearings are rare. *See, e.g.*, *United States v. Sandalo*, 70 F.4th 77, 86 (2d Cir. 2023) ("[T]he substantial preliminary showing standard imposes a 'high' burden on [the defendant].") (quoting *Rivera*, 928 F.2d at 604)); *United States v. Skyfield*, No. 23 Cr. 569 (LJL), 2023 WL 8879291, at *8 (S.D.N.Y. Dec. 22, 2023) (defendant's burden is "'a heavy one that requires more than a mere conclusory showing'" (quoting *Sandalo*, 70 F.4th at 86)); *United States v. Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016) ("The burden to obtain [a *Franks*] hearing is a heavy one, and such hearings are exceedingly rare.").

In reviewing a challenge to a warrant, alleged "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (internal quotation marks and citations omitted); *see also Awadallah*, 349 F.3d at 67. "[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010) (quoting *Awadallah*, 349 F.3d at 67-68).

As a result, the law recognizes that while "an officer may not disregard plainly exculpatory evidence," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), an affiant is "not required to include all potentially exculpatory information" in seeking the search warrant, *United States v. Maisonet*, No. 12 Cr. 829 (AKH), 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013); *see also United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 3577903, at *5 (S.D.N.Y. Jul. 1, 2020) (quoting *id.*). Indeed, "[a] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law." *United States v. Cromitie*, No. 09 Cr. 558 (CM), 2010 WL 3025670, at *6 (S.D.N.Y. July 28, 2010) (internal quotation marks omitted). Accordingly, "[o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Mandell*, 710 F. Supp. 2d at 374 (internal quotation marks omitted).

To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted). The movant must make a substantial preliminary showing that a reasonable person would have known that the magistrate judge would have wanted to know the kind of information that was omitted. *See United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003). "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000) (internal quotation marks and alteration omitted).

Importantly, a search warrant affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013).

"Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). Moreover, "[t]o prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted); *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient." (internal quotation marks omitted)).

Finally, "[t]o determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* (internal quotation marks omitted).

## B. Discussion

### 1. The Challenged Warrant Applications

The Liaw SCA Warrant was authorized by the Honorable Ona T. Wang, United States Magistrate Judge, Southern District of New York, on January 9, 2026. *See* Simons Decl. Ex. 1. The Liaw SCA Warrant authorized a search of the defendant's and Sun's Apple iCloud accounts and Google accounts. *Id*. at 2. In support of the warrant, the Government submitted an affidavit from an experienced special agent in the FBI's counterintelligence division. *See id*. The affidavit, which is 77 pages long, outlined at length information about the defendant's and his co-conspirators' involvement in the charged conspiracies, including: (i) information learned from one

of the defendant's co-conspirators, Individual-1, during a proffer session about the defendant's role in the diversion scheme and efforts undertaken to conceal it; (ii) numerous descriptions and excerpts of communications between and among the defendant and his co-conspirators provided by Company-1, through U.S.-based counsel, including communications evidencing the defendant's direct interactions with the third-party brokers described in the Indictment; (iii) descriptions of specific server purchases through Company-1 that were diverted to China, including the identification of the third-party brokers and Chinese companies involved in those transactions; and (iv) communications and photographic evidence, including screenshots of video surveillance, showing the use of dummy servers to deceive the U.S. Manufacturer's compliance team and U.S. authorities. *See generally id*.

The Liaw Devices Warrant was authorized by the Honorable Virginia K. DeMarchi, United States Magistrate Judge, Northern District of California, on March 18, 2026. *See* Simons Decl. Ex. 3.[7] The Liaw Devices Warrant authorized, as is relevant here, a search of the defendant's home and person for electronic devices. *Id*. at 2-3. In support of the Liaw Devices Warrant, the Government submitted an affidavit from another experienced special agent in the FBI's

[7] After the issuance of the Liaw SCA Warrant, and prior to the issuance of the Liaw Devices Warrant, the Government also obtained the following warrants: (i) a historical cell-site warrant for the defendant's and Sun's cellphone location data, signed on January 22, 2026, by the Honorable Sarah Netburn, United States Magistrate Judge, Southern District of New York; (ii) a warrant for the Apple iCloud and Google account of co-defendant Steven Chang, signed on February 9, 2026, by the Honorable Katharine H. Parker, United States Magistrate Judge, Southern District of New York; (iii) a warrant for prospective location information for the defendant, Sun, and other investigative subjects, signed on March 6, 2026, by the Honorable Valerie Figueredo, United States Magistrate Judge, Southern District of New York; and (iv) a warrant for the Apple iCloud accounts for those other investigative subjects, signed on March 6, 2026, by the Honorable Valerie Figueredo, United States Magistrate Judge, Southern District of New York, *see* Simons Decl. Ex. 3 (the "March 6 SCA Warrant"). Each of these other warrants relied on substantially similar affidavits as those submitted in support of the Liaw SCA Warrant and Liaw Devices Warrant. Those other warrants and their supporting affidavits were produced in discovery.

counterintelligence division, which incorporated the March 6 SCA Warrant and the Liaw SCA Warrant and described additional evidence obtained during the investigation about the defendant's involvement in the charged conspiracies. The Liaw Devices Warrant also attached and incorporated the Indictment, which had been returned under seal the day before, as well as the affidavit in support of the March 6 SCA Warrant. The affidavit for the Liaw Devices Warrant, which alone was 47 pages long (excluding its nearly 200 pages of incorporated attachments), thus included, among other things, (i) additional information learned from Individual-1 and another Company-1 executive ("Individual-2") in proffer sessions held after the Liaw SCA Warrant was authorized; (ii) factual allegations drawn from the Indictment, including communications showing the defendant's knowledge of the illegality of diversion scheme; and (iii) evidence of additional efforts undertaken by the defendant and his co-conspirators to conceal and advance the scheme, including communications obtained from the defendant's iCloud account pursuant to the Liaw SCA Warrant. *See generally id*.

The defendant makes two primary arguments in support of his motion to suppress: (1) that the affidavits contained material omissions and misrepresentations regarding information and materials provided by Company-1 as part of an ongoing VSD; and (2) that the affidavits presented the defendant's electronic communications in a misleading way and omitted "critical context." Mot. at 31-44. Each of these arguments fails. As described below, the affidavits did not omit any material information about Company-1's VSD, and the defendant's allegations about date discrepancies in screenshots of text messages provided by Company-1 are based on an incorrect reading of those materials. Had counsel inquired with the Government about any purported date discrepancies in the screenshots prior to filing the defendant's motion, or reviewed the native files of those messages that were produced in discovery, it would have learned that there are no

discrepancies to support the motion. In addition, the defendant's arguments that the affidavits presented his communications in a misleading way are wrong. The defendant ignores that probable cause determinations are based on a totality of the circumstances including, for example, that the affiants had participated in proffers with the defendant's co-conspirators that provided context for interpreting communications which, on their face, may not appear illegal, but which the affiants reasonably concluded were in furtherance of the criminal conduct in this case.

### 2. There Were No Material Omissions or Misrepresentations as to Company-1 or the Materials it Provided

The defendant first argues that the warrants relied on "unreliable" and "uncorroborated" information provided by Company-1 and omitted information about Company-1's incentives to cooperate with the Government. Mot. at 31-40. The defendant's arguments are meritless.

#### a. Disclosures Regarding Company-1's VSD and Proffers

To start, the defendant argues that the affidavits did not disclose information that bore on the credibility and incentives of Company-1 to purportedly "protect itself" and "implicate senior figures" of the U.S. Manufacturer. Mot. at 33-34. In support, he claims that the affidavits omitted that Company-1 began providing information to the Government after the DOC's Bureau of Industry and Security ("BIS") indicated that it would conduct a PSV of Company-1 and, therefore, that the description of Company-1's disclosure as "voluntary" was "materially misleading and went directly to the reliability of the information" that the Government relied upon in the warrant affidavits. *Id*. at 34. The defendant is wrong.

The affidavits state that, in late September 2025, Company-1, through its U.S.-based counsel, made a VSD to BIS and the U.S. Department of Justice's National Security Division ("NSD") regarding the re-export of servers to China. *See*, *e.g.*, Simons Decl. Ex. 1 at ¶ 28. The affidavits also described the potential incentives associated with VSDs, including the potential for

a "presumption that the company will receive a non-prosecution agreement and will not pay a fine" and the "potential to receive a reduced penalty or no action from BIS." *See id.* at n.17. After outlining the scheme that the defendant and others carried out, the affidavits stated that, by August 2025, BIS had "informed [the U.S. Manufacturer] that it had reason to believe that Company-1 was diverting servers to China," had "placed a compliance hold on all shipment from [the U.S. Manufacturer] to Company-1," and "would be conducting a PSV of certain [U.S. Manufacturer] servers purchased bv Company-1." *Id.* at ¶ 34. The affidavits thus made clear that the September 2025 VSD came *after* BIS had placed a hold on shipments to Company-1 and decided to conduct a PSV of Company-1. The defendant's argument that the affidavits "omitted this sequence of events and instead presented [Company-1's] disclosure as a spontaneous act of corporate good citizenship" is thus belied by the record. Mot. at 34.

In this same vein, the defendant claims that the affidavits "omit any specific communications surrounding the proffers of [Individual-1] and [Individual-2], including whether the government offered any inducements, assurances, or representations that cooperation could result in non-prosecution agreements." Mot. at 35. Again, the defendant is wrong. Individual-1 and Individual-2 met with the Government as part of Company-1's ongoing VSD, the potential incentives for which were described in the affidavits. *See, e.g.*, Simons Decl. Ex. 1 at n.17.[8] Regardless, because no promises or assurances about any non-prosecution agreement had been

---

[8] The affidavits also described the meetings with Individual-1 and Individual-2 as "proffers," which, as counsel is aware, is common parlance for meetings between the Government, witnesses, and their counsel, often governed by proffer agreements that disclaim any promise of a benefit. *See, e.g.*, *id.* at ⁋ 30; *see also* Simons Decl. Ex. 2 at ⁋15. Indeed, the proffers were conducted pursuant to standard proffer agreements, stating that "the Government does not agree to make a motion on [the witness's] behalf or enter into a cooperation agreement, plea agreement, or non-prosecution agreement." The Government will provide copies of the agreements to counsel when it produces Section 3500 material for these witnesses. To the extent the Court wishes to view these agreements in connection with this motion, the Government will promptly provide them.

made to the witnesses at the time the affidavits were sworn out, there was nothing to disclose to the magistrate judges in that regard. The reviewing magistrate judges thus had all the relevant information needed to make credibility assessments of the information provided by Company-1, including through Individual-1 and Individual-2.

#### b. Purported Discrepancies in the Communications Referenced in the Warrant Affidavits

The defendant further claims that "chat communications relied upon in the Warrant Affidavits are rife with inconsistencies in dates, times, and content," and that "none of these discrepancies were disclosed to the reviewing Magistrate Judges." Mot. at 35. The defendant's argument is based on an incorrect reading of the dates in screenshots of chat messages provided by Company-1 and ignores the native versions of those same chats that were later produced in discovery and show that there are no such discrepancies.

As an initial matter, as part of its ongoing VSD, Company-1 provided the Government with certain screenshots of excerpted communications between the defendant, Individual-1, Individual-2, Chang, Sun, and others, evidencing the scheme to divert servers to China and to conceal that activity. Importantly, when the Liaw SCA Warrant was authorized on January 9, 2026, the Government had only received certain excerpts of those chats from Company-1's counsel. The Government did not receive the longer versions of those chats, which the defendant appends to his motion and which he claims contain discrepancies that undermine the probable cause in the warrant affidavits, until February 2026—*after* the Liaw SCA Warrant was sworn out. *See* Simons Decl. Ex. 13, 14. The affidavit in support of the Liaw SCA Warrant accurately described that the Government had received "excerpts of text message communications provided by Company-1 as part of its VSD" and was justified in relying on those excerpts (which were corroborated by, among other things, information learned during a December 2025 proffer with Individual-1 and video

surveillance). *See, e.g.*, Simons Decl. Ex. 1 at ¶ 32. There is thus no basis for suppression of the Liaw SCA Warrant returns based on purported discrepancies in screenshots of chats that the Government did not have in its possession at the time the warrant was sworn out.

Even if the Government had in its possession the longer chats at the time, which it did not, the defendant's arguments for suppression based on purported discrepancies would fail. The Government understands, based on its conversations with Company-1's counsel, that the screenshots of the chats appended to the defendant's motion were taken from screen recordings of chat conversations, and included, at the top of each screenshot, a "banner date" indicative of the date of the first chat captured in the screen recording. If the conversation within the recording continued to subsequent dates, those subsequent dates were reflected within the screenshot itself. This meant that, where multiple screenshots were taken to capture sequential parts of a single screen recording, those screenshots each reflected the same "banner date" at the top associated with the first chat in the recording, even if the conversation carried over to later dates. The "banner date" at the top of each screenshot is thus not necessarily indicative of the dates of the chats in a particular screenshot; instead, the dates and timestamps embedded within the screenshots themselves show when the texts were sent.

The first example the defendant relies upon in support of his motion illustrates this point. He argues that screenshots of chats between Chang and Individual-2 presented "non-contiguous, contradictory depictions of conversations bearing the same date and time stamp." *See* Mot. at 36. A careful review of those screenshots shows otherwise. The defendant points to a chat that occurred between June 21, 2024 and June 23, 2024, produced across two screenshots—USAO_023340 and USAO_023341, both of which bear the "banner date" of June 21 at the top. *See* Simons Decl. Ex. 13. As reflected in USAO_023340, the conversation had been occurring on

June 21, then carried over to June 22 (as reflected midway through the chat). *See id.* at USAO_023340. The next screenshot, USAO_023341, still has the June 21, 2024 "banner date" at the top, but is clearly a continuation of the same June 22 conversation from the end of the prior screenshot, USAO_023340. *See id.* at USAO_023341. Indeed, the timestamp at the end of USAO_023340 shows a text sent at 10:23 a.m. and the first text in USAO_023341, which is simply a continuation of the chat from the prior page, is sent at 10:28 a.m. *See id.* The conversation in USAO_023341 then continues throughout the day on June 22, and as reflected towards the end of the screenshot, moves to June 23. *See id.* at USAO_023341. The defendant is thus wrong that this chat "jumps directly" from June 21 to June 23, skipping over chats on June 22. Mot. at 36.

Another example that the defendant relies upon is a screenshot of an October 2024 conversation, which the defendant claims to show Chang sending Individual-2 a photo on October 3, 2024 of an email dated October 11, 2024. Mot. at 38 (citing Simons Decl. Ex. 13 at USAO_023380). The defendant argues that this is a "chronological impossibility" that "undermines the reliability" of the chats. Mot. at 38. Here, again, the defendant misreads the evidence. While the "banner date" at the top of USAO_023380 says "October 3, 2024," the preceding screenshot makes clear that the chat is a continuation of a conversation that had been occurring on October 11, 2024. *See* Simons Decl. Ex. 13 at USAO_023379. Indeed, the timestamps and communications that flow from the end of USAO_023379 and begin on USAO_023380 show that USAO_023380 is a continuation of the same October 11 conversation that started at the end of USAO_023379. *Id.* at USAO_023379-80. There was thus no "chronological impossibility" in this chat.[9]

[9] The other examples the defendant points to suffer from similar flaws. *See* Mot. at 36-37 (citing Simons Decl. Ex. 13). For example, the chats stamped USAO_023374, while bearing a "banner

(*continued on next page*)

The defendant also argues that the screenshots of chats between Sun and Individual-2 "are riddled with the same kind of discrepancies." Mot. at 37. While the screenshots of the chats between Sun and Individual-2 do not appear in the same sequential order as those between Chang and Individual-2, that does not undermine their reliability. *See* Simons Decl. Ex. 14. For example, the defendant argues that USAO_023556 is a chat from August 4, 2025 to August 6, 2025 that is "not included in the previous page reflecting continuous messages between August 3, 2025 to August 11, 2025." Mot. at 37-38. But that is just because the Bates-stamped chats were provided to the Government in reverse chronological order. A more careful review of those screenshots reveals that USAO_023556 contains messages going from August 4 to August 6, which continue on the prior page, USAO_023555, with messages from August 6 to August 11 (despite the August 3, 2024 "banner date" at the top of each screenshot). *See* Simons Decl. Ex. 14.

The same is true of the defendant's July 30, 2025 example, in which he claims that there are "dueling July 30 messages" within two sequential screenshots. Mot. at 37. The confusion on the defendant's part appears to have been a result of screenshots having been Bates-stamped and provided to the Government in reverse chronological order. Indeed, the messages in USAO_023560 (which goes from at least July 25 to a July 29 attempted call from Sun at 4:09 p.m.) then pick up at the prior page, USAO_023559 (which starts at 4:09 p.m. with a message from Sun saying, "call me back please" and goes through July 30 at 8:32 a.m.). *See* Simons Decl. Ex. 14. The conversation then continues in the page before that, USAO_023558, with messages

date" of September 21, are in fact just chats from September 25, 2024 to September 27, 2024, not messages that "begin on September 21, 2024 and skip to September 26, 2024." *Id.* Similarly, the chats at USAO_023503 are not messages that "begin on April 24, 2024, and continue on May 7," but rather, messages from May 6 to May 7, as shown by the continuing conversation from the preceding screenshot dated May 6. *See id.* at USAO_023502.

picking back up at 8:32 a.m. *See id.*[10] Thus, while difficult to follow in the reverse chronological form in which they were initially produced, there was nothing unreliable about these messages.

In any event, as is dispositive to this issue, the Government also produced the native versions of the challenged chats in discovery, prior to the defendant's filing of his motion and prior to knowing that the defendant believed there to be discrepancies within those chats. Those native versions align with the dates of the challenged communications in the affidavits and further demonstrate that the defendant misunderstood the chats he relies upon to claim that the Government withheld information from the reviewing magistrate judges. To the extent the defendant continues to insist that the chats suffer from discrepancies that should have been disclosed in the warrant affidavits, and does not abandon this argument on reply, the Government can provide the Court with the native files of each chat cited in the defendant's brief.

**c. Purported Undisclosed Redactions**

Lastly, the defendant argues that the affidavits omitted that certain of the screenshots of chats provided by Company-1 contained redactions. *See* Mot. at 39. As noted above, however, the affidavits made clear that Company-1 provided "excerpts" of chat communications. *See, e.g.*, Simons Decl. Ex. 1 ¶¶ 28, 32. The affidavits do not say that the Government received full, unredacted versions of the chat messages, nor do they come close to suggesting that. Indeed, it is

---

[10] The defendant argues that USAO_023558 shows an additional message on July 30 sent at 7:04 a.m. that is incompatible with those sent in USAO_023559. *See* Mot. at 37. But that appears to be a function of a likely time zone change. Indeed, the native version of USAO_023558 shows that same 7:04 a.m. message as having been sent on July 31. Moreover, the other two examples the defendant points to, USAO_023560-63 and USAO_023568-72, do not show "different versions" of messages exchanged on the same day. Mot. at 28. Rather, like with the messages between Chang and Individual-2 described above, these are screenshots of chats that simply share the same "banner date" at the top. Mot. at 38 (citing Simons Decl. Ex. 14).

unclear what a disclosure about redactions would have added that was not already evident from the fact that the affidavit relied, in part, on excerpted portions of communications.

Just as importantly, the redactions in the chats did not "obscure context and impede a reliable interpretation of the communications," as the defendant suggests. Mot. at 39. As described at length in the affidavits, Individual-1 and Individual-2 participated in multiple proffers in which they described, in detail, their involvement in the charged conspiracies alongside the defendant. Those proffers, and the other evidence described in the affidavits, provided context for interpreting any excerpted communications that were not, on their face, criminal in nature.

Moreover, the defendant cannot meet the heavy burden of showing that any alleged omission in the affidavits was "made in reckless disregard of whether [it] would mislead," *Awadallah*, 349 F.3d at 68, much less that "the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154. The affidavits expressly and accurately informed the reviewing magistrate judges that they relied on *excerpts* of communications provided by Company-1. Moreover, as described further below, this was not a situation in which an additional disclosure about redactions would have reasonably caused a reviewing magistrate judge to question their probable cause determinations. As described above, the affidavits contained substantial evidence of criminal activity on the part of the defendant and his co-conspirators, far exceeding probable cause, including statements from witnesses with firsthand knowledge of the scheme, text messages referencing diversion to China and the use of dummy servers, and photos of the defendant's co-conspirators setting up dummy servers. The fact that the affidavits did not reference redactions thus has no bearing on the probable cause set forth in the affidavits.

### 3. The Affidavits Did Not Present the Defendant's Communications in a Misleading Way or Omit Critical Context

The defendant next argues that the affidavits "conflat[ed]" his conduct with that of his co-conspirators and mischaracterized his "ordinary business communications by simply juxtaposing them with communications that reference China but do not include [him]." Mot. at 40-41. In support, the defendant cherry picks isolated examples that he believes evidence an intent, or a reckless disregard, to mislead the reviewing magistrate judge. Critically, not only is the defendant wrong as to the examples he selects, but he also ignores the numerous paragraphs throughout the hundreds of pages of affidavits and exhibits that, taken together, conclusively showed his involvement in criminal conduct and formed the basis for the affiants' conclusions and beliefs.

The defendant first argues that the affidavits "erroneously pair sweeping assertions about illicit conduct of all the alleged co-conspirators" with no examples specific to him. Mot. at 41. For example, he argues that the affidavits "offer[ed] no evidence of [the defendant's] participation in or awareness" in conduct relating to deceiving the U.S. Manufacturer's compliance team and U.S. authorities, and that such conduct is instead attributable to Chang and Sun. Mot. at 41 (emphasis in original). This argument ignores that the affidavits described, among other things, (i) proffer statements about the defendant's involvement in the scheme to divert servers to China, *see, e.g.*, Simons Decl. Ex. 1 ¶ 30; (ii) communications about the defendant reaching out to a high-ranking executive to "do something" about an audit of Company-1, for which Chang had suggested using dummy servers, *id.* ¶ 33(b); (iii) a text from the defendant to Individual-1 following an audit by the U.S. Manufacturer—for which Chang and Sun arranged dummy servers—telling Individual-1 that Chang was "pushing hard for the compliance for you," *id.* ¶ 33(m); and (iv) descriptions of a November 2025 meeting between the defendant, Chang, Sun, and Individual-1 about the upcoming PSV of Company-1, for which dummy servers were used, *id.* ¶¶ 35-38.

The affidavit for the Liaw Devices Warrant, which incorporated the Indictment, the March 6 SCA Warrant affidavit, and the Liaw SCA Warrant affidavit, included even more evidence. For example, the Indictment describes that Sun texted the defendant photographs of the dummy servers used in the August 2025 audit, to which the defendant responded, "That's spectacular!" Simons Decl. Ex. 2 at Ex. 1 ¶ 24(e). The Indictment further describes a text from the defendant to Individual-1 and Chang stating that "[y]ou need to have strong and persuasive reasons to convince the [U.S. Manufacturer's] staffs" to lift a compliance hold. *Id*. Ex. 2 at Ex. 1 ¶ 20.[11] The argument that the affidavits were silent as to the defendant's involvement in efforts to deceive thus falls flat.

The defendant's argument that his communications did not specifically reference exports to China is equally unavailing. *See* Mot. at 41-42. It is entirely unsurprising that the defendant, the co-founder of the U.S. Manufacturer, was at times more careful about referencing China in his text messages than other of his co-conspirators who handled the on-the-ground, day-to-day logistics of coordinating shipments to China. But that does not weaken the probable cause laid out in the affidavits, particularly considering all the facts set forth above that provided context for his communications. The example that the defendant points to underscores this point. He highlights text messages that one of the brokers referenced in the Indictment sent to the defendant regarding the need to "speed up" server shipments for the broker's "investors," and expressing gratitude for Chang's and Individual-1's "hard work and dedication which have been essential in sustaining our collaboration." Mot. at 41 (citing Simons Decl. Ex. 1 at ¶ 32(b)(i)-(iv)). The defendant then texted Individual-1 a screenshot of those messages and asked, "How can we help her?" Simons Decl.

[11] Both the Liaw Devices Warrant and March 6 SCA Warrant affidavits also contained additional examples of efforts, not alleged in the Indictment, that were undertaken by the defendant and his co-conspirators to conceal the scheme. *See, e.g.*, Simons Decl. Ex. 3 ¶¶ 27, 45(f), (j).

Ex. 1 at ¶ 32(b)(iv). While the defendant's texts did not say "China," he was interacting directly with one of the brokers who ordered servers through Company-1 for diversion to China and then asking Individual-1 to assist in fulfilling the broker's requests. These types of communications were more than sufficient for the affiant to conclude that the defendant communicated with others to discuss Company-1's purchase of servers "for re-export to China." Mot. at 41.[12]

Second, the defendant argues that the affidavits' descriptions of certain of his communications "tack[ed]" on "unfounded references to China." Mot. at 42. As above, the defendant isolates certain examples that, on their face, could be read to constitute ordinary business. *See* Mot. at 42-43. But when viewed in the context of the other evidence set forth in the affidavits about the defendant's involvement in the illegal diversion scheme and how it operated, the affiants were more than justified in expressing their belief, based on their training and experience and involvement in this investigation, that the communications were not innocuous. Here, again, the defendant ignores that the affidavits were replete with evidence of the defendant's involvement in an illegal diversion scheme with the same individuals with whom he was communicating in the examples he has highlighted. For example, the defendant argues that his request to Individual-1 to send a purchase order to Chang "to book the allocation asap" is "consistent with [his] other communications with [Individual-1] regarding placing purchase orders." Mot. at 44. But as described elsewhere in the affidavit, that is exactly how the scheme worked. *See, e.g.*, Simons Decl. Ex. 1 ¶ 30(c) (describing that, as part of the scheme, the defendant

[12] The defendant's argument that his text messages urging Individual-1 to provide forecasts for orders are in "stark" contrast to those between Chang and Individual-2—in which they reference orders to China specifically—fails for the same reason. *See* Mot. at 42. The defendant's request for Company-1 to provide a forecast to secure a GPU allocation served a primary goal of the conspiracy: to have GPUs allocated to Company-1 so that they could then be integrated into servers for diversion to China, as described throughout the affidavits.

would "request that Company-1 place purchase orders" for servers, which were then diverted to China, and "instructed Individual-1 to coordinate with Sun and Chang"). And as described above, "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *Fama*, 758 F.2d at 838.

The defendant's other examples fare no better. *See* Mot. at 41-45. When viewed in the context of "all the circumstances set forth in the affidavit," *Illinois*, 462 U.S. at 238, these communications, and the affiants' well-founded belief in what they showed, only supported the otherwise substantial proof far exceeding probable cause. To the extent the defendant disagrees with the affiants' assessments of his communications, the law is clear that a mere "dispute with [the affiant's] interpretations of conversations does not warrant either a *Franks* hearing or suppression." *United States v. Gotti*, 42 F. Supp. 2d 252, 280 (S.D.N.Y. 1999); *United States v. Jimenez*, 824 F. Supp. 351, 361 (S.D.N.Y. 1993) (holding a "counter-interpretation of acts . . . does not satisfy the showing required for a *Franks* hearing.").

The affidavits thus did not include any misleading descriptions of the defendant's communications that would counsel in favor of suppression or a *Franks* hearing.

* * *

For the reasons set forth above, the defendant does not come close to meeting the heavy burden of showing that the affidavits contained misstatements or omissions, much less any that were "designed to mislead" or were "made in reckless disregard of whether [they] would mislead." *Rajaratnam*, 719 F.3d at 154. The defendant's motion to suppress, and his request for a *Franks* hearing should thus be denied on that basis alone. Moreover, even if the Court were to find that any of the alleged omissions and misstatements were made intentionally, which they were not, the next step would be to correct those errors in the affidavits and determine whether there was still

probable cause. *See, e.g.*, *Canfield*, 212 F.3d at 718. Here, given the overwhelming evidence establishing probable cause—including summaries of percipient witness statements, text and email message communications, shipping records, video surveillance, and other evidence—the affidavits would unquestionably still support a probable cause finding.[13]

Accordingly, the defendant's motion to suppress the contents of his electronic accounts and devices, obtained pursuant to the Liaw SCA Warrant and Liaw Devices Warrant, respectively, should be denied without a hearing.

## V. The Defendant's Motion to Suppress the Contents of his Cellphones Should be Denied

The defendant also asks the Court to suppress the contents of the two cellphones (the "Work Phone" and the "Personal Phone," together, the "Phones") seized at the time of his arrest. Mot. at 49. The defendant makes three claims in support of that motion: (1) the agents violated the defendant's Sixth Amendment rights by asking him, after his right to counsel had attached, to confirm the passcode for his Work Phone and whether the same passcode applied to his Personal Phone; (2) the agents violated his Fifth Amendment rights by compelling him to disclose his passcodes without *Miranda* warnings and after he had invoked his right to counsel; and (3) the

[13] For these same reasons, the defendant's argument to suppress the contents of his devices obtained pursuant to the Liaw Devices Warrant because they were "obtained in reliance on the fruits of the defective Liaw SCA Warrant" should be rejected. *See* Mot. at 47-49. Indeed, even if the Court found that the Liaw SCA Warrant was defective, which it was not, "the resulting evidence will not be suppressed so long as the government demonstrates that the evidence was 'obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'" *Almaleh*, 2022 WL 602069, at *13 (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). As this Court has recognized, there are only four circumstances under which the so-called good faith exception will not apply: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Almaleh*, 2022 WL 602069, at *13 (citing *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)). The defendant has not, and cannot, establish any of these factors.

agents violated his Fourth Amendment rights by using the passcodes to open the Phones, which exceeded the scope of the Liaw Devices Warrant. *Id.* The Court should reject each of those arguments. The defendant did not unequivocally invoke his right to counsel, the agents did not compel any involuntary statements from the defendant, the phones were validly seized pursuant to the Liaw Devices Warrant, and the passcodes to the Phones would inevitably have been discovered even without the defendant's statements. His constitutional rights were not violated.

### A. Applicable Law

The Sixth Amendment provides the right to have the assistance of counsel "[i]n all criminal prosecutions." U.S. Const. amend. VI. The right attaches at the "initiation of adversary judicial criminal proceedings—whether by way of indictment or information." *United States v. Mills*, 412 F.3d 325, 328 (2d Cir. 2005). Once the right has attached, and a criminal defendant has "invoke[d] his Sixth Amendment right to counsel," *Michigan v. Harvey*, 494 U.S. 344, 345 (1990), the government has "an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel," *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993). Incriminating statements that are "deliberately elicited from a defendant without an express waiver" are inadmissible. *Harvey*, 494 U.S. at 348. "[To] make out a violation of [the Sixth Amendment right to counsel] . . . the defendant must demonstrate that [the government] took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). The intent of the government's agent is critical to the deliberate elicitation analysis, as the Sixth Amendment "is not violated by the merely fortuitous receipt of incriminating statements." *Rosa*, 11 F.3d at 329; *see also Maine v. Moulton*, 474 U.S. 159, 176 (1985).

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment

privilege, a communication must be testimonial, incriminating, and compelled." *United States v. Shvartsman*, 722 F. Supp. 3d 276, 314 (S.D.N.Y. 2024) (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189 (2004)). Incriminating statements to law enforcement are compelled if they "were not made voluntarily—that is, if the defendant's will was overborne." *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 201). "[A] finding that police conduct is false, misleading, or intended to trick and cajole the defendant into confessing does not render the confession involuntary. A court must still make specific findings that under the totality of the circumstances the defendant's will was overborne by the police conduct." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018). "Those circumstances generally fall into three categories: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *United States v. Mendonca*, 88 F.4th 144, 164 (2d Cir. 2023).

The Supreme Court has "expressly distinguished" the Sixth Amendment deliberate-elicitation standard "from the Fifth Amendment custodial-interrogation standard." *Fellers v. United States*, 540 U.S. 519, 524 (2004). "[T]he Fifth Amendment's interrogation inquiry . . . focuses 'primarily upon the perceptions of the suspect,'" while the Sixth Amendment focuses on the "intent" of the government officials. *Rommy*, 506 F.3d at 135 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

In *Miranda v. Arizona*, 384 U.S. 436, 439 (1966), the Supreme Court "adopted a set of prophylactic" rights, including the right to have counsel present during custodial interrogation, to assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself,. *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010). *Miranda* also provides that officers must cease custodial interrogation if a suspect indicates "that he wishes to consult with an attorney before speaking." 384 U.S. at 444-45. In *Edwards v.*

*Arizona*, 451 U.S. 477, 484-85 (1981), the Supreme Court further held that officers are barred from restarting interrogation of a suspect following a request for counsel to be present, as a further "second layer of prophylaxis for the *Miranda* right to counsel."

The Supreme Court, however, later clarified that the *Edwards* bar applies "only when the suspect has expressed his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*. It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (internal citations omitted, emphasis in original). In *Davis v. United States*, 512 U.S. 452, 459 (1994), the Supreme Court further limited the prophylactic rule of *Edwards* to situations involving a clear and unambiguous request to have counsel present before answering questions, and that "articulation of the desire to have counsel present must be sufficiently clear that a reasonable police officer under the circumstances would understand the statement to be a request for the presence of an attorney before answering any further questions." *United States v. Ephron*, No. 24 Cr. 418 (MMG), 2025 WL 524027, at *8 (S.D.N.Y. Feb. 18, 2025).

The Supreme Court has consistently held "a violation of *Miranda*" is not a *per se* "violation of the Fifth Amendment right against compelled self-incrimination," because a non-*Mirandized* statement is not necessarily a compelled statement. *See Vega v. Tekoh*, 597 U.S. 134, 142 (2022). "[I]t is easy to imagine many situations in which an un-*Mirandized* suspect in custody may make self-incriminating statements without any hint of compulsion." *Id.*; *see also Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985) (explaining that *Miranda* "sweeps more broadly than the Fifth Amendment" and excludes even "*voluntary* statements"); *United States v. Patane*, 542 U.S. 630, 634 (2004) (analyzing "unwarned but voluntary statement"). A defendant therefore may be "in

custody" for *Miranda* purposes such that they should receive *Miranda* warnings, but that does not make their statement "compelled" and "involuntary" under the Fifth Amendment in the absence of such warnings.

As described above, a communication also must be testimonial to qualify for the Fifth Amendment privilege. *United States v. Hubbell*, 530 U.S. 27, 34-35 (2000). The Supreme Court has held that the Fifth Amendment privilege also applies under the so-called "act of production" doctrine: compliance with a law enforcement request, such as a subpoena for documents, can be "testimonial" if compliance tacitly concedes the existence of what law enforcement seeks and the information is in the defendant's control. *Fisher v. United States*, 425 U.S. 391, 410 (1976). But under the "foregone conclusion" doctrine, the act of production doctrine requires suppression only if the implicit statement is incriminating; that is, if the act of production "adds little or nothing to the sum total of the Government's information," then production is not incriminating and there is no applicable privilege. *Id*. at 411.

Even if testimonial and incriminating, with respect to compulsion, "the Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony," and "[v]oluntary statements remain a proper element in law enforcement." *Elstad*, 470 U.S. at 304-07. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *accord Elstad*, 470 U.S. at 304-05 (noting that the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion"). Whether a statement is coerced is "determined by the totality of the circumstances," *Charlotte E. v. Safir*, 156 F.3d 340, 346-47 (2d Cir. 1998), including "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials," *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

A violation of the prophylactic *Miranda* rule does not require "suppression of the physical fruits of the suspect's unwarned but voluntary statements." *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion); *id*. at 645 (Kennedy, J., concurring) ("nontestimonial"). As the Supreme Court explained in *Patane*, 542 U.S. at 636, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context." Thus, unless agents, in violation of the Due Process Clause, coerced a defendant into making statements that led to the discovery of physical evidence, the physical evidence itself is admissible. *United States v. Hallford*, 816 F.3d 850 (D.C. Cir. 2016) (citing *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion)). "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (factors include youth of accused, lack of education, low intelligence, lack of any advice of his constitutional rights, length of detention, repeated and prolonged nature of the questioning, and use of physical punishment such as deprivation of food or sleep); *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (evidence of coercion may include "an incapacitated and sedated suspect, sleep and food deprivation, and threats.").

Moreover, under the "inevitable discovery doctrine," even evidence obtained unlawfully "should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984) (applying inevitable discovery doctrine in the context of Fifth Amendment violation). Where a court "can find, with a high level of

confidence," that the evidence would have been obtained irrespective of the error, the evidence should not be suppressed." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (internal quotation marks and citation omitted).

**B. Discussion**

The Government agrees that the defendant's Sixth Amendment rights had attached as of March 19, 2026, when he was arrested in this case. (Mot. at 53). But the defendant's arguments in support of his motion to suppress the Phones all fail, because he had not invoked that right to counsel when he entered his passcode into the Work Phone and then voluntarily answered the agents' questions. Even if the Court finds that he had unequivocally invoked, as described below, the Phones were validly seized pursuant to the Liaw Devices Warrant, and the passcodes would inevitably have been discovered.

The following undisputed facts are presented to the Court in the materials submitted in support of the defendant's motion, including the defendant's sworn declaration: (1) the defendant was holding the Phones when FBI agents arrested him at his home on March 19, 2026 (Liaw Decl. ¶ 3; Simons Decl. Ex. 32 at 8:25); (2) the defendant then set the Phones down on the floor (*id.*); (3) after the agents had seized the Phones, the defendant asked if he could have the Work Phone to retrieve his attorney's number (Mot. at 50); and (4) in plain view of the agents, the defendant typed the passcode "1111" into the Work Phone, which at least one agent saw unlocked the device. Liaw Decl. ¶ 8; Mot. at 50.

Once the Sixth Amendment right to counsel attaches, the government has an obligation not to solicit "incriminating" statements from the defendant. *Rosa*, 11 F.3d at 329 (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)). But "[t]he Sixth Amendment is not violated by the merely fortuitous receipt of incriminating statements." *Rosa*, 11 F.3d at 329. The Sixth Amendment focuses on the "intent" of the government officials. *Rommy*, 506 F.3d at 135. The

defendant was aware at the time that the agents had observed him type "1111" to unlock the Work Phone, and he "saw an officer writing just after [he] tapped [his] passcode." Liaw Decl. ¶ 8. "Nothing in the record supports a conclusion that [the defendant] could have perceived the agents to be seeking incriminating information beyond what he had already volunteered" through his plain-view actions when they simply asked him to confirm what they had seen him type in. *Rommy*, 506 F.3d at 134; *see also Innis*, 446 U.S. at 301. The agents similarly did not deliberately elicit the Personal Phone passcode; the question posed was simply whether the Personal Phone passcode was the same as the Work Phone passcode. Liaw Decl. ¶ 9. The defendant could have replied, "No," but he instead volunteered the Personal Phone passcode. *Id.*

In any event, the defendant's statements at issue regarding both the Work Phone Passcode and the Personal Phone passcode were neither testimonial nor incriminating, which is relevant to the analysis under both the Sixth Amendment and the Fifth Amendment. While the Second Circuit has not yet addressed how these doctrines apply to a law enforcement demand for a phone passcode, one court in this District has held that "if the Government can independently show the phone belonged to the defendant and that the defendant knew the password, the foregone conclusion doctrine applies, and the Fifth Amendment is not violated by the act of compelled decryption." *United States v. Smith*, 706 F. Supp. 3d 404, 408 (S.D.N.Y. 2023).[14] That is because

[14] This analysis of when an agent's request or confirmation for a phone passcode is "testimonial" and "incriminating" is consistent with the approaches taken by the Third Circuit, and by the highest state courts in Massachusetts and Illinois. *See United States v. Apple MacPro Computer*, 851 F.3d 238, 248-49 (3d Cir. 2017); *People v. Sneed*, 2023 IL 127968 ¶ 104 (Ill. 2023); *Commonwealth v. Jones*, 117 N.E.3d 702, 711 (Mass. 2019); *accord* Orin S. Kerr, Compelled Decryption and the Privilege Against Self-Incrimination, 97 Tex. L. Rev. 767, 782-85 (2019). *But see Shvartsman*, 722 F. Supp. 3d at 315-24 (holding that verbal disclosure of cellphone passcode to U.S. Customs officer during airport inspection was testimonial and incriminating); *State v. Valdez*, No. 20210175, 2023 WL 8635197, at *12, *13 (Utah Dec. 14, 2023) (holding that providing passcode is testimonial and foregone conclusion exception is inapplicable); *In re Grand Jury Subpoena*

(*continued on next page*)

"the act of physically unlocking a smartphone or providing the password does not communicate anything about what files exist on the phone, whether the files were created by the defendant, or whether the files are authentic. Rather, the testimonial significance of unlocking a cellphone or providing the password is the implied statement: 'I am the person who knows the password for this phone.'" *Id.* Here, the Government already possessed independent knowledge (1) of the existence of the Phones, (2) that the Phones—which the defendant had in his hand when he came to the door—were *the defendant's*, and (3) that the contents of the Phones were relevant to the investigation. *Smith*, 706 F. Supp. 3d at 408. Accordingly, his statements about the Phones' Passcodes were not testimonial or incriminating, and those statements should not be suppressed.

Moreover, the defendant's unlocking of the Work Phone using the Work Phone Passcode in plain view of the agents was not "compelled" (and, as described above, it also was not "incriminating"), and therefore neither that action nor subsequent statements about the Work Phone Passcode and the Personal Phone passcode violated his Fifth Amendment right against self-incrimination. While the Second Circuit has not opined on this particular fact pattern, a recent Fourth Circuit case is instructive. In *United States v. Bendann*, 180 F.4th 147 (4th Cir. 2026), law enforcement executed a warrant at Bendann's home, advised him of his *Miranda* rights, and informed him that the agents had a warrant to use his biometric data to unlock electronic devices. When an agent "asked Bendann if he wanted to talk, . . . he replied, 'Can I do it with my attorney? She said not to say anything to anyone.'" *Id.* at 153-54. When biometrics failed to unlock Bendann's phone, Bendann voluntarily entered his passcode into the phone in plain view of the agents, who had "made no demands during the very brief interaction," but were able to see that

---

*Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012) (holding subpoena must describe location and existence of documents sought on device with "reasonable particularity").

the first four of six digits that Bendann had entered were the month and day of his birthdate. *Id.* at 154. The agents then verbally verified Bendann's birthdate in his presence, and Bendann confirmed the passcode out loud. *Id.* In denying Bendann's suppression motion based on the voluntariness of his providing (and then confirming) the passcode, the Fourth Circuit noted that although the circumstances of the early-morning search were intimidating (where "a weapon-bearing SWAT team entered Bendann's home around 5 a.m. and handcuffed him undressed in his living room"), "by the time [the agent] approached Bendann with the iPhone, Bendann was uncuffed, clothed, and had been chatting politely with" the agent. *Id.* at 157.

Similar to Bendann, the defendant was not subject to "custodial interrogation" here when he voluntarily entered the passcode into his Work Phone in plain view of the agents. The agents did not direct the defendant to unlock the Work Phone—rather, he asked them to hand it to him so he could retrieve a phone number, and they did so. "[T]here is no evidence that [the agents] applied any pressure, threatened adverse consequences, or misrepresented the situation in order to encourage [the defendant] to enter the passcode." *United States v. Gogic*, 770 F. Supp. 3d 529, 541 (E.D.N.Y. 2025). The agents did not engage in any conduct "intended to trick and cajole the defendant into" unlocking his Work Phone and, under the totality of these circumstances, as described in greater detail below, the defendant's will was not "overborne by the police conduct." *Haak*, 884 F.3d at 409. The defendant's motion largely glosses over the defendant's voluntary unlocking of his Work Phone, because that fact is fatal to his suppression argument.

To grant the defendant's suppression motion, the Court would have to both disregard what the defendant admits the agents saw themselves, and then further find that the agents' subsequent conduct in politely asking the defendant to confirm the Work Phone Passcode, and then asking whether the same passcode would unlock the Personal Phone, was a "deliberate, reckless, or

grossly negligent" attempt to violate the defendant's *Miranda* rights. *Herring v. United States*, 555 U.S. 135, 144 (2009). Contrary to the defendant's self-serving claims, the "totality of the circumstances," *Schneckloth*, 412 U.S. at 219-23, does not support a finding that the atmosphere was "objectively coercive," *United States v. Guzman*, 724 F. Supp. 2d 434, 443 (S.D.N.Y. 2010), such that the defendant "did not believe, and could not have believed, that he had any choice but to answer the agents' questions." Mot. at 57. After placing him under arrest, but before transporting him to the station for processing, the agents permitted the defendant to "change into clothes and wash," and even eat "two eggs and a cookie" that his wife had prepared. *See* Liaw Decl. ¶ 7. After that, the agents handed the defendant the Work Phone at his request, *id.* ¶ 8, so he could unlock it to retrieve a phone number. There is nothing inherently coercive about those circumstances. *See Bendann*, 180 F.4th at 157.

The Court should also reject the defendant's claim that he was a person "susceptible to coercion." Mot. 64. To the contrary, the defendant's characteristics "favor a finding that [he] . . . voluntarily" disclosed his phone's passcode. *Shvartsman*, 722 F. Supp. 3d at 321 (quoting *Kourani*, 6 F.4th at 352 (internal quotations omitted). The defendant is an intelligent, middle-aged man who co-founded a Fortune 500 company and has served as one of the seniormost executives of that company for more than 30 years. Even accepting the defendant's claim that his "facility with the [English] language cannot be fairly characterized as fluent"—which the Government does not—he unquestionably speaks and understands English sufficiently, as evidenced by his many English-language communications described in the affidavits in support of the Liaw SCA Warrant and Liaw Devices Warrant. The cases the defendant cites in which courts looked to whether English was the native language of a defendant, *see United States v. Isiofia*, 370 F.3d 226, 233 (2d Cir. 2004) and *United States v. Garcia*, 554 F. Supp. 3d 421, 434 (E.D.N.Y. 2021), both relate to

the voluntariness of providing consent to search—not to whether interactions are so coercive such that statements must be suppressed. Mot. at 57-58. On the whole, the defendant's background and behavior suggest that he was not "prone to coercion," *Haak*, 884 F.3d at 414, and that his will was not overborne by police conduct, such that he did not feel he could decline to answer them. The defendant's claim that the agents asked the questions about his passcodes "despite [the defendant's request to call his counsel," *see* Mot. at 54, misstates the facts, and the cases he cites in fact support the Government's position. *See*, *e.g.*, *Rommy*, 506 F.3d at 135-36 ("[W]hen an agent, listening to a defendant's volunteered statement, asks him to spell a name, clarify a date, or explain an abbreviation, he does more than merely listen . . . [b]ut it is far from clear that such limited follow-up questions could be found to 'stimulate' discussion, to 'lead[] the conversation into any particular subject,' or to 'prompt[] any particular replies' beyond what [the defendant] himself had volunteered." (quoting *United States v. Henry*, 447 U.S. 264, 271 n.9 (1980)).

Accepting the defendant's own declaration as true, the defendant has alleged—at most—that he "asked [his wife] to call [his attorney] on [his] behalf," and that when he made that request, he "was thinking of" General Counsel for the U.S. Manufacturer. (Liaw Decl. ¶ 8). That request, and the defendant's unspoken context that he was "thinking of" a particular lawyer, simply does not satisfy the standard set forth in *Davis*. Asking to retrieve a phone number was not an "unequivocal" invocation of the right to counsel that prohibited agents from speaking with the defendant. He did not state, "I think I should get a lawyer," *see Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011). He "did not say that he wanted to remain silent or that he did not want to talk with the [agents]." *Berghuis*, 560 U.S. at 382. The defendant also has not alleged any further statements he made that amounted to an invocation of counsel, between the time he unlocked his Work Phone in plain view of the agents to retrieve a number and when an agent "asked [him] to confirm that

[his] passcode was four 1s," or when an agent asked him for the passcode to his Personal Phone. Liaw Decl. ¶ 8. The defendant's own account of the events of March 19, 2026, undermines the claim that he was "peppered with questions about his phone passcodes and objectively believed that cooperating with the agent's demands was necessary to facilitate his request for counsel." Mot. at 58. The Court should reject this argument, which has no basis even in the facts as sworn to by the defendant in his declaration.

And even if the defendant were asserting that his *Miranda* rights were violated, his motion to suppress the contents of the Phones would fail, because the suppression of physical evidence is not a proper remedy for a *Miranda* violation. *See Patane*, 542 U.S. at 642-43 ("The exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived *Miranda* violation."); *accord id.* at 645 (Kennedy, J., concurring in the judgment) ("doubtful" that excluding physical evidence due to failure to give *Miranda* warnings is warranted so long as statements are not introduced at trial). Indeed, the "failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements." *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010); *accord United States v. Haygood*, 157 F. App'x 448, 449 (2d Cir. 2005); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019); *United States v. Wilson*, 914 F. Supp. 2d 550, 562 (S.D.N.Y. 2012); *United States v. Grant*, No. 07 Cr. 1119 (CM), 2008 WL 2971781, at *6-*7 (S.D.N.Y. Aug. 1, 2008). And while the Second Circuit has not yet applied *Patane*'s holding to when a defendant is asked for his phone passcode, the Fourth Circuit has held that *Patane* squarely precludes suppression of data from a phone searched using a passcode obtained from a defendant without first providing *Miranda* warnings. *See United States v. Oloyede*, 933 F.3d 302, 309-10 (4th Cir. 2019).

Moreover, even if the Court were to find that the defendant's statements were elicited in violation of his *Miranda* rights—and for the reasons set forth above, it should not—the agents' indisputable good faith also bars application of the exclusionary rule to suppress the *contents* of the Phones that were unlocked with the Work Phone passcode and the Personal Phone passcode. *Leon*, 468 U.S. at 922. At the time the agent asked the defendant to verbally confirm that the passcode he had entered to unlock the Work Phone was "1111," the agent had already observed that the passcode "1111" successfully unlocked the Work Phone. The defendant's own description of the sequence of events forecloses any argument at all that the agents' questions to the defendant violated his rights. As the defendant himself admits, the agents first "watched [him] as [he] typed in [his] passcode, which was the number '1' 4 times" and immediately thereafter wrote something down, *see* Liaw Decl. ¶ 8, and only *after* that asked the defendant to confirm that he had entered "1111" to unlock the Work Phone. The defendant's second statement was not compelled, for the reasons described in detail above, and therefore also does not require suppression of the contents of the Personal Phone.

In any event, the "ultimate or inevitable discovery exception to the exclusionary rule," *Nix*, 467 U.S. at 433, requires only that the Government prove by a preponderance of the evidence that discovery of the challenged evidence "would have been more likely than not inevitable absent" its actual and disputed acquisition. *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 103 (2d Cir. 2016). Should the Court reach this question, the record provides an ample basis to avoid "the substantial social costs" of suppression on this ground. *Leon*, 468 U.S. at 907. Here, because observing the defendant type in his passcode to the Work Phone was neither in violation of the scope of the Liaw Devices Warrant nor the defendant's constitutional rights, the fact that the defendant had a substantially similar passcode for the Personal Phone (with all 1's) as the one

observed for the Work Phone, the passcode for the Personal Phone would have been discovered by law enforcement either by simply trying similar passcodes to the one for the Work Phone or by connecting the device to standard law enforcement tools designed to access password-protected phones.

Finally, the defendant claims that the seizure and search of the Phones, after obtaining the passcodes from the defendant, exceeded the scope of the Liaw Devices Warrant in violation of his Fourth Amendment rights. The Liaw Devices Warrant clearly authorized the seizure of "all cellphones[] . . . belonging to and/or found in reasonable proximity to and/or demonstrating a connection or nexus to" the defendant. Simons Decl. Ex. 2 at 194. The defendant mischaracterizes the scope of the Liaw Devices Warrant in claiming that it "directed the agents to open the Phones *only through biometrics*, not by questioning of [the defendant] to reveal his passcodes." Mot. at 54 (emphasis added); *see also* Mot. at 56 ("[T]he government was authorized *solely* to open [the defendant's] phones through biometrics, not using his passcodes.") (emphasis added). Not so. The Liaw Devices Warrant specified various procedures for searching electronically stored information contained on any electronic devices validly seized pursuant to the Liaw Devices Warrant, which unquestionably includes the Phones. *See* Simons Decl. Ex. 2 at 61. While the Liaw Devices Warrant expressly permitted the FBI to attempt to access the contents of the Phones (or other electronic devices) on site by compelling compliance with displaying biometric features, if applicable, that provision in no way precluded the FBI from seizing the Phones for later access and review using typical law enforcement methods, including based on statements that the defendant had made. Indeed, Attachment C to the Liaw Devices Warrant expressly states: "In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device in

order to make a mirror image of the contents of the device." Simons Decl. Ex. 2 at 65. The seizure of the Phones was authorized and entirely reasonable. As set forth above, law enforcement did not compel the defendant to enter his passcode into the Work Phone, and the subsequent statements he made to law enforcement similarly were voluntary. The cases the defendant cites in his motion in support of this argument all presume that the Phones were seized "outside the scope of a valid warrant." *See, e.g.*, Mot. at 54-55 (citing *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988)). They were not, and this argument should be rejected out of hand.

## VI. The Defendant's Motion to Strike Surplusage is Moot

The defendant argues that the Court should strike certain language from the first fourteen paragraphs of the Indictment, which generally describe the nature of the demand for and use of servers integrating advanced GPUs in China, because it contains "irrelevant, prejudicial material . . . that risks inflaming the jury's passions." *See* Mot. at 1-2, 25-26. The Court should deny the motion as moot because the Government does not intend to provide the jury with a version of the Indictment, or any reading of the charges therein, that contains anything beyond the statutory allegations. Should the Court reach the merits of the motion, however, it should deny or at least defer the motion until after the presentation of the Government's evidence at trial.

### A. Applicable Law

Federal Rule of Criminal Procedure 7(d) permits the Court to "strike surplusage from the indictment" on a defendant's motion. This is an "exacting standard," *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990), for "it has long been the policy of courts within the Southern District to refrain from tampering with indictments," *United States v. Tomero*, 496 F. Supp. 2d 253, 255 (S.D.N.Y. 2007); *accord United States v. Johnson*, No. 21 Cr. 428 (ER), 2023 WL 5632473, at *12 n.19 (S.D.N.Y. Aug. 31, 2023). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are

inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001); *see also United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (same). "If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa*, 913 F.2d at 1013.

As this Court has recognized, "courts in this district routinely defer ruling on a motion to strike until the presentation of the Government's evidence at trial." *Johnson*, 2023 WL 5632473, at 12 n.19; *see also United States v. Tuzman*, 301 F. Supp. 3d 430, 453 (S.D.N.Y. 2017) (same); *United States v. Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013) (same). Deferring until after the Government's presentation of evidence permits the Court to decide the issues of relevance and prejudice "in the context of trial," and affords an opportunity to resolve the issue through "a stipulation between the parties." *United States v. Ahmed*, No. 10 Cr. 131 (PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011).

Finally, even where material in an indictment is both prejudicial and unnecessary, the Second Circuit has held that prejudice from surplusage can be "remedied by an instruction to the jury to disregard the material." *United States v. Langella*, 776 F.2d 1078, 1081 (2d Cir. 1985). And if the challenged portions of an indictment are not presented to the jury at all, then there can be no prejudice and any motion to strike those portions is moot. *See, e.g.*, *Butler*, 351 F. Supp. 2d at 124 ("[M]otions to strike purported surplusage are largely meaningless, at least in this Court. It is not the usual practice of this Court to provide the jury with a copy of the indictment in any event, and if it should be appropriate to give a copy of the indictment to the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial. There is little or no purpose in attempting to predict in

advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.”).

**B. Discussion**

The defendant’s motion to strike certain language from the first fourteen paragraphs of the Indictment should be denied as moot. The Government is not seeking at present to provide the Indictment to the jury or to have the Court read the Indictment to the jury, nor does that appear to be the default practice of this Court. *See Johnson*, 2023 WL 5632473, at *12 n.19. Because it does not appear that the jury will be presented with the first fourteen paragraphs of the Indictment, either orally or in writing, the defendant cannot meet his burden of showing those paragraphs are “prejudicial.” *Mulder*, 273 F.3d at 99. The Court should therefore deny the motion as moot.

Should the Court reach the merits, however, it should deny or at least defer the motion “until after the presentation of the Government’s evidence at trial, because that evidence may affect how specific allegations relate to the overall charges,” *United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021), *aff’d*, 118 F.4th 256 (2d Cir. 2024), and the Court can then address “whether [it] should provide the jury with the indictment, and, if so, whether portions of the [I]ndictment should be stricken,” *Johnson*, 2023 WL 5632473, at *12 n.19 (citing *Tuzman*, 301 F. Supp. 3d at 453-54; *Butler*, 351 F. Supp. 2d at 123)). Here, although the defendant suggests that the first fourteen paragraphs of the Indictment contain surplusage to be stricken, he cites only to portions of two sentences in paragraphs 5 and 6 regarding the demand for and use of servers integrating advanced GPUs in China and the basis for the U.S. export controls that restrict the export such technology. *See* Mot. at 25. The Government has charged the defendant with participating in a scheme to unlawfully divert export-controlled technology to China in violation of such U.S. export controls. The nature of the market in China for such technology, and the scale of its demand, is relevant to conduct alleged in the Indictment, which includes the defendant’s

intent to bypass export control laws to divert restricted technology to the Chinese market in enormous volumes. Moreover, the illicit nature of that market, and the basis for the applicable laws and regulations the defendant sought to evade, are further relevant to his *mens rea* in participating in such a scheme.

Because the allegations in the first fourteen paragraphs of the Indictment are "relevant to the crime charged," *Mulder*, 273 F.3d at 99, the Court should not strike them. At a minimum, however, the Court should defer decision until the Government has presented its evidence at trial. With the benefit of the Government's proof in the context of the trial, the Court will be better placed to determine which speaking portions of the Indictment—if any—to send to the jury.

## VII. The Defendant's Motion to Unseal Grand Jury Records Should be Denied

The defendant's motion to unseal grand jury records, which rests on substantially the same arguments he raises in support of his motion to suppress the Liaw SCA Warrant and Liaw Devices Warrant, should also be denied. *See* Mot. at 66-69. He has failed to credibly allege any misconduct in connection with the grand jury proceedings and is thus not entitled to unsealing of any grand jury material, which maintain a presumption of secrecy that cannot be overcome here.

### A. Applicable Law

Grand jury proceedings are presumed to be valid, *see United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring), and should presumptively remain secret, *see United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958). A court "may" authorize disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). However, "[t]o obtain disclosure of grand jury materials, a defendant must demonstrate a 'particularized need' for the materials." *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 519 (S.D.N.Y. 2007) (quoting *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978)). And even where the defendant

can articulate a need, courts still consider the harm that may be caused by unsealing grand jury material, particularly where a grand jury investigation remains active. *See, e.g.*, *Moten*, 582 F.2d at 662 ("While a grand jury investigation is active, there are a variety of reasons for secrecy[.]").

Courts in this Circuit have long held that "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010); *see also United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct."); *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (noting that grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.").

Moreover, a district court's supervisory power to dismiss an indictment is limited to "where [] misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions." *United States v. Williams*, 504 U.S. 36, 46 (1992). "That power does not permit dismissal on the ground that the evidence presented to the grand jury was unreliable, even if the allegation is that the prosecutor's presentation was incomplete or misleading." *United States v. Jones*, 164 F.3d 620, 1998 WL 708952, at *2 (2d Cir. 1998) (citing *Williams*, 504 U.S. at 54).

**B. Discussion**

In support of his motion to unseal grand jury material, the defendant advances substantially the same arguments as those made in support of his motion to suppress the Liaw SCA Warrant and Liaw Devices Warrant. *See* Mot. at 67-69. Specifically, he argues that certain communications referenced in the Indictment and the affidavits suggest that there is a "strong likelihood" that "misleading information was presented to the grand jury." *Id.* at 67-68. The defendant is wrong.

As described above, the affidavits in support of the warrants did not, in any way, include descriptions of communications that were intended to mislead the reviewing magistrate judges. *See supra* at 50-53. To the contrary, those affidavits set forth ample probable cause and the affiants' well-founded belief, based on the totality of the circumstances, that certain communications were in furtherance of the charged conspiracies to divert servers to China. *See supra* at 39-41. The defendant's baseless allegations about the affidavits fall far short of demonstrating that there was any grand jury misconduct and that he warrants access to otherwise sealed materials. Indeed, far from presenting "concrete allegations of Government misconduct," *Leung*, 40 F.3d at 582, the defendant simply points to additional examples of communications referenced in the Indictment that, in his view, do not evidence criminal activity, *see* Mot. at 67-68. But the defendant's myopic view of those communications fails to take into consideration that probable cause determinations are made based on a totality of the circumstances, which, as set forth in the warrant affidavits, included overwhelming proof establishing the defendant's involvement in the charged conspiracies. Because the defendant cannot allege misconduct and, as a result, cannot demonstrate a "particularized need" for unsealing, his motion should be denied.

Finally, the defendant cannot overcome the presumption of secrecy that continues to apply to the grand jury proceedings in this case by arguing that he believes the Government's investigation is complete. *See* Mot. at 68-69. It is not. As the defendant knows from the discovery produced to date, including the search warrants obtained relating to additional investigative subjects and offenses, the Government's investigation remains ongoing. Accordingly, there is no basis to unseal grand jury material at this time.[15] *See, e.g.*, *Moten*, 582 F.2d at 662.

---

[15] Consistent with its disclosure obligations, the Government will produce any discoverable grand jury material pertaining to Government witnesses when it produces Section 3500 and *Giglio* material in advance of trial pursuant to the protective order entered in this case.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motions in their entirety.

Dated: New York, New York
October 20, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: /s/
Juliana N. Murray
David J. Robles
Kevin T. Sullivan
Assistant United States Attorneys
(212) 637-2314 / -2550 / -1587