**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | No. 26 Crim. 100 (ER) |
| YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, | : | |
| Defendants. | : | |

# YIH-SHYAN "WALLY" LIAW'S MEMORANDUM OF LAW IN SUPPORT OF HIS PRETRIAL MOTIONS

Nelson A. Boxer
Guy Petrillo
David Hoffman
Eliza Simons
Petrillo Klein + Boxer LLP
655 Third Avenue
New York, NY 10017
(212) 370-0330

Jason Liang
Liang Ly LLP
601 South Figueroa Street
Los Angeles, CA 90017
(213) 262-8000

September 15, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

BACKGROUND ........ 4

I. Procedural History ........ 4

II. The Indictment ........ 4

MOTION TO DISMISS ........ 6

I. The Indictment Should Be Dismissed for Improper Venue. ........ 6

A. Legal Standard ........ 7

B. The Indictment Fails to Plead "Overt Acts" in this District. ........ 8

C. Prosecuting Mr. Liaw in this District Would Violate the Second Circuit's "Substantial Contacts" Limitation. ........ 10

II. Count II Should Be Dismissed Because It Fails to Plead a Conspiracy to Smuggle Goods from the United States. ........ 13

A. A GPU Is Not an "Object Contrary to Any Law or Regulation." ........ 15

B. The GPUs Were Not Smuggled "From the United States." ........ 17

MOTION FOR AN ORDER REQUIRING A BILL OF PARTICULARS ........ 19

MOTION TO STRIKE SURPLUSAGE ........ 25

MOTION TO SUPPRESS EVIDENCE OR FOR A *FRANKS* HEARING ........ 26

I. The Court Should Suppress the Materials Seized from Mr. Liaw's Apple iCloud Account, Google Account, and Two Phones Because Probable Cause did not Exist to Support the Warrants, or, Alternatively, Order A *Franks* Hearing. ........ 26

A. Background ........ 27

B. Legal Standard ........ 29

C. The Warrants Deliberately or Recklessly Misled the Magistrate Judges by Omitting Material Information and Misleadingly Presenting Mr. Liaw's Communications. ........ 31

1. The Warrants Rely Substantially on Uncorroborated Information Supplied by Unreliable Informants, Without Disclosure of Their Criminal Conduct. ........ 31

2. The Warrants Present Mr. Liaw's Communications in a Misleading Manner and Omit Critical Context. ........ 40

D. The Warrants' Omissions and Misleading Presentations Were Necessary to a Finding of Probable Cause. ........ 45

E. The Evidence Derived from the Devices Warrant Should Be Suppressed for the Additional Reason That It Is Fruit of the Poisonous Tree. ........ 47

II. Because the Government Violated Mr. Liaw's Constitutional Rights and the Express Provisions of the Warrant in Gaining Access to His Phones, the Court Should Suppress the Contents of the Phones ... 49

A. Background ... 49

B. The Government Violated Mr. Liaw's Sixth Amendment Rights by Deliberately Eliciting His Passcodes After the Right to Counsel Had Attached. ... 51

C. The Government Violated Mr. Liaw's Fourth Amendment Rights by Exceeding the Devices Warrant's Scope. ... 54

1. The Devices Warrant Authorized the Government to Unlock Mr. Liaw's Phones Only Through the Use of Biometrics. ... 55

2. The Government Unlocked Mr. Liaw's Phones by Compelling His Disclosure of the Phones' Passcodes. ... 56

D. The Government Violated Mr. Liaw's Fifth Amendment Rights. ... 59

1. The Passcodes Were "Testimonial" and "Incriminating." ... 60

2. The Statements of Mr. Liaw Were Compelled While He Was in Custody in Violation of *Miranda* and *Edwards*. ... 62

3. Suppression of Derivative Evidence from the Phones Is Necessary Because the Passcodes Disclosure Was Involuntary. ... 64

MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA REVIEW* ... 66

I. Legal Standard ... 66

II. A Particularized Need to Disclose Grand Jury Materials Exists Here Because The Flawed Basis for Probable Cause in the Warrant Applications is Highly Likely to Have Permeated the Probable Cause Determination For the Indictment. ... 67

III. The Disclosure Sought Will Not Harm the Secrecy of the Grand Jury Proceedings and is No Greater than Necessary to Avoid Injustice. ... 68

CONCLUSION ... 70

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abouammo v. United States*,
146 S. Ct. 1571 (2026) ... 7

*Bryan v. United States*,
524 U.S. 184 (1998) ... 16

*Bumper v. North Carolina*,
391 U.S. 543 (1968) ... 58

*Davis v. United States*,
512 U.S. 452 (1994) ... 63

*Del Cole v. Rice*,
No. 11 Civ. 5138, 2013 WL 12316374 (E.D.N.Y. Nov. 6, 2013) ... 69

*Doe v. United States*,
487 U.S. 201 (1988) ... 60

*Douglas Oil Co. of California v. Petrol Stops Northwest*,
441 U.S. 211 (1979) ... 66, 68, 69

*Edwards v. Arizona*,
451 U.S. 477 (1981) ... 60, 62, 63, 64

*Ekopel D.O.O. v. Citibank, N.A.*,
717 F. Supp. 3d 17 (D.D.C. 2024) ... 10

*Franks v. Delaware*,
438 U.S. 154 (1978) ... *passim*

*Green v. Scully*,
850 F.2d 894 (2d Cir. 1988) ... 64

*Hamling v. United States*,
418 U.S. 87 (1974) ... 14

*Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*,
542 U.S. 177 (2004) ... 59

*Illinois v. Gates*,
462 U.S. 213 (1983) ... 30, 32, 35

*In re Grand Jury*,
583 F.2d 128 (5th Cir. 1978) .................................................. 68

*In re Petition of Craig*,
131 F.3d 99 (2d Cir. 1997) .................................................. 66

*Kamyab v. Uribe*,
No. 08 Civ. 5557, 2009 WL 1520022 (C.D. Cal. May 29, 2009) .................................................. 63

*Kastigar v. United States*,
406 U.S. 441 (1972) .................................................. 62

*Kaupp v. Texas*,
538 U.S. 626 (2003) .................................................. 65

*Liparota v. United States*,
471 U.S. 419 (1985) .................................................. 16

*Lynumn v. Illinois*,
372 U.S. 528 (1963) .................................................. 64

*Maryland v. Shatzer*,
559 U.S. 98 (2010) .................................................. 59

*Massiah v. United States*,
377 U.S. 201 (1964) .................................................. 52

*McColley v. Cnty. of Rensselaer*,
740 F.3d 817 (2d Cir. 2014) .................................................. 35, 39, 46

*Michigan v. Harvey*,
494 U.S. 344 (1990) .................................................. 52

*Miranda v. Arizona*,
384 U.S. 436 (1966) .................................................. *passim*

*Missouri v. Seibert*,
542 U.S. 600 (2004) .................................................. 63

*Montejo v. Louisiana*,
556 U.S. 778 (2009) .................................................. 63

*New York v. Quarles*,
467 U.S. 649 (1984) .................................................. 62

*New York v. Tanella*,
374 F.3d 141 (2d Cir. 2004) .......... 14

*Nix v. Williams*,
467 U.S. 431 (1984) .......... 52

*Ortiz v. Stambach*,
137 F.4th 48 (2d Cir. 2025) .......... 65

*Ramirez v. United States*,
898 F. Supp. 2d 659 (S.D.N.Y. 2012) .......... 11

*Rhode Island v. Innis*,
446 U.S. 291 (1980) .......... 63

*Riley v. California*,
573 U.S. 373 (2014) .......... 54

*Rivera v. United States*,
928 F.2d 592 (2d Cir. 1991) .......... 30

*Russell v. United States*,
369 U.S. 749 (1962) .......... 21

*Schmerber v. California*,
384 U.S. 757 (1966) .......... 61

*Schneckloth v. Bustamonte*,
412 U.S. 218 (1973) .......... 57

*Simon v. City of N.Y.*,
893 F.3d 83 (2d Cir. 2018) .......... 54

*United States v. Bezmalinovic*,
962 F. Supp. 435 (S.D.N.Y. 1997) .......... 9, 10

*United States v. Ahlers*,
305 F.3d 54 (1st Cir. 2002) .......... 15

*United States v. Akhavan*,
No. 20 Crim. 188, 2020 WL 2555333 (S.D.N.Y. May 20, 2020) .......... 24

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) .......... 14, 17

*United States v. Almaleh*,
No. 17 Crim. 25, 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) ............................................. 30

*United States v. Anderson*,
929 F.2d 96 (2d Cir. 1991) ................................................................................................ 65

*United States v. Atkinson*,
653 F. Supp. 668 (S.D.N.Y. 1987) ..................................................................................... 32

*United States v. Austin*,
496 F. Supp. 3d 815 (S.D.N.Y. 2020) ................................................................................ 53

*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) ........................................................................................ 30, 31, 45

*United States v. Barrera*,
950 F. Supp. 2d 461 (E.D.N.Y. 2013) ................................................................................ 25

*United States v. Barrett*,
153 F. Supp. 3d 552 (E.D.N.Y. 2015) ................................................................................ 24

*United States v. Bauer*,
No. 25 Crim. 79, 2025 WL 2532670 (N.D. Cal. Sept. 2, 2025) ............................................ 65

*United States v. Beech-Nut Nutrition Corp.*,
871 F.2d 1181, 1188 (2d Cir. 1989) ..................................................................................... 7

*United States v. Bershchansky*,
788 F.3d 102 (2d Cir. 2015) ............................................................................................... 56

*United States v. Bertini*,
No. 23 Crim. 61, 2023 WL 8258334 (S.D.N.Y. Nov. 29, 2023) ........................................... 42

*United States v. Big Apple Bag Co.*,
306 F. Supp. 2d 331 (E.D.N.Y. 2004) ................................................................................ 47

*United States v. Big Apple Bag Co.*,
317 F. Supp. 2d 181 (E.D.N.Y. 2004) ................................................................................ 47

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000) .................................................................................. 24

*United States v. Booker*,
561 F. Supp. 3d 924 (S.D. Cal. 2021) ................................................................................ 58

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) .......... 20

*United States v. Brennan*,
183 F.3d 139 (2d Cir. 1999) .......... 8

*United States v. Brown*,
125 F.4th 1186 (D.C. Cir. 2025) .......... 62

*United States v. Cacace*,
796 F.3d 176 (2d Cir. 2015) .......... 48

*United States v. Calonge*,
74 F.4th 31 (2d Cir. 2023) .......... 7, 8,

*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000) .......... 31

*United States v. Castellanos*,
820 F. Supp. 80 (S.D.N.Y. 1993) .......... 30, 45

*United States v. Ceballos*,
812 F.2d 42 (2d Cir. 1987) .......... 64

*United States v. Chi Tong Kuok*,
671 F.3d 931 (9th Cir. 2012) .......... 15

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011) .......... 40

*United States v. Clark*,
683 F. Supp. 3d 97 (D. Mass. 2023) .......... 60

*United States v. Cohen*,
23 Crim. 134, 2025 WL 3687502 (S.D.N.Y. Dec. 19, 2025) .......... 8

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) .......... 8

*United States v. Davis*,
648 F.3d 84 (2d Cir. 2011) .......... 15

*United States v. Disla Ramos*,
22 Crim. 431, 2022 WL 17830637 (S.D.N.Y. Dec. 21, 2022) .......... 31

*United States v. Djibo*,
151 F. Supp. 3d 297, 309 (E.D.N.Y. 2015) .......... 48, 60, 64

*United States v. Elliott*,
266 F. Supp. 318 (S.D.N.Y. 1967) .......... 12

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) .......... 30

*United States v. Figueroa*,
165 F.3d 111 (2d Cir. 1998) .......... 16

*United States v. Freed*,
401 U.S. 601 (1971) .......... 16, 17

*United States v. Gagnon*,
373 F.3d 230 (2d Cir. 2004) .......... 32, 35

*United States v. Garcia*,
554 F. Supp. 3d 421 (E.D.N.Y. 2021) .......... 57

*United States v. Garibay*,
143 F.3d 534 (9th Cir. 1998) .......... 64

*United States v. Gasperini*,
No. 16 Crim. 441, 2017 WL 2399693 (E.D.N.Y. June 1, 2017) .......... 20

*United States v. Glover*,
755 F.3d 811 (7th Cir. 2014) .......... 35, 46

*United States v. Gray*,
No. 21 Crim. 713, 2024 WL 1526368 (S.D.N.Y. Apr. 9, 2024) .......... 61, 62

*United States v. Greenfield*,
831 F.3d 106 (2d Cir. 2016) .......... 62

*United States v. Greer*,
631 F.3d 608 (2d Cir. 2011) .......... 60

*United States v. Groos*,
616 F. Supp. 2d 777 (N.D. Ill. 2008) .......... 26

*United States v. Gross*,
No. 15 Crim. 769, 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) .......... 8

*United States v. Guzman*,
724 F. Supp. 2d 434 (S.D.N.Y. 2010) .......... 57

*United States v. Hanratty*,
No. 24 Crim. 153, 2024 WL 4892742 (S.D.N.Y. Nov. 26, 2024) .......... 23

*United States v. Hawit*,
No. 15 Crim. 252, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) .......... 23

*United States v. Heicklen*,
858 F. Supp. 2d 256 (S.D.N.Y. 2012) .......... 14

*United States v. Henry*,
447 U.S. 264 (1980) .......... 52, 53

*United States v. Hernandez*,
No. 19 Crim. 97, 2020 WL 3257937 (S.D.N.Y. June 16, 2020) .......... 57

*United States v. Hubbell*,
530 U.S. 27 (2000) .......... 61

*United States v. Isiofia*,
370 F.3d 226 (2d Cir. 2004) .......... 57

*United States v. Jacques*,
684 F.3d 324 (2d Cir. 2012) .......... 52

*United States v. Jimenez*,
419 F. Supp. 3d 232 (D. Mass. 2020) .......... 61

*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) .......... 24

*United States v. Kanekar*,
No. 17 Crim. 353, 2020 WL 730353 (E.D.N.Y. Feb. 12, 2020) .......... 24

*United States v. Kim*,
246 F.3d 186 (2d Cir. 2001) .......... 9

*United States v. Kimball*,
884 F.2d 1274 (9th Cir. 1989) .......... 52

*United States v. Kirk Tang Yuk*,
885 F.3d 57 (2d Cir. 2018) .......... 8

*United States v. Kon Yu-Leung*,
910 F.2d 33 (2d Cir. 1990) .......... 59

*United States v. Lahey*,
967 F. Supp. 2d 698 (S.D.N.Y. 2013) .......... 31, 46

*United States v. Laster*,
No. S1 6 Crim. 1064, 2007 WL 3070599 (S.D.N.Y. Oct. 19, 2007) .......... 67

*United States v. Leon*,
468 U.S. 897 (1984) .......... 40

*United States v. Luna*,
No. 05 Crim. 58, 2006 WL 1668006 (D. Conn. May 17, 2006) .......... 23

*United States v. Lustyik*,
57 F. Supp. 3d 213 (S.D.N.Y. 2014) .......... 55

*United States v. Madeoy*,
652 F. Supp. 371 (D.D.C. 1987) .......... 22

*United States v. Maffei*,
No. 18 Crim. 174, 2019 WL 1864712 (N.D. Cal. Apr. 25, 2019) .......... 54, 56, 57

*United States v. Mahaffy*,
446 F. Supp. 2d 115 (E.D.N.Y. 2006) .......... 20

*United States v. Mahmood*,
415 F. Supp. 2d 13 (D. Mass. 2006) .......... 64

*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988) .......... 55

*United States v. Medunjanin*,
752 F.3d 576 (2d Cir. 2014) .......... 60

*United States v. Mendez*,
No. 24 Crim. 2430, 2026 WL 1021408 (S.D. Cal. Apr. 15, 2026) .......... 66

*United States v. Mills*,
412 F.3d 325 (2d Cir. 2005) .......... 52, 53

*United States v. Montes-Reyes*,
547 F. Supp. 2d 281 (S.D.N.Y. 2008) .......... 58

*United States v. Mulder*,
273 F.3d 91 (2d Cir. 2001) ........................................................................................ 25

*United States v. Munoz*,
987 F. Supp. 2d 438 (S.D.N.Y. 2013) ........................................................................ 58

*United States v. Murgio*,
209 F. Supp. 3d 698 (S.D.N.Y. 2016) ........................................................................ 22

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000) .......................................................................... 23

*United States v. Naumovski*,
No. 20 Crim. 384, 2023 WL 5278437 (E.D.N.Y. Aug. 16, 2023) ............................... 7

*United States v. Newton*,
369 F.3d 659 (2d Cir. 2004) ...................................................................................... 62

*United States v. Oruche*,
No. 07 Crim. 124, 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008) ................................... 20

*United States v. Patane*,
542 U.S. 630 (2004) ................................................................................................. 64

*United States v. Payne*,
99 F.4th 495 (9th Cir. 2024) ................................................................................ 55, 61

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ....................................................................................... 14

*United States v. Plaza Health Lab'ys, Inc.*,
3 F.3d 643 (2d Cir. 1993) ......................................................................................... 14

*United States v. Plugh*,
648 F.3d 118 (2d Cir. 2011) ...................................................................................... 64

*United States v. Puglisi*,
790 F.2d 240 (2d Cir. 1986) ...................................................................................... 58

*United States v. Quinn*,
401 F. Supp. 2d 80 (D.D.C. 2005) ............................................................................. 25

*United States v. Raymond*,
No. 21 Crim. 380, 2023 WL 7005341 (D.D.C. Oct. 24, 2023) ................................... 56

*United States v. Raymonda*,
780 F.3d 105 (2d Cir. 2015) ........................................................................................ 40

*United States v. Reed*,
773 F.2d 477 (2d Cir. 1985) .................................................................................... 8, 12

*United States v. Robinson*,
No. 23 Crim. 192, 2025 WL 1359352 (E.D.N.Y. May 9, 2025) ............................................. 59

*United States v. Roman*,
311 F. Supp. 3d 427 (D. Mass. 2018) ............................................................................ 40

*United States v. Rommy*,
506 F.3d 108 (2d Cir. 2007) ........................................................................................ 54

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993) .......................................................................................... 52

*United States v. Saavedra*,
223 F.3d 85 (2d Cir. 2000) ..................................................................................... 10, 13

*United States v. Sanders*,
211 F.3d 711 (2d Cir. 2000) ........................................................................................ 16

*United States v. Seppala*,
No. 16 Crim. 436, 2017 WL 5633167 (S.D.N.Y. Nov. 22, 2017) ........................................... 63

*United States v. Shvartsman*,
722 F. Supp. 3d 276 (S.D.N.Y. 2024) ....................................................................... 61, 62

*United States v. Smith*,
673 F. Supp. 3d 381 (S.D.N.Y. 2023) ............................................................................ 48

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003) .......................................................................................... 7

*United States v. Vasquez*,
638 F.2d 507 (2d Cir. 1980) ........................................................................................ 58

*United States v. Wey*,
No. 15 Crim. 611, 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .............................................. 20

*United States v. Wysinger*,
683 F.3d 784 (7th Cir. 2012) ....................................................................................... 63

*United States v. Ying Lin*,
270 F. Supp. 3d 631 (E.D.N.Y. 2017) .... 15, 16, 17

*United States v. Zhi Yong Guo*,
634 F.3d 1119 (9th Cir. 2011) .... 17

*Wong Sun v. United States*,
371 U.S. 471 (1963) .... 48

*Wood v. Ercole*,
644 F.3d 83 (2d Cir. 2011) .... 63

*Ybarra v. Illinois*,
444 U.S. 85 (1979) .... 41

*Yoo v. United States*,
43 F.4th 64 (2d Cir. 2022) .... 15

**Statutes**

18 U.S.C. § 371 .... 12

18 U.S.C. § 554 .... *passim*

18 U.S.C. § 554(a) .... 14, 15

18 U.S.C. § 831 .... 17

18 U.S.C § 3237(a) .... 7

21 U.S.C. § 844 .... 17

50 U.S.C. § 1705 .... 17

50 U.S.C. § 4819 .... 21

U.S. Const. amend. IV .... *passim*

U.S. Const. amend. V .... *passim*

U.S. Const., amend. VI .... *passim*

U.S. Const. art. III, § 2, cl. 3 .... 7

**Rules**

Fed. R. Crim. P. 7(d) ..... 1, 2, 25

Fed. Crim. P. 7(f) ..... 1, 20

Fed. R. Crim. P. 12(b)(3)(A)(i) ..... 7

Fed. R. Crim. P. 12(b)(3)(B)(v) ..... 14

Fed. R. Crim. P. 18 ..... 7

Fed. R. Crim. P. 6(e)(3)(E) ..... 66

Fed. R. Evid. 801(d)(2)(E) ..... 24

**Regulations**

15 C.F.R. § 736.2 ..... 21

15 C.F.R. § 742.6 ..... 22

15 C.F.R. § 742.6(a)(6)(iii)(A) ..... 17

15 C.F.R. § 764.2 ..... 22

15 C.F.R. § 764.2(a)-(k) ..... 21, 22

15 C.F.R. Pt. 774 ..... 17

**Other Authorities**

Black's Law Dictionary (9th ed. 2009) ..... 15

*Framework for Artificial Intelligence Diffusion,* 90 Fed. Reg. 4,544 (Jan. 15, 2025) ..... 67

## INTRODUCTION

Defendant Yih-Shyan "Wally" Liaw moves pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P." or "Rule") (1) to dismiss the Indictment, ECF No. 2 ("Indictment" or "Ind."), for lack of venue as to all Counts and failure to state an offense in Count II; (2) pursuant to Rule 7(f), for an Order requiring the government to provide a bill of particulars; (3) pursuant to Rule 7(d), to strike surplusage from the Indictment; (4) pursuant to the Fourth, Fifth, and Sixth Amendments of the U.S. Constitution, to suppress evidence seized from Mr. Liaw's Apple iCloud account, Google account, and two cell phones seized when he was arrested after the Indictment was returned and unsealed, or, in the alternative, for a *Franks* hearing; and (5) pursuant to Rule 6(e), to unseal and disclose grand jury materials, or, in the alternative, for an inspection of certain grand jury materials *in camera*.

*Dismissal*. The Indictment alleges that, beginning in or around 2024 and continuing to the date of Indictment (March 17, 2026), Mr. Liaw conspired to divert Super Micro Computer Inc. ("Super Micro") servers containing Nvidia Corp. ("Nvidia") Graphics Processing Units ("GPUs") to China, in violation of U.S. export control laws by use of a [redacted] "pass-through" company, [redacted]. *See* Ind. ¶¶ 1–4, 10–12. For all counts, the sole alleged basis for venue in this District is the alleged passage of wires through correspondent banks in Manhattan. *See* Ind. ¶ 4. The Indictment should be dismissed because such transitory wires were merely incidental to the alleged conspiracies and the use of a correspondent bank in this District for wire transfers initiated by coconspirators or third parties was not foreseeable to Mr. Liaw. Moreover, Mr. Liaw would face substantial hardship were a trial to proceed in this District, a critical factor under the applicable "substantial contacts" test that decisively bolsters the case for dismissal. Separately, Count II, s*ee id.* ¶¶ 33–36, should be dismissed for failure to state an offense

because the allegations are insufficient to state a Conspiracy to Smuggle Goods from the United States. The object offense of the charged conspiracy requires the alleged smuggling of an "object contrary to any law or regulation. . . ." 18 U.S.C. § 554. Where, as here, there is nothing *per se* illegal about a GPU, it is not an "object contrary to law" within the statute's meaning. Further, because Nvidia manufactures its GPUs in Taiwan, and Super Micro incorporates those GPUs into its servers in Taiwan when producing servers for Asia-located customers like [redacted], even if an agreement to transport GPUs existed, it was not an agreement to smuggle GPUs "from the United States." 18 U.S.C. § 554.

*Particulars*. Mr. Liaw seeks particulars necessary to prevent unfair surprise at trial, in three categories: (1) the subsections of the Export Administration Regulations ("EAR") that it is alleged he conspired to violate; (2) the specific Super Micro shipments to [redacted] that [redacted] allegedly reexported into China and Hong Kong; and (3) the identities of all purported coconspirators. Given the immense (and ever-growing) discovery produced by the government—much of which is in Chinese (including written and audio communications) and Thai—this information is critical to the defense.

*Surplusage*. The Indictment contains significant prejudicial material regarding the rationale behind restricting GPU exports to China. *See* Ind. ¶¶ 1–12 (exporting GPUs to China "poses an unacceptable risk to national security. . ."). None of this policy discourse is relevant to the jury's determination whether Mr. Liaw conspired to violate a regulatory framework. To avoid the "well-poisoning" effect of allegations that Mr. Liaw allegedly aided China's military at the expense of U.S. national security, *see, e.g.*, *id.* ¶ 5 (GPUs aid China develop "autonomous weapons systems" and run "nuclear weapons simulations"), this prejudicial surplusage should be struck under Rule 7(d).

*Suppression*. Suppression of the contents of (a) Mr. Liaw's Apple iCloud and Google accounts and (b) two iPhones seized on arrest is well warranted.[1]

Initially, the Liaw SCA Warrant was not supported by probable cause. The Warrant Affidavits rested almost entirely on information provided by a criminal informant that did not disclose the reporting party's incentive to inculpate Mr. Liaw and contained a misleading presentation of that evidence that was not supported in the underlying communications cited by the application. The application juxtaposes Mr. Liaw's neutral and innocent conduct with the contemporaneous conspiratorial conduct of his Codefendants to suggest that Mr. Liaw knew of their conduct. But the Liaw SCA Warrant Affidavit does not provide any connective Liaw-statements to support such inference. The Devices Warrant suffers from the same defects. It is also independently infirm because it relies on evidence derived from the defective Liaw SCA Warrant, as well as other similarly defective warrants not at issue in this motion.

Next, on March 19, 2026, after Mr. Liaw was indicted and the right to counsel had attached, the government violated Mr. Liaw's constitutional rights when executing the Devices Warrant by compelling him to disclose the passcodes to the phones. Notwithstanding that the Devices Warrant authorized the government to open Mr. Liaw's Phones only biometrically (*e.g.*, with FaceID), the government, through prohibited questioning, compelled Mr. Liaw to provide his passcodes—thereby exceeding the scope of the Devices Warrant in violation of the Fourth Amendment. The

[1] The government seized and searched the contents of Mr. Liaw's Apple iCloud and Google accounts pursuant to a warrant dated January 9, 2026, issued by a Magistrate Judge in this District. *See* Simons Decl., Ex. 1 (the "Liaw SCA Affidavit" or "Liaw SCA Aff." and "Liaw SCA Warrant" or "Liaw SCA Warr."). It seized and searched the contents of his iPhone 16 Pro Max (the "Personal Phone") and iPhone 17 Pro Max (the "Work Phone," and together with the Personal Phone, the "Phones") pursuant to a warrant dated March 18, 2026, issued from the Northern District of California. *See* Simons Decl. Ex. 2 (the "Devices Affidavit" or "Dev. Aff." and "Devices Warrant" or "Dev. War."). The Liaw SCA Warrant and the Devices Warrant are referred to collectively as the "Warrants" or "Warrant Affidavits." A warrant to search the Apple iCloud accounts of [redacted] and [redacted], *see* Simons Decl. Ex. 3 (the [redacted] or [redacted] and [redacted] or [redacted]), was attached to the Devices Warrant as Exhibit 2 and incorporated therein by reference.

government also compelled Mr. Liaw to provide his passcodes—a testimonial communication—before administering *Miranda* warnings and after he had invoked his right to counsel in violation of his Fifth Amendment rights. In so doing, the government "deliberately elicited" Mr. Liaw's passcodes—two days after indictment—in violation of his Sixth Amendment right to counsel.

*Grand Jury Materials*. Insofar as the Indictment repeats the same mischaracterized communications and omissions that undermine probable cause in the Warrant Affidavits, a strong likelihood exists that similarly flawed evidence was presented to the Grand Jury. As a result, a particularized need for a limited disclosure exists.

## BACKGROUND

### I. Procedural History

The Indictment charging Mr. Liaw, along with Ruei-Tsang "Steven" Chang, and Ting-Wei "Willy" Sun, was returned on or about March 17, 2026, and sealed. The Federal Bureau of Investigation ("FBI") arrested Mr. Liaw at his home in Fremont, California on the morning of March 19, 2026. *See* ECF No. 9. Mr. Liaw was presented before Magistrate Judge Virginia K. DeMarchi in the Northern District of California at approximately 1:00 PM on March 19, 2026, and released on bail that day. Mr. Liaw was first presented in this District on April 1, 2026, and entered a plea of not guilty.

### II. The Indictment

The Indictment alleges that, between in or around 2024 and March 17, 2026, Mr. Liaw, Mr. Chang, Mr. Willy Sun, and "others" conspired to divert Super Micro servers containing Nvidia GPUs to China through a company called [redacted] that is based in [redacted]. *See* Ind. ¶¶ 1–4, 10–12. Per the Indictment, under U.S. Commerce Department regulations in place since October 2022, export or re-export to China and Hong Kong of the GPUs was barred without a Commerce

Department license. *See id.* ¶¶ 5–9. Between 2024 and 2026, Mr. Liaw, a Super Micro cofounder, worked as its Senior Vice President of Business Development. *Id.* ¶ 10. Mr. Chang served as a general manager in Super Micro's Taiwan office. *Id.* ¶ 11. And Mr. Willy Sun worked as "a third-party broker and fixer" who helped "facilitat[e]" and "conceal the scheme" alleged in the Indictment. *Id.* ¶ 12.

The Indictment alleges that [redacted] submitted purchase orders to Super Micro falsely certifying that it would be the "end user" of the servers and then, on delivery, routed the servers to entities in China through third-party brokers. *See id.* ¶¶ 2, 12, 17–18. It further alleges that [redacted] became a major Super Micro customer despite lacking the capacity to use the volume of servers it purchased. *See id.* ¶¶ 13–14. The Indictment alleges that when Super Micro's compliance function examined [redacted] purchases, Mr. Liaw and Mr. Chang sought to remove compliance holds, justify [redacted] orders, and/or fabricate documentation (*e.g.*, data center leases) to justify continued shipments. *See id.* ¶¶ 15–16, 20. The Indictment further alleges concealment conduct during a Super Micro Compliance on-site inspection of servers at [redacted] facilities in August 2025, and in an on-site "post-shipment verification" ("PSV") in December 2025 by the Commerce Department's Bureau of Industry and Security ("BIS"). *See id.* ¶¶ 23–30. For example, during the December 2025 PSV, Mr. Chang and Mr. Willy Sun (a) allegedly staged "dummy" servers with Super Micro labels at an [redacted] facility in [redacted] because the servers that [redacted] had purchased from Super Micro had already been shipped to China and (b) Mr. Willy Sun falsely presented himself to BIS as "Michael," an assistant from [redacted] local law firm. *See id.* ¶¶ 25–30.

The Indictment charges Conspiracy to Violate the Export Control Reform Act ("ECRA") (Count I), Conspiracy to Smuggle Goods from the United States (Count II), and Conspiracy to Defraud the United States (Count III). Ind. ¶¶ 31–39.

## MOTION TO DISMISS

### I. The Indictment Should Be Dismissed for Improper Venue.

The Indictment fails to satisfy the venue requirement of Article III, § 2, cl. 3 of the Constitution and the Sixth Amendment. On the face of each Count, there is no connection to this District to support venue. The Indictment does not allege that any coconspirator ever set foot in this District, that any criminal or non-criminal act occurred in this District, or that any communication was sent to or received in this District. It does not even allege that any money was sent to or ultimately received by a financial institution located in the District. Rather, venue purports to rest solely on the fortuitous transit of wire transfers through intermediary financial institutions in the District, events that were neither essential to the charged conspiracies nor acts sufficient to render this District "the district wherein the crime shall have been committed." U.S. Const., amend. VI. Any transmission of wire transfers through correspondent banks in this District was not reasonably foreseeable to Mr. Liaw, as neither his conduct nor that of his alleged coconspirators, to the extent known to him, would have led him to anticipate such routing. Additionally, venue fails under the substantial contacts test, which the Court should apply because Mr. Liaw would face substantial hardship should he be tried in this District: he is a resident of the Northern District of California; none of his conduct took place in or was directed at this District; the evidence and witnesses are located outside this District; and the alleged conduct in this District is irrelevant to the elements of the charged offenses.

**A. Legal Standard**

The Constitution twice safeguards a defendant's right to venue. Article III requires that "the Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, and the Sixth Amendment further guarantees all defendants a trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." *Id.* amend. VI; *see also Abouammo v. United States*, 146 S. Ct. 1571, 1576–77 (2026).[2] Codifying this constitutional mandate, Rule 18 provides that the government must prosecute an offense "in a district where the offense was committed." Fed. R. Crim. P. 18.

Venue must separately lie for each count. *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). Where venue is challenged pre-trial, *see* Fed. R. Crim. P. 12(b)(3)(A)(i), the government must show "the indictment alleges facts sufficient to support venue." *United States v. Naumovski*, No. 20 Crim. 384, 2023 WL 5278437, at *2 (E.D.N.Y. Aug. 16, 2023). Because "[o]nly essential conduct elements provide the basis for venue," the court's venue analysis must "separate essential conduct elements from circumstance elements." *United States v. Calonge*, 74 F.4th 31, 35 (2d Cir. 2023). "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). For a conspiracy charge, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the co-conspirators." *Id.*; 18 U.S.C § 3237(a) (for continuing offenses, venue is proper in "any district in which such offense was begun, continued, or completed.").

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes, citations, and quotations are omitted, and all alterations within cited opinions are adopted.

Although venue may be proper in more than one district and/or based on overt acts performed by coconspirators, to safeguard the constitutional right to venue, a "substantial contacts rule" applies in this Circuit. *See United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985). This test supplements the venue requirement where "the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial." *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012) (affirming district court's application of substantial contacts test); *United States v. Gross*, No. 15 Crim. 769, 2017 WL 4685111, at *37 (S.D.N.Y. Oct. 18, 2017) (substantial contacts test "safeguard[s] against hardship to the defendant that may arise when a continuing offense lays venue in numerous districts, some of which are remote."). The substantial contacts test analyzes four factors: "[1] the site of the defendant's acts, [2] the elements and nature of the crime, [3] the locus of the effect of the criminal conduct, and [4] the suitability of each district for accurate factfinding." *Reed*, 773 F.2d at 481.[3]

**B. The Indictment Fails to Plead "Overt Acts" in this District.**

The allegation of venue here hinges on nothing more than the happenstance path of wire transfers through intermediary financial institutions in this District. But it is not an element of charged conspiracy counts or their respective uncharged object offenses, that any money be exchanged. Such wires are paradigmatic "circumstance elements," not "essential conduct elements," *Calonge*, 74 F.4th at 35, rendering venue absent. *See also United States v. Brennan*, 183 F.3d 139, 145–46 (2d Cir. 1999) (venue improper in the Eastern District of New York, where

[3] The Second Circuit's treatment of foreseeability in the constitutional venue context has varied, with some decisions subsuming it within the substantial contacts test and others evaluating it as an independent requirement. *Compare e.g.,United States v. Kirk Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018) (analyzing foreseeability separately from substantial contacts), *with United States v. Calonge*, 74 F.4th 31, n.1 (2d Cir. 2023) (explaining that the "substantial contacts test asks whether the acts' occurrence in the district would have been reasonably foreseeable to the defendant"); *see also United States v. Cohen*, 23 Crim. 134, 2025 WL 3687502, at *5 (S.D.N.Y. Dec. 19, 2025) ("Second Circuit caselaw is unclear as to whether there is an independent foreseeability requirement over and above any possible substantial contacts test as applied to venue allegations.").

letters mailed from Manhattan to other states and countries passed through airports in the Eastern District of New York, because the "essential conduct elements" of the mail fraud statute occurred elsewhere).

A wire that merely passes through an intermediary bank in this District on its way from point A (outside the District) to point B (outside the District) is ancillary and ministerial to the charged offenses. *See United States v. Bezmalinovic*, 962 F. Supp. 435, 437 (S.D.N.Y. 1997) (venue improper where "[t]he only acts alleged to have occurred in the Southern District of New York are the ministerial actions taken by [financial institutions located in New York] in the process of crediting defendant's account."). The routing of funds through correspondent banks in this District did not advance the alleged scheme, as the involvement of such intermediary banks was ministerial and incidental to routine banking operations and was not essential to the alleged objective of exporting servers to China. The Indictment's narrative confirms as much. It alleges conspiracies centered on allegedly falsified end-user documentation and lease agreements, alleged "dummy" servers staged for Super Micro and government audits, and the physical diversion of servers through [redacted] and individual brokers to customers in China. No part of this alleged conduct depended upon the routing of money through an intermediary bank or financial institution in this District, and it could all be accomplished without such routing.

Additionally, Mr. Liaw could not have reasonably foreseen that a wire transfer from [redacted], a [redacted] company, to Super Micro Taiwan, the entity which received the payments from [redacted], would pass through a correspondent bank in this District. *Cf. United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001) (venue proper where defendant "caused communications to be transmitted into and out of the Southern District when he approved fraudulent invoices *knowing* that [the victim] paid its vendors from New York banks") (emphasis added). A payment from a

bank for a [redacted] business to a bank for a Taiwanese business does not foreseeably implicate use of a New York correspondent bank. *See, e.g.*, Simons Decl., Ex. 4 (Invoice from Super Micro Taiwan to [redacted] with wire instructions); Simons Decl., Ex. 5 (Remittance from [redacted] to Super Micro Taiwan). Notably, the choice of correspondent bank is dictated by the remitting or beneficiary bank's preexisting U.S. dollar clearing arrangements, not by the buyer or seller. *See Ekopel D.O.O. v. Citibank, N.A.*, 717 F. Supp. 3d 17, 22 (D.D.C. 2024) (explaining flow of an international wire transfer through intermediary banks). Thus, this District's connection to the wires that purportedly furthered the alleged conspiracies rests solely on the unforeseeable fortuity of correspondent bank routing, not on any act, decision, or direction by Mr. Liaw or any alleged coconspirator.

### C. Prosecuting Mr. Liaw in this District Would Violate the Second Circuit's "Substantial Contacts" Limitation.

The substantial contacts test applies here because prosecution of Mr. Liaw in this District would result in substantial hardship for Mr. Liaw and undermine the fairness of his trial. The substantial contacts test is particularly apt where, as here, "the defendant's acts did not take place within the district selected as the venue for the trial." *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000); *see, e.g.*, *Bezmalinovic*, 962 F. Supp. at 441 (granting motion to dismiss for improper venue after applying substantial contacts test).

<u>*Site of Defendant's Acts*</u>. Mr. Liaw and his alleged conduct bear no connection to this District. Mr. Liaw founded and served as Senior Vice President of Business Development of Super Micro and was a Board member. Super Micro, whose "core business" is the design, manufacture, and sale of the servers at the heart of this case, Ind. ¶ 5, has been and is headquartered in San Jose, California. Super Micro's servers integrating Nvidia GPUs are manufactured in San Jose, Taiwan, the Netherlands, and Malaysia. *See* Simons Decl., Ex. 6 (Super Micro Computer, Inc., 2025 Form

10-K) at 34. None of the conduct attributed to Mr. Liaw in the Indictment is alleged to have occurred in this District.

The Indictment does not allege that any of Mr. Liaw's business or other conduct were carried out in this District. With respect to the acts attributed to Mr. Liaw in the Indictment, they are all communications of Mr. Liaw with various individuals, none of which were sent or received in this District. Specifically, the Indictment alleges that Mr. Liaw directed [redacted] CEO to place purchase orders and transfer money from [redacted] to Super Micro, *e.g.,* Ind. ¶¶ 12–13, 16, 19–20, 24(e), and that Mr. Liaw texted with third-party brokers. *E.g.*, Ind. ¶ 17–18, 22. It makes no allegation that his conduct occurred in the Southern District of New York. The Indictment also alleges that Mr. Liaw undermined various Super Micro and BIS audits. *See* Ind. ¶¶ 20, 23–29. But all such audits occurred in [redacted] when Mr. Liaw was neither present in this District nor in communication with any person in this District, much less concerning the alleged audits.

*Suitability of the District for Fact-Finding*. Importantly, the witnesses most likely to have relevant testimony, including personnel from the Super Micro's Compliance Department and Sales team members responsible for Asia-based customers, are very likely to be found in California or overseas, where Super Micro operates, not in this District. The same is true of any potentially relevant Nvidia personnel, a California-headquartered company. Additionally, Mr. Liaw has resided in California with his wife for many decades and his children also reside in that State. *Cf. Ramirez v. United States*, 898 F. Supp. 2d 659, 668 (S.D.N.Y. 2012) (Southern District was suitable under substantial contacts test because defendants "lived in this district and the Organization operated here"). In a case where it seems undisputed that all of Mr. Liaw's relevant conduct took place *outside* this District, the location of his residence and the location of any potentially relevant witness establish hardship and unfairness, undermining proper venue.

Proceeding to trial in this District contravenes the venue guarantee of the Sixth Amendment, which expressly links the right to trial by jury to the community where the crime and the evidence needed to adjudicate it are situated.

Elements and Nature of Crimes. The alleged wire transfers bear no relationship to the essential elements of the charged conspiracy offenses, let alone the uncharged substantive object offenses of the charged conspiracies. *Reed*, 773 F.2d at 481 (substantial contacts test considers "essential elements of a crime"). Count One charges a conspiracy to violate the ECRA, the gravamen of which is the unlicensed export of controlled items, namely, electronics components on the Commerce Control List ("CCL"), from the United States to China. Ind. ¶¶ 31–32. Count Two charges a conspiracy to smuggle those same goods from the United States in violation of 18 U.S.C. § 554, which criminalizes exporting illegal merchandise from the United States. *Id.* ¶¶ 34–35. Count Three charges a conspiracy to defraud the United States under 18 U.S.C. § 371 by impeding and obstructing, through deceitful and dishonest means, the lawful licensing and enforcement functions of the Department of Commerce. Ind. ¶¶ 37–39. Each of these offenses is complete at such time as an alleged agreement to violate the law came to exist and a defendant intentionally joined the agreement, not on the transfer of funds; nor is the exchange of funds an essential element of the uncharged objects of the alleged conspiracies. *United States v. Elliott,* 266 F. Supp. 318, 323 (S.D.N.Y. 1967) ("[C]onspiracy is a separate crime completed when the agreement is made.").

Locus of the Effects of Criminal Conduct. Moreover, and weighing heavily against a finding that venue is proper in this District, there is no suggestion that any of Mr. Liaw's alleged conduct had any effect on anyone or any institution in this District. *Reed*, 773 F.2d at 482 (noting "obvious" interest districts have in "preventing such effects from occurring"). If any district can

claim a genuine connection to the effects of the charged conspiracies, it would be the Northern District of California, the epicenter of the artificial intelligence and technology industry and home to Super Micro, the manufacturer whose export-controlled products are at the center of this case. Trying Mr. Liaw in a forum with no relationship to the site of his alleged acts, the location of the evidence, or the locus of the claimed harm amounts to precisely the hardship, prejudice, and unfairness that the substantial contacts test is designed to prevent. *See Saavedra*, 223 F.3d at 88 (noting requirement that an "accused not be subject to the hardship of being tried in a district remote from where the crime was committed").

***

The first substantive question the Court asked at the initial appearance in this case was "what is the government's theory of venue in the Southern District." Tr. 6:12–13 (Ramos, J.). The government's answer was: "There were a number of wires that transited through the Southern District of New York to pay for the servers that are at issue in the case." *Id.* at 6:14–16. That is the government's venue theory, and it does not withstand scrutiny. Even applying the generous leeway afforded the government to establish venue at trial, in the context of a motion to dismiss, (1) the purely ministerial and unforeseeable nature of the sole activity that is alleged to have occurred in this District, (2) the absence of any allegation that any coconspirator acted within or directed an action toward this District, and (3) the substantial hardship and prejudice to Mr. Liaw should he be tried in this District combine to establish the absence of venue on all counts. Because venue is lacking, the Indictment should be dismissed.

## II. Count II Should Be Dismissed Because It Fails to Plead a Conspiracy to Smuggle Goods from the United States.

"Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United*

*States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012); *see* Fed. R. Crim. P. 12(b)(3)(B)(v) (defendant may move to dismiss for a "defect in the indictment" based on the "failure to state an offense"). An indictment states an offense if it: (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). In deciding such a motion, the court "assume[s] the truth of the allegations in the indictment." *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004). But "the indictment must be considered as it was actually drawn, not as it might have been drawn," *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000), and the question is whether the "alleged activities, accepted as true, are prohibited by the statute." *United States v. Heicklen*, 858 F. Supp. 2d 256, 263 (S.D.N.Y. 2012). When analysis renders it unclear that a charge states an offense, "the rule of lenity requires that ambiguities in the statute be resolved in the defendant's favor." *United States v. Plaza Health Lab'ys, Inc.*, 3 F.3d 643, 649 (2d Cir. 1993).

Count II charges Mr. Liaw with a Conspiracy to Smuggle Goods from the United States. *See* Ind. ¶¶ 33–36. For purposes of this conspiracy Count, the "object of the conspiracy" is a violation of 18 U.S.C. § 554. *See* Ind. ¶ 34. Section 554 states:

> Whoever (1) fraudulently or knowingly exports or sends *from the United States*, or attempts to export or send from the United States, *any merchandise, article, or object contrary to any law or regulation of the United States*, or (2) receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of *such merchandise, article or object*, prior to exportation, knowing the same to be intended for *exportation contrary to any law or regulation of the United States*, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 554(a) (numbering and emphasis added). Count II fails to plead a conspiracy to violate this statute because it does not allege a conspiracy to export (1) an "object contrary to any law or regulation" (2) "from the United States."

**A. A GPU Is Not an "Object Contrary to Any Law or Regulation."**

"[T]here are two ways to violate 18 U.S.C. § 554." *United States v. Ying Lin*, 270 F. Supp. 3d 631, 633-35 (E.D.N.Y. 2017). First, a defendant "may be convicted of smuggling if [he] exports an illegal item"—*i.e.*, if he "fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States." *Id.* (emphasis omitted). Because there is no comma between the words "contrary" and "object," the phrase "contrary to any law or regulation" modifies the nouns "merchandise, article, or object," not the verbs "exports or sends." *Id.*[4] Accordingly, under this first clause of the statute, the lawful status of the object, not its export, is at issue. *See id.*; *see also United States v. Davis*, 648 F.3d 84, 89–90 (2d Cir. 2011) ("The phrase 'contrary to law' means 'illegal; unlawful; conflicting with established law.'") (quoting Black's Law Dictionary 377 (9th ed. 2009)).

Second, a defendant may "be convicted of smuggling if, prior to exportation, [he] facilitates exportation of an illegal item knowing that it is intended for illegal exportation"—*i.e.*, "facilitates the transportation . . . of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation." *Ying Lin*, 270 F. Supp. 3d at 634. The word "such" demonstrates that the item must again be illegal in-and-of-itself. *See, e.g.*, *United States v. Ahlers*, 305 F.3d 54, 61 (1st Cir. 2002) ("Congress used the adjective 'such' to modify the [second noun]. That usage plainly refers back to the [noun] mentioned in the

[4] In *Ying Lin*, the court rejected the Ninth Circuit's interpretation that "contrary to any law" is an "adverbial clause modifying the verbs 'exports' and 'attempts to export,' not an adjectival clause modifying the noun 'merchandise.'" *Id.* at 634 n.1 (quoting *United States v. Chi Tong Kuok*, 671 F.3d 931, 945 (9th Cir. 2012)). The court's analysis that "contrary to any law" is an "adjectival" clause is reinforced by the inclusion of the second type of offense conduct under the statute, which requires knowledge that both the noun (*i.e.*, "such merchandise, article, or object") and the verb (*i.e.*, "exportation") be "contrary to law." 18 U.S.C. § 554(a). The alternative formulations of illegal conduct under the statute would be redundant under the Ninth Circuit's reading. *See Yoo v. United States*, 43 F.4th 64, 71–72 (2d Cir. 2022) ("[C]ourts seek to avoid readings that render statutory language surplusage or redundant.").

previous text. . . ."). But the defendant must also know that the act of "exportation" will be "contrary to any law or regulation." 18 U.S.C. § 554. That is, this second clause focuses on both the illegality of the object and its knowing exportation contrary to law.

Thus, under both the first and second clause, the "smuggled merchandise" must itself be illegal—independent of the defendant's "smuggling activity"—to sustain a conviction. *See Ying Lin*, 270 F. Supp. 3d at 635 (dismissing smuggling count because "[b]aggage is not illegal for export *per se*" and "the Government has not pointed to a United States law or regulation that prohibits unaccompanied baggage").

Any other reading of Section 554 would raise constitutional problems. *See Liparota v. United States*, 471 U.S. 419, 426 (1985) (courts disfavor interpretations of criminal statutes that would "criminalize a broad range of apparently innocent conduct"). Where, as here, a criminal statute penalizes substantive conduct accompanied by a *mens rea* of mere knowledge—as opposed to willfulness—the prohibited conduct must be obviously illegal to the point of alerting a "reasonable person" that criminal liability would attach.[5] *See United States v. Figueroa*, 165 F.3d 111, 115–18 (2d Cir. 1998) (describing "strong . . . presumption that for knowledge to suffice for criminal culpability, it should, at minimum, be extensive enough to attribute to the knower a 'guilty mind,' or knowledge that he or she is performing a wrongful act"); *see*, *e.g.*, *United States v. Sanders*, 211 F.3d 711, 723 (2d Cir. 2000) ("knowledge" sufficient because "one would hardly be surprised to learn that the unauthorized removal of parts or property from [an airplane] crash site is not an innocent act"); *see also United States v. Freed*, 401 U.S. 601, 609 (1971) (knowledge sufficient for conviction for possession of hand grenades because they are "highly dangerous").

[5] Statutes that require "willfulness" generally demand proof "that the defendant acted with knowledge that his conduct was unlawful" whereas statutes that require "knowledge" only demand "proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 192–93 (1998).

Given Section 554's "knowingly" *mens rea* element, it is necessary that the statute require the transported item to be illegal *per se*.[6]

No law or regulation criminalizes the mere manufacture or possession of a GPU, and there is nothing otherwise *per se* illegal about a GPU, the transported item alleged in Count II. *Compare, e.g.*, 21 U.S.C. § 844 (Controlled Substances); 18 U.S.C. § 831 (Nuclear Materials). Rather, during the relevant period, criminal sanction applied to (1) the export of a GPU that (2) surpassed certain performance thresholds (3) to Commerce Department-listed countries (such as China) (4) without a license. *See* 15 C.F.R. Pt. 774, Supp. 1 at ECCN 3A090; 4A090.[7] As Section 554 applies only to "object[s] contrary to any law or regulation," that is, products that are in-and-of-themselves illegal *per se*, *see Ying Lin*, 270 F. Supp. 3d at 635, Count II fails to state a claim and should be dismissed. *Cf. Aleynikov*, 676 F.3d at 75–76 (indictment failed to state offense because theft of "computer source code" was not a "stolen" "good" under charged statute).

**B. The GPUs Were Not Smuggled "From the United States."**

Count II should also be dismissed because Section 554 applies only to items smuggled "from the United States." 18 U.S.C. § 554. The Indictment pleads (1) that some of the Super Micro servers that were shipped to [redacted] were assembled in the United States and (2) that those servers contained Nvidia GPUs, but it does not allege that Nvidia GPUs were integrated into the

[6] Given their impenetrability, EAR violations do not raise the specter of obvious criminality. *See, e.g.*, *United States v. Zhi Yong Guo*, 634 F.3d 1119, 1120 (9th Cir. 2011) (export controls governed by "complicated framework of statutes, executive orders, and regulations"). Indeed, "one" might be "surprised to learn" that exporting many items on the CCL are "not an innocent act." *Freed*, 401 U.S. at 609; *see, e.g.*, 15 C.F.R. Pt. 774, Supp. 1 at ECCN 0A980 (exporting a horse by boat); ECCN 8A992i (exporting life jackets). By requiring that the item be inherently illegal, Section 554 prevents the government from circumventing the "willfulness" standard that renders the export control statutes constitutional. *See* 50 U.S.C. § 4819 (ECRA); 50 U.S.C. § 1705 (IEEPA); *see also Zhi Yong Guo*, 634 F.3d at 1123 (IEEPA not unconstitutionally vague because the willfulness requirement "alleviates any concern over the complexity of the regulatory scheme" for EAR violations).

[7] In January 2025, BIS adopted a worldwide licensing requirement for the export of high performing GPUs, which became effective in May 2025. *See* 15 C.F.R. § 742.6(a)(6)(iii)(A). But, for most of the period at issue, licensing requirements applied only to certain countries.

Super Micro servers in the United States. *See, e.g.*, Ind. ¶ 1 ("[D]efendants, conspired to divert billions of dollars' worth of the U.S. Manufacturer's ***servers*** to China, many of which were assembled in the United States. The U.S. Manufacturer's flagship products, servers integrating graphics processing units ("GPUs") manufactured by Nvidia, are subject to strict U.S. export controls barring their sale to China without a license." (emphasis added)). The Indictment alleges where Super Micro's ***servers*** were assembled and from where the servers were shipped. It does not allege the location where the Nvidia ***GPUs*** were incorporated into the servers. Public disclosures confirm that Nvidia does not manufacture its GPUs but outsources its production to companies in Asia, principally in Taiwan. *See, e.g.*, Simons Decl., Ex. 7 (Nvidia Corp., Annual Rep., 8–9 (Form 10-K) (Feb. 26, 2025)) ("Our supply chain is mainly concentrated in the Asia-Pacific region. We utilize foundries, such as Taiwan Semiconductor Manufacturing Company Limited . . . to produce our semiconductor wafers."). Super Micro maintains a large manufacturing facility in Taiwan adjacent to Nvidia's GPU manufacturers. *See, e.g.*, *id.* at Ex. 6 (Super Micro Computer, Inc., 2025 Form 10-K) at 29 ("[O]ur business depends on our ability to receive consistent and reliable supplies from our overseas partners, especially in Taiwan.").

Accordingly, when building servers with Nvidia GPUs for Asia-based customers such as [redacted], Super Micro typically integrates the GPUs into its servers in Taiwan. (It would not make logistical sense to ship the GPUs to the United States only to ship them back to Asia.) But the Indictment's export allegation focuses on servers not the restricted GPUs. *See* Ind. ¶ 12 ("Those servers were often assembled in the United States and shipped to the U.S. Manufacturer's facilities in Taiwan, then delivered to [redacted] . . ."). Indeed, the notes of the lead Commerce Department BIS agent reflect that he searched [redacted] "export history" through BIS's Automated Export System database and concluded that (except for one shipment and six server repairs) "[e]verything

they are getting is produced overseas. . ."—*i.e.*, produced outside the United States. Simons Decl., Ex. 8 at USAO_008965.

Thus, there was no conspiracy to transport GPUs "from the United States" and Count II fails for this reason as well.[8]

**MOTION FOR AN ORDER REQUIRING A BILL OF PARTICULARS**

Mr. Liaw herein moves for an Order directing the government to particularize the following:

1. The specific subsections of the EAR that Mr. Liaw purportedly conspired to violate.

2. The GPUs that the government contends [redacted] diverted to China—a category that the Indictment alleges amounted to "billions of dollars worth" of product while providing only three "example[s]" of shipments that were diverted to China in May 2025, each totaling approximately $18 million. *See* Ind. ¶¶ 1, 21(a)–(c). The government should specify:

- The serial numbers and purchase order numbers of each Nvidia GPU and each Super Micro server allegedly diverted to China or Hong Kong.
- The location where Nvidia manufactured each allegedly diverted GPU.
- The location where Super Micro received each allegedly diverted GPU from Nvidia.
- The location where Super Micro integrated each allegedly diverted GPU into its servers.
- The location from where Super Micro shipped each allegedly diverted server to [redacted]
- The entity/location to which [redacted] shipped each allegedly diverted Super Micro server.

---

[8] For the reasons stated below, *see infra at* Motion for an Order Requiring a Bill of Particulars, to the extent the government contends that the Indictment charges that the restricted GPUs, *i.e.*, not only the server chassis, were shipped to [redacted] in [redacted] from the United States, it should be ordered to particularize evidence supporting such claim.

- The "end user" or "ultimate consignee" for each Nvidia GPU and Super Micro server that [redacted] allegedly shipped into China or Hong Kong.

3. The identities of all alleged unindicted coconspirators.

Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant (1) to prepare for trial, (2) to prevent surprise, and (3) to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (numbering added). Courts grant a bill of particulars when "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Gasperini*, No. 16 Crim. 441, 2017 WL 2399693, at *10 (E.D.N.Y. June 1, 2017). Courts assess "the totality of the information available to the defendant, including the indictment and general pre-trial discovery," when ruling on a Rule 7(f) motion. *United States v. Wey*, No. 15 Crim. 611, 2017 WL 237651, at *18 (S.D.N.Y. Jan. 18, 2017). A bill of particulars is often most necessary where the government has produced "mountains of documents to defense counsel" who are thereby "left unguided." *Bortnovsky*, 820 F.2d at 575; *see, e.g.*, *United States v. Mahaffy*, 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006) (Bill of Particulars "most frequent[ly]" needed "where discovery is overwhelmingly extensive"). This is especially true when voluminous discovery is in a foreign language. *See, e.g.*, *United States v. Oruche*, No. 07 Crim. 124, 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008) (ordering Bill of Particulars where "[t]he Government produced 8000 pages of linesheets of conversations in a foreign language").

Mr. Liaw has tendered three letters to the government seeking particulars. *See* Boxer Decl., Exs. A, C, and D. In response to the first letter, on April 20, 2026, the government provided only a short index identifying the anonymized names in the Indictment. *See* Boxer Decl. Ex. B. On September 4, 2026, the government responded to the Letters and, as relevant to this motion, (a)

wholesale declined to identify the subsections of the EAR charged by the grand jury; (b) declined to identify the serial numbers of the Supermicro servers allegedly shipped to China-based end users or their ultimate destinations in China, instead pointing only to a communication between Mr. Liaw and Mr. Willy Sun referencing [redacted] and to exemplar outbound shipping documents written entirely in a foreign language; and (c) declined to identify the unindicted coconspirators and instead directed counsel to the defective warrants (discussed below) and a spreadsheet with thousands of rows reflecting communications between Mr. Liaw and Mr. Willy Sun. *See* Boxer Decl. Ex. E. Accordingly, we respectfully request that the Court order the government to provide the above-requested particulars.

*First*, the bill of particulars should identify the specific subsections of the EAR that Mr. Liaw purportedly conspired to violate. Count I of the Indictment alleges a conspiracy under 50 U.S.C. § 4819 to violate the following regulations: 15 C.F.R. § 736.2; 15 C.F.R. § 742.6; and 15 C.F.R. § 764.2. *See* Ind. ¶ 32. However, each of these regulations contains tens of subsections. *See, e.g.*, 15 C.F.R. § 764.2(a)-(k). The specific subsections "as found by the grand jury" should be particularized so that Mr. Liaw (1) need not guess as to the conduct of which he stands accused and (2) the government is not able to change its theory later. *Russell v. United States*, 369 U.S. 749, 771 (1962). For example, Mr. Liaw should not have to guess whether he is accused of scheming to engage in "[l]icense alteration" because the government failed to state the subsections of 15 C.F.R. § 764.2 it alleges he conspired to violate. *Id.* § (j). An indictment cannot use strategic ambiguity to hide the ball from a defendant. *See, e.g.*, *United States v. Murgio*, 209 F. Supp. 3d 698, 720 (S.D.N.Y. 2016) (ordering bill of particulars regarding the laws, regulations, or duties defendant allegedly intended to violate when accepting alleged bribes); *United States v. Madeoy*,

652 F. Supp. 371, 374 (D.D.C. 1987) (ordering bill of particulars to identify specific regulations violated when indictment charged violation of voluminous C.F.R. provisions).

<u>*Second*</u>, the bill should identify the GPUs that the Indictment contends [redacted] diverted to China or Hong Kong. The Indictment alleges that Mr. Liaw "conspired to divert billions of dollars worth" of servers to China between 2024 and 2026, *see* Ind. ¶ 1, but alleges only three "example[s]" of Super Micro shipments that were diverted to China in May 2025, each totaling approximately $18 million. *See id.* ¶¶ 21(a)–(c).[9] The government's claimed knowledge of the dollar amount of allegedly diverted servers necessarily implies knowledge of the exact servers involved. Given that the export controls attach to the Nvidia GPUs housed within those servers, and not to the servers in the abstract, the government should be required to specify the ultimate destination and shipment details as to the allegedly diverted GPUs. Accordingly, the government should be directed to specify: (a) the serial numbers and purchase order numbers of every Nvidia GPU and Super Micro server allegedly diverted to China, as charged by the Indictment; (b) the location where Nvidia manufactured each allegedly diverted GPU; (c) the location where Super Micro received each allegedly diverted GPU from Nvidia; (d) the location at which Super Micro integrated each allegedly diverted GPU into its servers; (e) the location from which Super Micro shipped each allegedly diverted server to [redacted]; (f) the entity/location to which [redacted] shipped every allegedly diverted Super Micro server; and (g) the "end user" or "ultimate consignee" for each Nvidia GPU and Super Micro server that [redacted] allegedly shipped into China or Hong Kong.

The provision of thousands of pages of invoices and shipping records to the defense in a mix of English, Thai, and Chinese is inadequate. *See, e.g.*, *United States v. Luna*, No. 05 Crim.

[9] Even with respect to these three shipments, the Indictment is short on details—merely stating that [redacted] "outbound consignee for those servers was a technology company in China." Ind. ¶¶ 21(a)–(c). The Indictment does not state whether that "technology company in China" was the "end user" of the servers. Ind. ¶¶ 21(a)–(c).

58, 2006 WL 1668006, at *2 (D. Conn. May 17, 2006) (ordering bill of particulars where "the government's disclosures include thousands of recorded telephone calls in both English and Spanish"). Without knowing which of Super Micro's shipments to [redacted] (beyond the three listed in the Indictment) the government contends were diverted to China, Mr. Liaw's defense is left to guess, a fundamental unfairness in a criminal case. *Cf. United States v. Hanratty*, No. 24 Crim. 153, 2024 WL 4892742, at *9 (S.D.N.Y. Nov. 26, 2024) (ordering bill of particulars "identifying each asset listing . . . that the Government intends to prove was fraudulent"); *United States v. Hawit*, No. 15 Crim. 252, 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) ("[T]he Government shall file a bill of particulars specifying the transactions . . . that the Government will seek to prove were tainted by an unlawful conspiracy. . . ."); *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (ordering bill of particulars because the government "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims" but "has not yet informed the defendants which of these claims were false and in what way they were false").

*Third*, the bill should identify all alleged unindicted coconspirators. Courts generally consider six factors in determining whether to order a Bill of Particulars identifying coconspirators:

> (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation.

*Barrett*, 153 F. Supp. 3d at 572.

These factors support the requested particulars. The Indictment vaguely alludes to numerous alleged coconspirators operating across the globe and representing an array of entities involved in conspiracy of more than two years. *See, e.g.*, Ind. ¶ 12 (defendants "routed" the servers "to purchasers in China" via "a rotating cast of third-party brokers" who were "elsewhere in

Southeast Asia"); *id.* ¶ 23 (defendants conspired with "others" to ensure that [redacted] "could pass additional audits and inspections. . ."). As a result, "it is uncertain how many co-conspirators are involved," *United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y. 2015), and they operate "in various countries around the world . . . ." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000).[10] It also fails to give notice of which statements—where the volume of emails, chats and video recording is enormous—could be admissible as nonhearsay pursuant to Federal Rule of Evidence 801(d)(2)(E). In such circumstances, identification of alleged coconspirators is necessary to prevent unfair surprise at trial. *See, e.g.*, *United States v. Akhavan*, No. 20 Crim. 188, 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (granting bill of particulars because "the indictment suggests that the co-conspirators represented several distinct organizations"); *United States v. Kahale*, 789 F. Supp. 2d 359, 372 (E.D.N.Y. 2009) (granting bill where "the geographic scope of the conspiracy"—which potentially included "unknown international locations"—was "expansive").

And the need for particulars is especially relevant here given the volume of discovery to date and that much of it is in Mandarin. The government has produced hundreds of thousands of documents (in addition to more than 1.75 terabytes of data from the devices and iCloud and Google accounts of various individuals) with tens of thousands of documents in foreign languages. *See* Simons Decl. ¶ 2; *see, e.g.*, *United States v. Kanekar*, No. 17 Crim. 353, 2020 WL 730353, at *6 (E.D.N.Y. Feb. 12, 2020) (granting bill of particulars identifying coconspirators where government produced "over 500,000 discovery documents"). There is also no suggestion that Mr. Liaw poses any risk to potential witnesses. *See United States v. Barrera*, 950 F. Supp. 2d 461, 477 (E.D.N.Y.

---

[10] Codefendant Mr. Willy Sun alone appears to have operated in Japan, Thailand, Taiwan, China, Malaysia, Singapore, South Korea, and Canada.

2013) ("common thread running through cases" is that "the identities of unindicted co-conspirators have been disclosed primarily in cases in which violence was not alleged").

In sum, the Court should order the government to produce a bill of particulars as described herein.

## MOTION TO STRIKE SURPLUSAGE

"Upon the defendant's motion, the court may strike surplusage from the indictment." Fed. R. Crim. P. 7(d). This provision protects defendants from unfair prejudice suffered when an indictment is read to the jury and contains allegations that are "not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001). To the extent that the Court plans to read the Indictment to the jury or provide it during deliberations, such relief is warranted here. The Indictment contains irrelevant, prejudicial material—regarding dangers to national security if China secures GPUs—that risks inflaming the jury's passions. *See* Ind. ¶¶ 1–14 (export of GPUs to China "poses an unacceptable risk to national security" because "China has been executing a state-directed campaign to dominate artificial global intelligence" with "potential applications in signals intelligence, autonomous weapons systems, nuclear weapons simulations, and other advanced military programs. . ."). This language in the Indictment is irrelevant to the charges the government must prove at trial and if presented would risk triggering an emotional reaction by the jury in lieu of its objective analysis of the evidence under the law the Court provides. *See United States v. Quinn*, 401 F. Supp. 2d 80, 98–99 (D.D.C. 2005) (striking background from an IEEPA indictment because "the policies underlying the trade embargo against Iran are irrelevant to the charges defendants face" and "[t]he potential for prejudice, meanwhile, is substantial because of the seriousness with which the government and the public treat the present war on terrorism"). Therefore, the Court should strike from the

Indictment all discussion of the policy reasons for the ban on GPU exports to China. *See United States v. Groos*, 616 F. Supp. 2d 777, 790 (N.D. Ill. 2008) ("References to national security and terrorism are likely to inflame passions that could cause jurors to judge the facts more harshly than they would if presented with an indictment strictly discussing violations of a trade embargo.").[11]

## MOTION TO SUPPRESS EVIDENCE OR FOR A *FRANKS* HEARING

The Court should suppress evidence seized from Mr. Liaw's Apple iCloud account, Google account, and Phones because (1) probable cause was lacking to support the Warrants and (2) Mr. Liaw's Fourth, Fifth, and Sixth Amendment rights were violated because the government compelled Mr. Liaw to reveal the Phones' passcodes when the Devices Warrant was executed.

### I. The Court Should Suppress the Materials Seized from Mr. Liaw's Apple iCloud Account, Google Account, and Two Phones Because Probable Cause did not Exist to Support the Warrants, or, Alternatively, Order A *Franks* Hearing.

The Liaw SCA Warrant and the Devices Warrant lacked probable cause because they (a) relied extensively on the Voluntary Self-Disclosure ("VSD") of, and unreliable documents provided by, untrustworthy criminal informants, namely [redacted] and its senior executives—facts the Warrant Affidavits did not disclose to the Magistrate Judges who issued the Warrants; (b) misleadingly overlaid a criminal interpretation on Mr. Liaw's statements notwithstanding that the cited underlying documents on their face did not support such interpretations; and (c) necessarily offered this narrative intentionally, given the actual content of the referenced documents. These omissions and mischaracterizations served as the necessary foundation for the Magistrate Judges' findings of probable cause. As a result, the evidence seized first pursuant to the Liaw SCA Warrant was unlawfully obtained. Next, because this evidence was then used as a basis for subsequent

[11] Underscoring the point, in conjunction with the Indictment, then-U.S. Attorney Clayton issued a press release to denounce the alleged damage to national security caused by the conduct alleged in the Indictment. *See* Press Release, *Three Charged with Conspiring to Unlawfully Divert U.S. Artificial Intelligence Technology to China*, Dept' J. (March 19, 2026) (describing "brazen evasion of our laws that protect national security and U.S. competitiveness").

warrants seeking electronically stored information from the accounts of Mr. Chang, [redacted] and [redacted] those warrants were also defective. Ultimately, the chain of unlawfully derived warrants led to the Indictment and, shortly after, the Devices Warrant, which is defective for the same reasons as described below for the Liaw SCA Warrant, and also as fruit of the poisonous tree.

Accordingly, Mr. Liaw moves, either pre- or post-*Franks* hearing, *Franks v. Delaware*, 438 U.S. 154 (1978), to suppress evidence seized under the Liaw SCA Warrant and the Devices Warrant.

**A. Background**

On September 26, 2025, [redacted] made its VSD to BIS and the Department of Justice's National Security Division regarding "potential export control violations for its role in re-exporting [Super Micro] servers to China." Liaw SCA Warr. ¶ 28; [redacted] As part of the VSD, which was not yet complete as of the dates of the Warrants, [redacted] provided "numerous communications and other records," including text messages between and among: Individual-1, identified by the government as [redacted]; Individual-2, identified by the government as [redacted]; Mr. Liaw; Mr. Willy Sun; Mr. Chang; [redacted] and [redacted] Liaw SCA Warr. ¶ 28; [redacted] [redacted] also produced "transaction and shipment records, summaries of key findings to date, contact information for the Target Subjects and others, and security camera footage from [redacted] warehouse in [redacted]" Liaw SCA Warr. ¶ 28; [redacted]

[12] [redacted] is referred to as [redacted] to distinguish him from Codefendant Mr. Willy Sun.

On December 22, 2025, [redacted] participated in a proffer session during which he "described the illegal re-export scheme" and the efforts of the "Target Subjects" to "deceive [Super Micro's] compliance team and U.S. authorities." Liaw SCA Warr. ¶ 28.

On January 9, 2026, Honorable Ona T. Wang, United States Magistrate Judge for the Southern District of New York, signed the Liaw SCA Warrant, authorizing the search of Mr. Liaw's Apple iCloud and Google accounts, as well as like accounts of Mr. Willy Sun. *See* Simons Decl., Ex. 1 at USAO_000478. Attached was an affidavit sworn by Charles Edwards, Special Agent of the FBI, purporting to establish probable cause. *Id.* at USAO_000403–478. In substance and effect, the application and warrant sought all content, regardless of date, associated with Mr. Liaw's Apple iCloud account and his Google account. *See* Liaw SCA Warr., Attachment A.

On February 9, 2026, Honorable Katherine H. Parker, United States Magistrate Judge for the Southern District of New York, signed a search warrant for the Apple iCloud and Google accounts of Mr. Chang. *See* Simons Decl., Ex. 9 (the "Chang SCA Warrant"). The affidavit of Agent Edwards in support of the warrant application relied primarily on [redacted]'s VSD and documents provided by [redacted] *see* Chang SCA Warr. ¶¶ 30–35, 40–41, and the evidence seized pursuant to the Liaw SCA Warrant. *See id.* ¶ 43(a).

After the Liaw SCA Warrant and the Chang SCA Warrant were executed, [redacted] and [redacted] participated in additional proffer sessions with the government, both remotely and in person. [redacted] The proffers took place between in or around December 2025 and in or around February 2026. *Id.* In addition, pursuant to a grand jury subpoena, Super Micro produced certain "text message communications, shipping and transaction records, bank records, and email communications." *Id.* ¶ 30.

On March 6, 2026, Honorable Valerie Figueredo, United States Magistrate Judge for the Southern District of New York, signed the [redacted] authorizing the search of the Apple iCloud accounts belonging to [redacted] *See* Simons Decl., Ex. 3 at USAO_000842, 844. The supporting affidavit sworn by Agent Edwards substantially overlapped with his affidavit in support of the Liaw SCA Warrant.

On March 17, 2026, the Indictment was returned. *See supra* at Background § 1.

On March 18, 2026, Honorable Virginia K. DeMarchi, United States Magistrate Judge of the Northern District of California, signed the Devices Warrant, authorizing searches of three premises—Mr. Liaw's home, [redacted] and the temporary rental home of Mr. Willy Sun—and the persons of Messrs. Liaw, Willy Sun, [redacted]. *See* Simons Decl., Ex. 2 at USAO_000900. The [redacted] was attached and incorporated by reference in the applications for these warrants as Exhibit 2. *See id.* at USAO_000939. The Devices Warrant authorized the search and seizure of "any and all electronic devices, cellphones, tablets, computers, and electronic storage media on the person of, or in the possession, custody, or control of [Mr. Liaw]." *Id.* at USAO_000906. An affidavit sworn by Agent Renee Cabirac was submitted in support of the Devices Warrant.

On March 19, 2026, at approximately 6:00 A.M., the FBI arrested Mr. Liaw at his home and seized and subsequently searched his two Phones. *See* Simons Decl., Ex. 10.

**B. Legal Standard**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. "In evaluating a warrant, therefore, a reviewing court must determine whether the warrant in question was sufficiently particular and whether the warrant was supported by probable cause." *United States v. Almaleh*, No. 17 Crim.

25, 2022 WL 602069, at *11 (S.D.N.Y. Feb. 28, 2022) (Ramos, J). To determine whether a warrant is supported by probable cause, the issuing magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at *12 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Because "the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks*, 438 U.S. at 164–65 (emphasis in original). The Fourth Amendment protection would be "reduced to a nullity" if deliberately false allegations could be used "to demonstrate probable cause." *United States v. Castellanos*, 820 F. Supp. 80, 84 (S.D.N.Y. 1993) (quoting *Franks*, 438 U.S. at 168). Accordingly, although "a search or seizure pursuant to a warrant is presumed valid," a defendant may, "[i]n certain circumstances," request an evidentiary hearing pursuant to *Franks* to "challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64–65 (2d Cir. 2003).

A defendant is entitled to a *Franks* hearing if he makes a "substantial preliminary showing" that (1) "a deliberate falsehood or a statement made with reckless disregard for the truth was included in the warrant affidavit" and (2) the statement was material, or "necessary to the judge's finding of probable cause." *United States v. Falso,* 544 F.3d 110, 125 (2d Cir. 2008). *Franks* protects against misleading omissions as well as affirmative misstatements. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

"[T]he guideposts for determining recklessness are different when evaluating misrepresentation and omissions." *United States v. Lahey*, 967 F. Supp. 2d 698, 709 (S.D.N.Y.

2013). When evaluating whether a misrepresentation was made knowingly or recklessly, courts generally ask whether the affiant "made a false statement with knowledge that the statement was false;" "had a serious doubt as to the truth of the statement when [he or she] made it;" or "had obvious reason to doubt the veracity of the statement." *Id.* at 709-10. "In the case of an omission, recklessness may be inferred where the omitted information was clearly critical to the probable cause determination." *United States v. Disla Ramos*, 22 Crim. 431, 2022 WL 17830637, at *8 (S.D.N.Y. Dec. 21, 2022). Recklessness can also be found when a series of omissions all "drive in the same direction" towards strengthening the government's case for probable cause. *Lahey*, 967 F. Supp. 2d at 723.

A misrepresentation or omission is material "when the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *Awadallah*, 349 F.3d at 65. Therefore, to assess materiality, courts "should disregard the allegedly false statements, insert the omitted truths, and determine whether there remains a residue of independent and lawful information sufficient to support probable cause." *Disla Ramos*, 2022 WL 17830637, at *8. On *de novo* review, the issuing judge's determination is entitled to no deference, because she "did not have an opportunity to assess the affidavit without the inaccuracies." *United States v. Canfield,* 212 F.3d 713, 717 (2d Cir. 2000).

### C. The Warrants Deliberately or Recklessly Misled the Magistrate Judges by Omitting Material Information and Misleadingly Presenting Mr. Liaw's Communications.

#### 1. The Warrants Rely Substantially on Uncorroborated Information Supplied by Unreliable Informants, Without Disclosure of Their Criminal Conduct.

The Warrants' statements in support of probable cause as to Mr. Liaw's Accounts and Devices are predicated largely upon uncorroborated proffers from [redacted] executives and on

facially unreliable documents.[13] Although a warrant affidavit may properly rely on information supplied by an informant with a criminal history, it is accepted that such information is less reliable than that of a source with no such history and that a lack of corroboration of such a source's information or a track record of accuracy casts serious doubt on the existence of probable cause. *See United States v. Gagnon*, 373 F.3d 230, 236–37 (2d Cir. 2004) (cautioning that "a criminal informer is less reliable than an innocent bystander with no apparent motive to falsify."); *United States v. Atkinson*, 653 F. Supp. 668, 672 (S.D.N.Y. 1987) (no probable cause because informant's tip was unreliable due to "incentive to ease the conditions of his own arrest," previous untruthfulness, and lack of independent corroboration). Accordingly, where law enforcement relies on information provided by an informant, a court examining the totality of circumstances, must assess the informant's "veracity, reliability and basis of knowledge," and the extent to which the informant's statements were "reasonably corroborated." *Gates*, 462 U.S. at 230, 241–44.

The Warrant Affidavits, however, omitted material information bearing on the reliability, completeness, and accuracy of the information provided by [redacted] and its executives. *First*, the Warrant Affidavits fail to disclose the powerful incentives for [redacted] and its leadership to obtain leniency by providing information that inculpated other parties and any promises or commitments made to [redacted] by the government relating to information provided by [redacted] and potential consequences for the company and its senior executives based on their cooperation. And, the Warrant Affidavits omitted any description of whether [redacted] and its executives were offered any

---

[13] *See* Liaw SCA Warrant ¶ 30 ("Based on my involvement in this investigation, including my participation in the December 22, 2025 proffer with Individual-1, as well as my review of disclosures made by [redacted] as part of its ongoing VSD . . . ."); *id* ¶ 31 (relying on purchase and shipment records provided by [redacted]); *id* ¶ 32 (relying on "excerpts of text message communications provided by [redacted] as part of its ongoing VSD"); *id* ¶ 33 (relying on a "review of excerpts of text message communications provided by [redacted] and reports prepared by [redacted] counsel"); *id.* ¶ 35 (relying on "participation in the December 22, 2025 proffer with [redacted]" and a "review of information provided by [redacted]"); *id.* ¶ 40 ("Based on my participation in the December 22, 2025 proffer with [redacted], I have learned the following . . . ."); Devices Warrant ¶¶ 15–16; [redacted]

promises, benefits, or concessions. *Second*, the underlying screenshots of communications relied upon in the Warrant Affidavits in their original form depict messages presented out of chronological sequence, ignore multiple, oddly different versions of conversations occurring on the same (or overlapping) dates and times, and fail to disclose that, among these, the versions of communications that appeared to discuss shipments to China were selected while contemporaneous others were not presented or even mentioned. *Third*, the communications supplied by [redacted] and relied upon in the Warrant Affidavits contain extensive [redacted]-administered redactions, with no meaningful indication why such withheld material would be subject to redaction. Rather, with these communications, [redacted] provided to the government a "Certification of Authenticity" (under Thai law) that the submitted messages were "business" records and otherwise "unedited and a duplicate of original records" and that [redacted]'s counsel had applied redactions to portions of messages, without explaining counsel's basis if any to do so. *See* Simons Decl., Ex. 11 ([redacted] Certification); Simons Decl., Ex. 12 ([redacted] Certification). The Warrant Affidavits also fail to explain that [redacted]'s executives' representations about the documents they provided do not comport with the form and content of the documents themselves, which have been produced in discovery. Accordingly, serious grounds exist to question the completeness and authenticity of the above-referenced documents and, taken together, the omissions and the manner in which the Warrant Affidavits characterized certain communications render deficient the basis presented for probable cause.

*VSD and Proffers*. [redacted], an entity that allegedly had spent years actively lying to Super Micro—most directly to Super Micro's Compliance Department, to BIS, and to the government about the true destination of the servers it was purchasing from Super Micro—only began cooperating once it had every incentive to protect itself. As alleged in the Indictment, by August

20, 2025, BIS had informed Super Micro that it believed [redacted] was diverting servers to China and had requested Super Micro to hold all shipments to [redacted]. *See* Ind. ¶ 25; *see also* Simons Decl., Ex. 8 at USAO_008918. Around September 12, 2025, BIS initiated a post-shipment verification of [redacted]'s servers to ensure they had been delivered to [redacted] in [redacted], after which [redacted] promptly retained U.S. counsel. *Id.* at USAO_008920. Once [redacted] realized that BIS knew what it was doing, the jig was up and, on September 26, 2025, it made its VSD to BIS and the Department of Justice.

The Warrant Affidavits describe [redacted]'s disclosure as "voluntary," and formally it was, but they omit to explain that [redacted] did not come forward because it had a change of heart; it came forward because it knew, or had every reason to know, that BIS had already identified it as a participant in a criminal diversion scheme and had already cut off its supply of servers. [redacted], [redacted], and [redacted]—who sought immunity from prosecution under a government policy—were motivated to tailor their accounts to suit the government's purposes, namely, to implicate senior figures of a U.S. company, here, a Super Micro senior leader. But the Warrant Affidavits omitted this sequence of events and instead presented [redacted]'s disclosure as a spontaneous act of corporate good citizenship. This presentation was materially misleading and went directly to the reliability of the information received from the government's informants and thus the underlying narrative of evidence in support of probable cause.

The VSD upon which the Warrants rely was made under BIS's Voluntary Self-Disclosure policy, which applies "a presumption" that a fully cooperative disclosing company will receive a non-prosecution agreement and avoid a fine. *See* Liaw SCA Warr. ¶ 28 n. 17. [redacted] and its employees therefore had a direct and substantial incentive to "cooperate," that is, to cast their own conduct and the conduct they attributed to Mr. Liaw in a light that would maximize their

cooperation credit and immunize them from exposure. Statements elicited from an informant with a self-interested motive to curry favor with the government are inherently less reliable. *See Gagnon*, 373 F.3d at 236. The Warrants omit any specific communications surrounding the proffers of [redacted] and [redacted], including whether the government offered any inducements, assurances, or representations that cooperation could result in non-prosecution agreements. Without this information, the Warrants fail to present a necessary picture of [redacted] and its executives' incentive to falsely implicate others to shield themselves from prosecution. *See McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 825 (2d Cir. 2014) (where informant's "credibility is plainly relevant—even critical—to the probable cause determination," failure to provide "known information that goes directly to the credibility" is material); *see also United States v. Glover*, 755 F.3d 811, 817–818 (7th Cir. 2014) (remanding for a *Franks* hearing where "the officer's affidavit omitted all credibility information" and "the magistrate had no meaningful opportunity to exercise his or her discretion to draw favorable or unfavorable inferences" (citing *Gates*, 462 U.S. at 240)).

<u>*Date/Time/Content Discrepancies*</u>. The chat communications relied upon in the Warrant Affidavits are rife with inconsistencies in dates, times, and content, yet none of these discrepancies were disclosed to the reviewing Magistrate Judges. These inconsistencies are apparent on the face of the communications themselves that were subsequently produced in discovery and manifest in two distinct ways. First, [redacted] produced documents that appear to depict the same individuals exchanging messages using the same chat applications during the same or overlapping time periods, yet their messages reflect different conversations during those periods, a seeming impossibility. Second, the [redacted]-produced communication documents include an underlying screenshot that took place *after* the purported date of the chat, a chronological impossibility. The contents of these messages on the same dates and times are different—suggesting that [redacted]

manipulated the materials prior to producing them to the government. Rather than explain to the Magistrate Judges these irregularities in the documents on which the government was asking the Judges to rely for probable cause, the government simply cherry-picked quotes from the documentary morass.[14]

A Line[15] messaging thread between Mr. Chang and [redacted], *see* Simons Decl., Ex. 13 (the "Chang-[redacted] Chats"), provided by [redacted] and heavily relied upon in the Warrant Affidavits,[16] presents non-contiguous, contradictory depictions of conversations bearing the same date and time stamp. For instance, on page USAO_023340, the conversation begins on June 21, 2024 at 6:01 PM, continues on June 22, 2024 at 9:59 AM, and ends at 10:23 AM on the same day. The following page of this document—again, the same individuals are still using Line—reflects a conversation that starts on June 21, 2024 at 10:28 AM, but then jumps directly to June 23, 2024 at 12:34 PM, with no sign of the June 22, 2024 conversation from the previous page. *Id.* at USAO_023341. These chat excerpts were crucial to establishing probable cause because the Warrants cite a message purportedly sent by Mr. Chang on June 22, 2024 at 10:05 AM that stated, "we need to ship 6 Units to Christine Bejing [sic]." *See* Liaw SCA Warr. ¶ 32(b)(vii); [redacted] And this example is not an isolated one. The Line conversations between Mr. Chang and [redacted] are replete with these inconsistencies. *See, e.g.,* Chang-[redacted] Line at USAO_023374 (messages begin on September 21, 2024 and skip to September 26,

---

[14] We requested that the government identify the search parameters applied to documents produced by [redacted] and the process used to select the screen shots of the instant messaging applications provided by [redacted]. *See* Boxer Decl., Ex. C. The government declined to provide the requested information. Boxer Decl., Ex. E.

[15] Line is an instant messaging application commonly used in Asia.

[16] *See* Liaw SCA Warr. ¶ 32(b)(v) (quoting Chang-[redacted] Chats at USAO_023335) *id.* ¶ 32(b)(viii) (quoting Chang-[redacted] Chats at USAO_023364), *id.* ¶ 32(b)(ix);(quoting Chang-[redacted] Chats at USAO_023446), *id.* ¶ 32(b)(x) (quoting Chang-[redacted] Chats at USAO_023464); *id.* ¶ 33(b) (quoting Chang-[redacted] Chats at USAO_023500); *id.* ¶ 33(h) (quoting Chang-[redacted] Chats at USAO_023532); *id.* ¶ 33(k) (quoting Chang-[redacted] Chats at USAO_023534); *see also* Devices Warr. ¶ 14(d) (quoting Chang-[redacted] Chats at USAO_023340); *id.* ¶ 14(f) (quoting Chang-[redacted] Chats at USAO_023380); *id* ¶ 14(g) (quoting Chang-[redacted] Chats at USAO_023408); *id.* ¶ 14(l)(iii) (quoting Chang-[redacted] Chats at USAO_023532).

but messages on previous page end on September 25, 2024); *id.* at USAO_023503 (messages begin on April 24, 2024, and continue on May 7, but messages on previous page show messages beginning on April 24 and continuing on May 3–5, 2025); *id.* at USAO_023524 (messages begin on June 13, 2025 and continue on June 28, but previous page reflects messages from June 27).

Excerpted Line communications between Mr. Willy Sun and [redacted], also heavily relied on throughout the Warrants,[17] are riddled with the same kind of discrepancies. *See* Simons Decl., Ex. 14 (the "Willy Sun-[redacted] Chats"). Paragraph 33(h) to the Liaw SCA Warrant discusses a July 30, 2025, conversation between Mr. Willy Sun and [redacted] regarding a draft email to send to Super Micro Compliance about an upcoming Super Micro audit. The Agent's interpretation of those communications was that Mr. Willy Sun was instructing [redacted] to send an email falsely stating that Super Micro's servers were located at [redacted]'s SuperNap data center in [redacted]. Liaw SCA Warr. ¶ 33(h); *see also* Devices Warr. ¶ 14(l)(iii) (referencing the same message); [redacted] (same). The above-referenced July 30, 2025 Line communication is time stamped 5:36 AM, with another message immediately following at 7:53 AM. *See* Willy Sun-[redacted] Chats at USAO_023559. The previous page of the same document of Line communications, *id.* at USAO_023558, reflects messages attributed to the same speakers from July 30 (the same day) time stamped 7:04 AM to 11:09 PM. Yet, the 7:53 AM message purportedly from the same day is nowhere to be seen in this message string. The implausibility of these dueling July 30 messages could not have been missed by the agents who swore to the Warrant Affidavits. And issue is pervasive throughout the Willy Sun-[redacted] Chats. *See id.* at USAO_023556 (reflecting chats dated August 4 and 6, 2025, regarding a Super Micro audit of [redacted] that are not included in the previous

[17] *See* Liaw SCA Warr. ¶ 32(b)(xi) (quoting Willy Sun-[redacted] Chats at USAO_023564); *id.* ¶¶ 33(c) (quoting Willy Sun-[redacted] Chats at USAO_023570); *id.* ¶ 33(d) (quoting Willy Sun-[redacted] Chats at USAO_023565); *id.* ¶ 33(h) (quoting Willy Sun-[redacted] Chats at USAO_023559);Devices Warr. ¶ 14(l)(iii) (quoting Willy Sun-[redacted] Chats at USAO_023559); *see also* [redacted]

page reflecting continuous messages between August 3, 2025 to August 11, 2025); *id.* at USAO_023560–63 (reflecting four different versions of messages exchanged "Thu, 7/10"); *id.* at USAO_023568–72 (showing at least four different versions of messages exchanged on "Thu, 5/1").

The facial unreliability of these communications is further demonstrated by messages containing embedded screenshots that, on their faces, were not created until ***after*** the messages transmitting them were sent. Paragraph 14(f) of the Devices Warrant alleges that Mr. Liaw "took steps" to remove a compliance hold and "undermine the audit," referencing communications reflected in the Chang-[redacted] Chats. *See* Simons Decl., Ex. 14 at USAO_023380. The record underlying this allegation is a Line conversation dated October *3*, 2024, concerning the audit site visit, registration of auditors, and a related leasing/contract document exchange. *Id.* Within that same October *3*, exchange, Mr. Chang allegedly sent [redacted] a screenshot of an email from Mr. Liaw to Mr. Chang and a Super Micro Compliance team member—that is dated October *11*, 2024. *Id.*; *see also* Simons Decl., Ex. 15.[18] An email sent on October 11 obviously cannot have been captured in a screenshot transmitted in a Line message dated eight days *earlier*, on October 3. *See also* Simons Decl., Ex. 13 at USAO_023515 (showing text messages dated May 9, 2025, but a screen shot of an email dated May 19, 2025); *id.* at USAO_023530 (showing text messages dated July 9, but a screen shot of a Super Micro email dated July 24, and discussing emails sent in August). This is not a reflection of differing time zones or a metadata artifact; it is a chronological impossibility, and it seriously undermines the reliability of the Line communications that the

[18] The underlying email is dated October 11, 2024, as a result of differing time zones associated with its transmission and receipt.

Warrant Affidavits relied on to support the contention that Mr. Liaw took steps to undermine the Super Micro audit.

*Undisclosed Redactions*. The text message screenshots on which the Warrant Affidavits rely contain heavy redactions, often mid-conversation, that obscure context and impede a reliable interpretation of the communications. Yet the government omitted this fact when it quoted from them in Warrant Affidavits. For example, as discussed, the Warrants frequently quote and characterize exchanges reflected in the Chang-[redacted] Chats. Simons Decl., Ex. 13. That collection of Line communications provided to the government spans 215 PDF pages, 81 of which contain redactions. The Warrants also rely on Line communications between Mr. Chang and [redacted] *See* Liaw SCA Warr. ¶ 33(e) (relying on Simons Decl., Ex. 16 at USAO_0181247); Devices Warr. ¶ 14(l)(i) (same), [redacted] (same). That document alone has 14 PDF pages that are completely redacted for unknown reasons which were not communicated to the Magistrate Judges. The prevalence of these redactions, along with the demonstrated history of untruthfulness of the individuals who provided them ([redacted] and [redacted], who have reported their involvement in a litany of misrepresentation to Super Micro Compliance), would have alerted the Magistrate Judges that they lacked context for many of the referenced conversations.

The government possessed, but did not disclose, information about the heavy redactions and multiple inconsistent versions of the conversations that were central to the Warrant Affidavits' probable-cause showing. These glaring omissions constitute a "reckless disregard for the truth" in a statement necessary for the Magistrate Judges' probable cause findings, requiring suppression of evidence seized pursuant to the Warrants. *See Franks*, 438 U.S. at 154; *see also McColley*, 740 F.3d at 823 ("Recklessness is inferred where the omitted information was clearly critical to the probable cause determination."). The failure to offer any explanation of the [redacted]'s numerous

redactions was too significant to be dismissed as innocent oversight, *see United States v. Roman*, 311 F. Supp. 3d 427, 429 (D. Mass. 2018) (finding "the Government committed a series of easily avoidable errors which, combined with the admittedly high risk of the harm . . . amounted to a reckless disregard for the truth"), as there were multiple inconsistent versions of conversation strings between the same participants on the same dates, frequently only pages apart. *See, e.g.*, Simons Decl., Ex. 13 at USAO_023357–62 (showing six different versions of communications from August 5, 2024).

Also, the good-faith exception cannot salvage the Warrants. It does not apply, and suppression remains appropriate where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *See United States v. Leon*, 468 U.S. 897, 923 (1984). The government cannot claim objectively reasonable reliance on Warrants where it rendered them defective by omitting information it possessed and knew, or should have known, was material to the probable cause determination. *See United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (good-faith exception "cannot shield even an officer who relies on a duly issued warrant" where "the issuing magistrate has been knowingly misled" (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011))).

**2. The Warrants Present Mr. Liaw's Communications in a Misleading Manner and Omit Critical Context.**

Suppression is also warranted because the Warrant Affidavits present Mr. Liaw's communications misleadingly by (a) conflating Mr. Liaw's conduct with that of his alleged co-

conspirators and (b) mischaracterizing Mr. Liaw's ordinary business communications by simply juxtaposing them with communications that reference China but do not include Mr. Liaw.

*Conflating Mr. Liaw with Others*. The Warrant Affidavits erroneously pair sweeping assertions about illicit conduct of all the alleged co-conspirators with no examples specific to Mr. Liaw. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("a search or seizure of a person must be supported by probable cause particularized with respect *to that person*.") (emphasis added). For example, the Liaw SCA Warrant Paragraph 27 states: "In furtherance of this scheme, it *appears* that LIAW, [Willy] SUN, CHANG, and others, have also sought to deceive [Super Micro's] internal compliance team and U.S. authorities conducting audits and inspections of [redacted] purchases of [Super Micro] servers." Liaw SCA Warr. ¶ 27 (emphasis added). But the example that immediately follows that statement concerns only Mr. Willy Sun's and Mr. Chang's alleged efforts to arrange dummy servers in [redacted]'s warehouse to mislead Super Micro auditors and, later, to mislead a BIS agent conducting a post-shipment verification. *See id.* The Warrant Affidavits offer *no* evidence of Mr. Liaw's participation in or awareness of such conduct.

Likewise, Liaw SCA Warrant Paragraph 32(b), and an identical statement in the [redacted] (Exhibit 2 to the Devices Warrant), asserts that Mr. Liaw, Willy Sun, Chang, and [redacted] and [redacted] communicated through Line to discuss [redacted]'s purchase of Super Micro servers "for re-export to China." But the examples referencing Mr. Liaw that follow contain *no* reference at all to Mr. Liaw's discussions of exports or shipments, let alone to China. Instead, Paragraphs 32(b)(i)–(iv) of the Liaw SCA Warrant quote messages from Mr. Liaw to [redacted], a Super Micro customer, asking him to deliver purchase orders to Super Micro and a screen shot of a conversation where a broker, [redacted], is complaining about a *lack* of shipment. *See also* [redacted] Other paragraphs cite examples

attributed to other individuals, not to Mr. Liaw, in particular to communications between Mr. Chang and [redacted] and Mr. Willy Sun and [redacted] that refer to shipments to China. But Mr. Liaw is not involved in any of these communications. *See* Liaw SCA Warr. ¶¶ 32(b)(v)–(x); [redacted]

Similarly, Paragraph 14(g) to the Devices Warrant Affidavit asserts that "LIAW and Chang worked to grow Supermicro's business in China by encouraging [redacted] to increase the speed and size of its orders." The Warrant quotes two messages in support of that assertion: first, a Line communication between Mr. Chang and [redacted], asking whether a shipment is going to Shenzhen or Hong Kong, *see* Simons Decl., Ex. 13 at USAO_023408; and second, a text message on the same day from Mr. Liaw to [redacted] asking for his forecast for the next few months, so that [redacted] can secure a GPU allocation from Nvidia. *See* Simons Decl., Ex. 17 at USAO_018457. The contrast between the quoted communications is stark. The [redacted]-Chang exchange discusses a shipment to China, but the Liaw-[redacted] message simply asks a customer for a forward-looking sales forecast to facilitate the planning of GPU allocations.

<u>*Unsupported China References*</u>. The Warrant Affidavits tack onto Mr. Liaw's communications unfounded references to China, where the communications themselves contain no such reference. *See United States v. Bertini*, No. 23 Crim. 61, 2023 WL 8258334, at *5–*6 (S.D.N.Y. Nov. 29, 2023) (warrant lacked probable cause where agent made assumptions that were unsupported by the underlying photo and video evidence). The following three examples are illustrative.

(1) Paragraph 32(a)(ii) to the Liaw SCA Warrant points to an email exchange in which Mr. Willy Sun tells Mr. Liaw that "there are many customers who have "needs for AI inference" and asks for help reducing the price of GPUs. The agent extrapolates from that message the averment

that Mr. Willy Sun was asking for Mr. Liaw's help to reduce the price of GPUs "for potential re-export to China." *See* Liaw SCA Warr. ¶ 32(a)(ii); *see also* [redacted] The underlying document itself, however, contains *no* mention of China. *See* Simons Decl., Ex. 18 at USAO_R01_00883056. The email was, in fact, included as part of Mr. Liaw's regular report to his superior, in which Mr. Liaw provides an update on his week's activities. Nothing in the report references China. Rather, the email reflects a discussion concerning a different Super Micro customer, not [redacted], that was seeking a lower price on servers nearing end-of-life status. *Id.* It cannot be viewed as a good faith error that the Agent read into this email exchange an implication that Mr. Liaw was communicating about shipments or prices for GPUs to be sold to China customers.

(2) The Liaw SCA Warrant Paragraph 32(a)(iii) describes an email in which Mr. Willy Sun asked a Nvidia representative about the purchase of GPUs and additional Nvidia installation equipment, as well as a related email in which Willy Sun explained to Mr. Liaw that Willy Sun's team had the engineering expertise to install the GPUs themselves. Based on these communications, the agent asserts that Willy Sun was informing Mr. Liaw that he would handle installing Nvidia GPUs into Super Micro servers "for potential re-export to China." Liaw SCA Warr. ¶ 32(a)(iii); *see also* [redacted] But there is no reference to China in this email, nor anything that could be read to imply one. *See* Simons Decl., Ex. 19 at USAO_R01_00883052–53. In the excerpted email, Mr. Willy Sun tells Nvidia personnel that he does not wish to purchase installation services for H100 servers and separately advises Mr. Liaw that his team can perform the server installation itself. The government's assertion that this reflects an effort to facilitate the re-export of Super Micro servers to China is illogical. If Mr. Liaw already

knew the servers were destined for China, there would have been no reason for Mr. Willy Sun to explain his team's installation capabilities.

(3) Paragraph 32(b)(iii) to the Liaw SCA Warrant Affidavit quotes a Line message from Mr. Liaw to [redacted] where Mr. Liaw asks [redacted], "Can you please get PO to Steven to book the allocation asap?" The Agent concludes from this message that Mr. Liaw was "instructing [redacted] to submit a purchase order to CHANG in order to ensure that those servers would be reserved in the 'allocation' for [redacted], for potential re-export to China." Liaw SCA Warrant ¶ 32(b)(iii); *see also* [redacted] This exchange contains no reference to China whatsoever. *See* Simons Decl., Ex. 17 at USAO_018482. In fact, this exchange is consistent with Mr. Liaw's other communications with [redacted] regarding placing purchase orders in order to reserve GPU allocations from Nvidia. *See id.* at USAO_018435 ("Nvidia will not do any allocation except Supermicro put po to Nvidia…Supermicro will not put PO to Nvidia if customers are not sending in po…"); *id.* at USAO_018480 ("We need to send the po or forecast to us then we need to book from NVidia in advance with PO to NVidia also! Otherwise, it will not count from Nvidia side!"); *id.* at USAO_018790 ("Once you put the PO in, we will allocate for you, sir! [redacted] has placed 144 x B300 … This is the 1st one specially allocated by Nvidia."); *id.* at USAO_018348 ("H200 will be very hot due to B200 delayed! So, need your PO to secure H200 allocation").

In addition, documents Super Micro produced to the government pursuant to a Grand Jury Subpoena before the Devices Warrant issued confirm that Mr. Liaw's messages reflect routine compliance with Super Micro's procedures for processing restricted GPU orders from customers. An April 2024 training deck, entitled "Sales Restricted GPUs—Due Diligence Qualification Process," explains that when a Super Micro sales team member starts on a sales lead he must

contact an Nvidia Account Manager, who will "create a forecast for the arrangement, and create a Product Named Customer (PAC) on Nvidia's CRM system for forecast tracking" used by Nvidia "for their material planning for potential allocation requirements." Simons Decl., Ex. 23 at 4; *see also* Simons Decl., Ex. 24 (describing company policy for restricted GPU orders that "[e]ach order must be complete" prior to engaging Nvidia). A detailed flow chart illustrates this process and confirms that formal Purchase Orders are required before a GPU allocation from Nvidia can be requested by Super Micro. *See* Simons Decl., Ex. 25. The government nevertheless appears to have invented out of whole cloth a "potential" China-connection in the above-referenced communication.

In each of these instances, the underlying Liaw communication is silent as to China, Chinese customers, or any shipment or export destination. The failure of the Affidavits to make this clear, while opining that the communications concerned potential exports to China, was intentional or, at best, reckless. *See Castellanos*, 820 F. Supp. at 84 ("[I]f the affiant made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true, that would show reckless disregard for the truth.").

**D. The Warrants' Omissions and Misleading Presentations Were Necessary to a Finding of Probable Cause.**

Having established that the Warrant Affidavits made omissions and misstatements with reckless disregard of the truth, the inquiry turns to materiality. Once the court sets aside the tainted material and inserts the omitted truths, the issue is whether there is "a residue of independent and lawful information sufficient to support probable cause." *Awadallah*, 349 F.3d at 65. Here that question should be answered in the negative.

The information omitted regarding informant credibility, together with the evident irregularities in the documents provided, were necessary to a finding of probable cause. Absent

those omissions, the Warrants could not withstand scrutiny. An informant's "credibility is plainly relevant—even critical—to the probable cause determination," and the failure to disclose "known information that goes directly to the credibility" of the source is material. *See McColley*, 740 F.3d at 825. The corrected Warrant Affidavits must therefore be read with [redacted]'s cooperation incentives disclosed; and, once they are, the proffers and [redacted]-supplied documents can no longer be credited at face value as they were presented to the Magistrate Judges. *Accord Glover*, 755 F.3d at 811 ("the complete omission of known, highly relevant, and damaging information about [the informant's] credibility . . . . impaired the neutral role of the magistrate deciding whether to issue the warrant"). The Warrant Affidavits also presented the [redacted]-provided chats as reliable evidence of a shipment-to-China scheme while omitting that the same conversations appeared in multiple, contradictory versions bearing identical date-and-time stamps, that certain screenshots depicted documents not created until after the messages purportedly transmitting them, and that the productions were pervasively redacted mid-conversation. Because the Warrant Affidavits draw extensively from these chat communications, *see supra* § I.C nn. 16–17, excising the quoted passages leaves insufficient evidence to support probable cause. *See Lahey*, 967 F. Supp. 2d at 724–25 (once affiant's "sequencing misrepresentation and related omissions" were corrected, the "hypothetical corrected affidavit [was] a thin reed on which to base a search").

Additionally, properly describing the quoted documents and removing the agents' unsupported gloss—"for potential re-export to China" and "potential export to China"—independently defeats probable cause. Had the Warrant Affidavits disclosed that Mr. Liaw's underlying communications say nothing about China, Chinese customers, or any export destination, it would have been obvious to the Magistrate Judges that these ordinary business communications did not support a probable cause finding. As in *United States v. Big Apple Bag*

*Co.*, the residue is a description of conduct that is equally as consistent with a lawful business as with an illegal one. 306 F. Supp. 2d 331, 336–37 (E.D.N.Y. 2004) (once the warrant affidavit's false statements about contraband "bullets" and crack pipes were excised, the remaining lawful information—large quantities of ordinary containers commonly used in a non-contraband business—was insufficient to establish probable cause).[19] Here, a corrected affidavit would characterize Mr. Liaw's communications as discussions of purchase orders and allocation requests, without reference to China, together with efforts to facilitate Super Micro's compliance review, all of which Super Micro's own procedures confirm were standard for restricted-GPU sales.

Accordingly, once the Court considers (1) [redacted]'s self-serving disclosure to BIS and the proffer statements of [redacted] and [redacted], presented with disclosure of [redacted]'s substantial incentives to cooperate with the government and achieve a nonprosecution agreement (2) the reliance in the Affidavits on redacted, selectively excerpted, and internally inconsistent and chronologically impossible message strings, and removes (3) the government's unsupported interpretation of routine business communications as references to exports to China where the underlying texts provide no support for such interpretations, the residue is insufficient to establish probable cause.

**E. The Evidence Derived from the Devices Warrant Should Be Suppressed for the Additional Reason That It Is Fruit of the Poisonous Tree.**

The evidence retrieved as a result of the Devices Warrant should be suppressed because it was obtained in reliance on the fruits of the defective Liaw SCA Warrant. The exclusionary rule

[19] On reconsideration, the court held that certain evidence was independently admissible under the plain view exception, but only because it was lawfully observed during a protective sweep separate from the defective warrant; the government conceded it would not contest the underlying suppression. See *United States v. Big Apple Bag Co.*, 317 F. Supp. 2d 181, 190 (E.D.N.Y. 2004). That ruling has no bearing here because the court left intact its holding that lawful conduct and items with ordinary lawful uses cannot, without more, establish probable cause, and here, Mr. Liaw's communications describe conduct that was itself lawful.

"reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality . . . ." *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015). The relevant question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

Evidence derived from the Devices Warrant should be suppressed because the Devices Warrant's probable cause showing was built directly on evidence obtained from the Liaw SCA Warrant. Notably, in *United States v. Djibo*, the court suppressed the fruits of a follow-on warrant because the record showed that the agent relied on material obtained through an earlier unlawful search. 151 F. Supp. 3d 297, 309 (E.D.N.Y. 2015); *see also United States v. Smith*, 673 F. Supp. 3d 381, 399–400 (S.D.N.Y. 2023) (finding that, despite "independent evidence of [the defendant's] potentially unlawful conduct," including "witness interviews, information taken from [the defendant's] social media page, and more" the only basis for probable cause was evidence already derived from a prior tainted search).

The Devices Warrant's reliance on the fruits of the Liaw SCA Warrant is explicit. Indeed, the [redacted] expressly cites text message communications over encrypted messaging applications, videos, and photographs derived from the Liaw SCA Warrant. *See, e.g.*, [redacted] ("Based on my involvement in this investigation, including . . . my review of returns from the [Liaw SCA Warrant], I have learned . . . ."); And the Devices Warrant repeatedly references the Agent's "review of returns from the SCA Warrants." *See* Devices Warr. ¶¶ 16 & n.1, 19, 21. Such express reliance forecloses any argument that the Devices Warrant rests on an independent source untainted by the unlawful Liaw SCA Warrant. As the

evidence derived from the Devices Warrant is a product of the prior unlawful search, it too must be suppressed.

## II. Because the Government Violated Mr. Liaw's Constitutional Rights and the Express Provisions of the Warrant in Gaining Access to His Phones, the Court Should Suppress the Contents of the Phones.

The Court should suppress the contents of the two Phones seized at the time of Mr. Liaw's arrest. As an initial matter, the agents acted beyond the scope of the Devices Warrant, which only authorized government access to the Phones by biometric means. The agents ignored this term of the Warrant and obtained access by passcodes in violation of the Fourth Amendment. And these phone passcodes were obtained by questioning Mr. Liaw after the right to counsel had attached in violation of the Sixth Amendment. In addition, the agents questioned Mr. Liaw while he was in custody but before he was read *Miranda* warnings, and after he had asked to call an attorney, in violation of the Fifth Amendment.

### A. Background

Mr. Liaw was indicted on March 17, 2026. On March 19, 2026, at approximately 6:07 AM, *see* Simons Decl., Ex. 26, Mr. Liaw and his wife were asleep when seventeen FBI agents surrounded their home. *See* Simons Decl., Ex. 27; Simons Decl., Ex. 28 (video). When Mr. Liaw and his wife did not respond to door-knocking by the agents, Simons Decl., Ex. 29 (video), the agents broke down the front door with a battering ram. *See* Simons Decl., Ex. 30; Simons Decl., Ex. 41 (video) at 5:11. Mr. Liaw thought they were being robbed. Liaw Decl. ¶ 3. Mr. Liaw picked up his two Phones from the nightstand where they were charging and went downstairs to investigate, as did his wife. *Id.* There, they encountered a group of agents armed with automatic rifles and drawn handguns. *Id.*; *see also* Simons Decl., Ex. 26. The agents told Mr. Liaw to drop the Phones (and raise his hands), and he put them down on the floor. *See* Liaw Decl. ¶ 3; Simons

Decl., Ex. 32 (video) at 8:25. Mr. Liaw was then handcuffed. *See* Simons Decl., Ex. 27 (Mr. Liaw "was placed under arrest at approximately 6:15 AM"); Simons Decl., Ex. 41 (video) at 7:01.

An agent explained that they had a warrant to seize and search Mr. Liaw's Phones. *See* Simons Decl., Ex. 33 (video) at 9:42 (Agent: "We have a search warrant for all of your devices, such as your cellphones and your computers. Will you help us find those? . . . We don't want to go through your whole house." Mr. Liaw: "My cellphone is [inaudible]." Agent: "Ok. We will grab those."). The agents then seized the Phones that Mr. Liaw had dropped on the floor. *See* Simons Decl., Ex. 27. Mr. Liaw asked if he could have his cellphone to retrieve his attorney's phone number and call him, referring to an internal counsel at Super Micro. Liaw Decl. ¶ 8.[20] An agent informed Mr. Liaw that he would be able to call his attorney later, and handed Mr. Liaw his Work Phone to retrieve the attorney's phone number. *Id.*; *see* Simons Decl., Ex. 27 ("LIAW asked for his attorney's telephone number while still on scene."). With agents standing around him, Mr. Liaw punched in the passcode, 1111. *See* Liaw Decl. ¶ 8. One of the agents watched Mr. Liaw enter the passcode. *Id.* An agent then asked Mr. Liaw to confirm the passcode as four ones (1111), and Mr. Liaw did so. *Id.* After the internal counsel's telephone number was found, an agent wrote it down on a Post-It Note. *See* Simons Decl., Ex. 27; Liaw Decl. ¶ 8.

An agent then asked Mr. Liaw if the passcode to his second Phone (his Personal Phone) was also "1111." Liaw Decl. ¶ 9. Mr. Liaw responded that the passcode for his Personal Phone was "111111," after which he saw an officer writing. *See* Simons Decl., Ex. 34 (listing the iPhone 16 passcode as "111111" and iPhone 17 passcode as "1111"); Simons Decl., Ex. 10 (same). The agent handed Mr. Liaw his Personal Phone and told him to enter the "111111" passcode to "prove

[20] The agents turned off their bodycams prior to this portion of the interaction. FBI paperwork identifies Agent Renee Nicole Cabirac as the "locating" agent and Agent Kathryn Anke Taylor as the "seizing" agent with respect to the Phones. Simons Decl., Ex. 10.

that it worked;" Mr. Liaw complied and the Personal Phone opened. Liaw Decl., ¶ 9. The agent then again took possession of the second Phone.

The only evidence seized at the time of the search and arrest consists of Mr. Liaw's two Phones. *See* Simons Decl., Ex. 26. Although the Magistrate Judge, in the Devices Warrant, had only authorized phone access by facial recognition, the agents did not seek to open the Phones by this method. Liaw Decl. ¶ 10. During the above-summarized events, the agents spoke to Mr. Liaw in English. Mr. Liaw's native language is Chinese. *See* Liaw Decl. ¶ 14. He speaks English to a limited extent and speaks Chinese when endeavoring to understand a topic of conversation precisely. *Id.*

Mr. Liaw was transported to an FBI office. *See* Simons Decl., Ex. 27 (noting arrival at approximately 7:15 AM). The agents did not advise Mr. Liaw of his rights until 8:50 AM. *See id.* (Mr. Liaw "signed an Advice of Rights form" and "[n]o Interview was conducted" thereafter); Simons Dec., Ex. 35 (advice of rights form signed at approximately 8:50 AM). The agents next transported Mr. Liaw to the courthouse, arriving at 9:25 AM. Simons Decl., Ex. 27. He was presented before a Magistrate Judge in the Northern District of California at approximately 1:00 PM. *See* ECF No. 15. Despite the agent's representation to Mr. Liaw that he would be permitted to speak to his attorney using the number retrieved from Mr. Liaw's Work Phone, Mr. Liaw was not afforded an opportunity to call counsel. Liaw Decl. ¶ 12.[21]

### B. The Government Violated Mr. Liaw's Sixth Amendment Rights by Deliberately Eliciting His Passcodes After the Right to Counsel Had Attached.

Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth

[21] To the extent that the facts regarding the search of the Phones are disputed, or other factual defenses are raised by the government in its opposition papers, Mr. Liaw respectfully requests an evidentiary hearing regarding his motion to suppress the contents of his Phones.

Amendment right to counsel "attaches" at "the initiation of adversary judicial criminal proceedings—whether by way of indictment or information." *United States v. Mills*, 412 F.3d 325, 329 (2d Cir. 2005). Once the Sixth Amendment attaches, it "imposes on the government an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel." *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993) (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964)). Any incriminating statements "deliberately elicited" thereafter "without an express waiver of the right to counsel" are "render[ed] inadmissible in the prosecution's case in chief statements." *Michigan v. Harvey*, 494 U.S. 344, 348 (1990). Deliberate elicitation occurs when government conduct is "designed" to spark an incriminating response from the defendant. *Rosa*, 11 F.3d at 329. This encompasses both "affirmative interrogation" (*i.e.*, direct questioning), *see United States v. Henry*, 447 U.S. 264, 271 (1980), and any other conduct that seeks to generate an incriminating response. *See United States v. Jacques*, 684 F.3d 324, 331 (2d Cir. 2012) ("deliberate elicitation" is any "action, beyond merely listening" meant to stimulate inculpatory remarks). Once a Sixth Amendment violation is found, derivative evidence stemming from the defendant's statements is also suppressed. *See Nix v. Williams*, 467 U.S. 431, 441-43 (1984); *see, e.g*, *United States v. Kimball*, 884 F.2d 1274, 1278–79 (9th Cir. 1989) ("[T]he appropriate remedy for a violation of *Massiah* includes not only suppression of all evidence directly obtained through governmental misconduct, but also suppression of all evidence that can properly be designated the fruits of that conduct.").

The Court should suppress the evidence found on the Work Phone and Personal Phone because after Mr. Liaw's right to counsel had attached the government "deliberately elicited" Mr. Liaw's cellphone passcodes.

*Attachment*. The grand jury returned the Indictment on March 17, 2026. *See generally* Ind. Accordingly, when the government executed the Devices Warrant on March 19, 2026, *see* Simons Decl., Ex. 27, Mr. Liaw's Sixth Amendment rights had attached. *See Mills*, 412 F.3d at 328 (Sixth Amendment rights triggered by indictment); *see also United States v. Austin*, 496 F. Supp. 3d 815, 822 (S.D.N.Y. 2020) (after indictment "the defendant's right to assistance of counsel is self-executing and need not be invoked").[22]

*Deliberate Elicitation*. The government "deliberately elicited" Mr. Liaw's Phone passcodes. The agent started by asking Mr. Liaw if he could help her find all of his devices. *See* Simons Decl., Ex. 33 (video) at 9:42 (Agent: "We have a search warrant for all of your devices, such as your cellphones and your computers. Will you help us find those? . . ."). Later, when Mr. Liaw asked to call his attorney, an agent responded that he would be permitted to do so later, informing Mr. Liaw that he could retrieve the attorney's phone number from his Work Phone. Mr. Liaw typed in his passcode (1111) while surrounded by agents. An agent then asked Mr. Liaw to confirm the passcode, and Mr. Liaw so confirmed. Next, an agent asked Mr. Liaw if his Personal Phone's passcode was the same as the passcode for the Work Phone that Mr. Liaw had just opened. Mr. Liaw said that the passcode to the Personal Phone was 111111. An agent then handed the Personal Phone to Mr. Liaw and directed him to type in the passcode to "prove that it works," which Mr. Liaw did. Liaw Decl. ¶ 9.

Such deliberate elicitation of statements by Mr. Liaw ran afoul of the Sixth Amendment and the evidence found on both Phones should be suppressed. *See Henry*, 447 U.S. at 271 ("deliberate elicitation" test is "certainly" satisfied by "affirmative interrogation"). That the questions asked by the agents were designed to learn the passcode information and were not idle

[22] Mr. Liaw also invoked his right to counsel before the agents elicited and then demanded his passcodes. *See infra* Section II.D.

conversation is plain on the face of the questions asked and related statements made—*e.g.*, "confirm that your passcode is 1111" (Work Phone); "is your passcode for the [Personal Phone] the same as for the [Work Phone];" and enter the passcode to "prove that it works." And, notably, they posed these questions and statements despite Mr. Liaw's request to call his counsel, a request that—contrary to the agent's representation to Mr. Liaw that he would be permitted to do so—was never fulfilled. *See United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) (Sixth Amendment analysis focuses on the "intentional effort" of the government officers). Consequently, the Court should suppress the evidence from the Work Phone and Personal Phone. *See United States v. Maffei*, No. 18 Crim. 174, 2019 WL 1864712, at *10 (N.D. Cal. Apr. 25, 2019) (suppressing evidence from phones under Sixth Amendment where the agent "approach[ed] defendant after the initiation of formal proceedings, and after defendant had unequivocally invoked her right to counsel, and stat[ed] 'that he was there to get the passcode for the phones'").

### C. The Government Violated Mr. Liaw's Fourth Amendment Rights by Exceeding the Devices Warrant's Scope.

The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Here, though the government obtained the warrant necessary to seize and search Mr. Liaw's devices, *Riley v. California*, 573 U.S. 373, 393 (2014), the evidence found on Mr. Liaw's Phones should be suppressed, because the Device Warrant directed the agents to open the Phones only through biometrics, not by questioning Mr. Liaw to reveal his passcodes. As the Second Circuit has ruled, "because a warrant generally authorizes no more than what it expressly provides, to act unreasonably beyond the terms of a warrant is akin to acting without a warrant at all." *Simon v. City of N.Y.*, 893 F.3d 83, 94 (2d Cir. 2018). Indeed, "when items outside the scope of a valid warrant are seized, the normal remedy is suppression . . . ." *United States v. Matias*, 836 F.2d 744,

747 (2d Cir. 1988); *see also United States v. Lustyik*, 57 F. Supp. 3d 213, 230 (S.D.N.Y. 2014) ("[T]he retention of items outside the scope of the warrant can be justified only if the Government meets its burden of demonstrating that those items fall within an exception to the warrant requirement . . .").

**1. The Devices Warrant Authorized the Government to Unlock Mr. Liaw's Phones Only Through the Use of Biometrics.**

In the Devices Affidavit, the government requested authority to search Mr. Liaw's phones solely through a "biometric unlock." Dev. Aff. ¶ 30. The Devices Affidavit states:

> I request authority to allow law enforcement agents to compel the Subject Persons to display any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) requiring such biometric access subject to seizure pursuant to the warrant for which law enforcement has reasonable suspicion that the Subject Person in question's physical biometric characteristics will unlock the device(s). *This authority is not to compel the Subject Persons to provide a numeric passcode*.

*Id.* (emphasis added). The Devices Affidavit explained the basis for this request as follows:

*First*, many cellphones "offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode," *id.* ¶ 30a, and many users enable biometrics because they are "more convenient." *Id.* ¶ 30d. *Second*, under the Fifth Amendment, which we discuss *infra* at Section II.D.1, the government cannot compel a defendant to reveal his/her phone passcode but can manipulate the defendant's biometrics (e.g., place a finger to the scanner) to open a phone. *See id.* ¶ 29 n.1 (citing *United States v. Payne*, 99 F.4th 495, 513 (9th Cir. 2024)). *Third*, the "passcode or password that would unlock the device(s) subject to search currently is/are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant." *Id.* ¶ 31. *Fourth*, "biometric features will not unlock a device in some circumstances even if such features are

enabled;" for example, if "a device has been restarted, inactive, or has not been unlocked for a certain period." *Id.* Accordingly, "in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time." *Id.*[23]

Based on these representations, the Magistrate Judge authorized only a "biometric unlock" of Mr. Liaw's devices:

> [T]his warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the Subject Person(s) on the fingerprint scanner of any electronic devices seized, pursuant to this warrant, for which law enforcement has reasonable suspicion that the Subject Persons' physical biometric characteristics will unlock the devices; (2) hold such devices in front of the face(s) of the Subject Person(s) to activate the facial-recognition feature; and/or (3) hold such devices in front of the face(s) of the Subject Person(s) to activate the iris recognition feature.

Dev. Warr. at 914 § D.

**2. The Government Unlocked Mr. Liaw's Phones by Compelling His Disclosure of the Phones' Passcodes.**

The Devices Warrant is clear: the government was authorized solely to open Mr. Liaw's phones through biometrics, not by using his passcodes. *See United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015) ("We look directly to the text of the search warrant to determine the permissible scope of an authorized search."). Nevertheless, the agents declined to follow the Devices Warrant's command, not even attempting to open the Phones through biometrics. Instead, they questioned Mr. Liaw while he was in custody to disclose the passcodes. These facts alone mandate suppression. *See United States v. Raymond*, No. 21 Crim. 380, 2023 WL 7005341, at *10 (D.D.C. Oct. 24, 2023) (suppressing where government went "decidedly beyond the scope of the warrant" by "compel[ing] not just biometrics but also Defendant's entry of his passcodes");

[23] An iPhone's passcode also can only be changed by entering the current passcode, not through biometrics. *See Maffei*, 2019 WL 1864712, at *4 ("iPhone software requires the multidigit passcode in order to change or remove the encryption on the device.").

*Maffei*, 2019 WL 1864712, at *4 (suppressing where government demanded phone passcodes when the "text of the application . . ., and therefore the signed warrant provided, only the authority to compel defendant to provide a biometric key").

This consequence is not avoidable by an assertion that Mr. Liaw volunteered the passcodes. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219–23 (1973) (government must prove that consent was "freely and voluntarily given"—not "granted only in submission to a claim of lawful authority"—based on the "totality of all the circumstances"); *United States v. Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004) (government must prove voluntariness by a preponderance under an "objective" standard). Mr. Liaw did not believe, and could not have believed, that he had any choice but to answer the agents' questions. Seventeen agents, armed with guns, shocked Mr. Liaw out of bed at dawn by breaking down his door with a battering ram, pointing guns at him and his wife, separating him from his wife, and handcuffing him. And, the agents did not advise Mr. Liaw of his *Miranda* rights prior to asking their questions. *See, e.g. United States v. Hernandez*, No. 19 Crim. 97, 2020 WL 3257937, at *13 (S.D.N.Y. June 16, 2020) ("[T]he hour, the four or more officers present including some with guns . . . her lack of knowledge regarding her right to deny the police access, and the NYPD's failure to inform her of this right—indicates that Ms. Hernandez was vulnerable to the police's show of authority."); *United States v. Guzman*, 724 F. Supp. 2d 434, 442 (S.D.N.Y. 2010) (search not voluntary where "atmosphere" was "objectively coercive" based on "[s]even law enforcement officers" with "at least one with a firearm visible"). Mr. Liaw also interacted with the agents in English, which is not his native language, without an interpreter. *See, e.g.*, *Isiofia*, 370 F.3d at 233 (search not voluntary where defendant lacked "facility with English"); *United States v. Garcia*, 554 F. Supp. 3d 421, 434 (E.D.N.Y. 2021) (search not voluntary where

government failed to advise the defendant that she "may refuse consent to any search before the search begins" in Spanish). The totality of these facts objectively establish coercion.

The failure of the agents to provide M*iranda* warnings in these circumstances weighs heavily against a finding of voluntariness. *See, e.g.*, *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986) (key factor for voluntariness is "whether the alleged consenting person was advised of his constitutional rights"). The agents further represented that they had a warrant for Mr. Liaw's phones without disclosing that the warrant did not require him to reveal his phone passcodes. *See* Simons Decl., Ex. 33 (video) at 9:42. This created the misleading impression that Mr. Liaw was obligated to provide the passcodes. *See Bumper v. North Carolina*, 391 U.S. 543, 548-51 (1968); *see also United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir. 1980) ("Freedom of choice is deemed non-existent, however, if the officers have claimed official authority to conduct the search."); *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 287 (S.D.N.Y. 2008) (search not voluntary where "the person whose consent is sought is left with the impression that his consent cannot be lawfully withheld"); *cf. United States v. Munoz*, 987 F. Supp. 2d 438, 447 (S.D.N.Y. 2013) (suppressing given "coercive effect of a false promise that a warrant would issue" absent consent).

The questions the agents asked Mr. Liaw also followed his request to contact his lawyer. *See* Liaw Decl. ¶ 8. While trying to achieve that end, Mr. Liaw was peppered with questions about his phone passcodes and objectively believed that cooperating with the agent's demands was necessary to facilitate his request for counsel, adding to the factors that rendered his statements compelled, not voluntary. *See United States v. Booker*, 561 F. Supp. 3d 924, 932 (S.D. Cal. 2021) (suppressing phone search as involuntary where agent "essentially conditioned" the defendant's "access to [anxiety] medicine on disclosing his password"). Access to counsel cannot be used as a pressure point for leveraging consent to search. *See United States v. Kon Yu-Leung*, 910 F.2d

33, 41 (2d Cir. 1990) (refusal to allow a defendant to call his/her attorney is a factor suggesting a search was involuntary).

In sum, the "totality of circumstances" demonstrates Mr. Liaw's "submission" to the demands for his passcodes, not a "free and voluntary" grant of permission to search the Phones. *See, e.g.*, *United States v. Robinson*, No. 23 Crim. 192, 2025 WL 1359352, at *23 (E.D.N.Y. May 9, 2025) (suppressing phone search as non-voluntary because (1) the defendant was "not free to leave;" (2) the officer misrepresented that she "had full legal authority to search his phone;" and (3) the officer—by "stating 'what's the password for the phone'"—"did not ask [the defendant] for his consent to examine the contents of his cell phone" or give "any option but to consent . . .").

**D. The Government Violated Mr. Liaw's Fifth Amendment Rights.**

Under the Fifth Amendment, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be (1) testimonial, (2) incriminating, and (3) compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004) (numbering added). Because a suspect facing "custodial interrogation" feels "inherently compelling pressures" to acquiesce to law enforcement interrogation, the Supreme Court adopted a "set of prophylactic measures to protect a suspect's Fifth Amendment right." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010). These "prophylactic" rules create a "presumption" that custodial communications are compelled unless certain conditions are met. *See id.* at 103-05. In *Miranda v. Arizona*, the Supreme Court held that, before questioning a suspect in custody, law enforcement must advise suspects of their rights to silence and counsel. *See* 384 U.S. 436, 467-73 (1966). If the suspect invokes those rights, then interrogation must cease until the suspect makes a knowing, intelligent,

and voluntary waiver. *See id.* at 473–75.[24] In *Edwards v. Arizona*, the Supreme Court held that once a suspect invokes the right to counsel, the suspect cannot be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication . . . with the police." 451 U.S. 477, 484-85 (1981).

Accordingly, an additional ground for suppression of the phone evidence arises from the violation of Mr. Liaw's Fifth Amendment rights through the compelled disclosure of his passcodes without *Miranda* warnings and after he had invoked his right to counsel. *See, e.g.*, *United States v. Clark*, 683 F. Supp. 3d 97, 108 (D. Mass. 2023) (suppressing where the agent's "interrogation regarding [defendant's] passcodes violated *Miranda*" because the defendant had already requested counsel and the government did not show voluntariness); *Djibo*, 151 F. Supp. 3d at 306 (suppressing contents of phone because the government obtained the defendant's passcode in violation of *Miranda*).

**1. The Passcodes Were "Testimonial" and "Incriminating."**

Mr. Liaw's compelled disclosure of his Phone passcodes satisfy the requirements for Fifth Amendment protection.

*Testimonial*. The Phone passcodes were testimonial. "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). "It is the extortion of information from the accused, the attempt to force him to disclose the contents of his own mind, that implicates the Self–Incrimination Clause." *Id.* at 211. By contrast, the Fifth Amendment does "not protect a criminal suspect from being compelled to exhibit physical characteristics." *United States v. Greer*,

[24] A *Miranda* waiver is "voluntary" if it is "a free and deliberate choice rather than intimidation, coercion, or deception" and is "knowing" if it is made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014).

631 F.3d 608, 612 (2d Cir. 2011); *see, e.g.*, *Schmerber v. California*, 384 U.S. 757, 764 (1966) (Fifth Amendment does not protect suspects from compelled blood samples). As the Supreme Court has explained this divide: a defendant can be "forced to surrender the key to a strongbox" but cannot be compelled to "tell[] an inquisitor the combination to a wall safe." *United States v. Hubbell*, 530 U.S. 27, 43 (2000).

Applying this framework, as the courts have determined, a defendant can be compelled to open a cellphone with biometrics but cannot be compelled to open it with a passcode in response to questions. *See, e.g.*, *United States v. Gray*, No. 21 Crim. 713, 2024 WL 1526368, at *2 (S.D.N.Y. Apr. 9, 2024) ("[T]he Court finds that the Fifth Amendment bars the Government from compelling a criminal defendant to disclose the passcode to his smartphone."); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 316 (S.D.N.Y. 2024) ("Garelick's articulation of the phone passcode—like the vast majority of verbal statements—was testimonial."); *see also United States v. Payne*, 99 F.4th 495, 510-13 (9th Cir. 2024) (compelling defendant to "turn over their alphanumeric passcode" is "an act that is generally accepted to be protected by the Fifth Amendment because it requires an individual to divulge the contents of his mind" but "the use of [a defendant's] thumb to unlock his phone [is] not a testimonial act and the Fifth Amendment does not apply"). This is true whether the government compels the defendant to disclose her passcode verbally or by entering it in view of the government agents. *See United States v. Jimenez*, 419 F. Supp. 3d 232, 233 (D. Mass. 2020) ("Whether the defendant is forced to reveal his passcode or unlock the phone in the presence of law enforcement . . . would force defendant to disclose the contents of his own mind and accordingly are testimonial acts violating the Fifth Amendment."). Even compelling a defendant to choose the biometrics used to open a phone is testimonial. *See*

*United States v. Brown*, 125 F.4th 1186, 1204 (D.C. Cir. 2025) (forcing a defendant to select what finger to use to unlock a phone is a compelled testimonial act under the Fifth Amendment).

*Incriminating*. Mr. Liaw's passcodes were incriminating. The Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972); *see also United States v. Greenfield*, 831 F.3d 106, 114 (2d Cir. 2016) (Fifth Amendment extends to communications "that, while not themselves inculpatory, would furnish a link in the chain of evidence. . ."). The passcodes readily satisfy this standard. Disclosure of Mr. Liaw's passcodes permitted the government access to his email and text communications with individuals who the government alleges are his coconspirators. *See Gray*, 2024 WL 1526368, at *2 (compelled disclosure of passcode is "incriminating because it may lead to incriminating evidence, even if the passcode itself is not inculpatory") (cleaned up); *see, e.g.*, *Shvartsman*, 722 F. Supp. 3d at 316 ("Because the passcode enabled the Government to unlock Garelick's phone at will and access incriminating evidence on the phone, Garelick's disclosure of his passcode furnished a link in the chain of evidence.").

**2. The Statements of Mr. Liaw Were Compelled While He Was in Custody in Violation of *Miranda* and *Edwards*.**

According to the FBI, and as corroborated by videotape, Mr. Liaw "was placed under arrest at approximately 6:15 AM." Simons Decl., Ex. 27; Simons Decl., Ex. 41 (video) at 7:01 (Mr. Liaw handcuffed outside front door). Mr. Liaw was "in custody" when he disclosed his passcode. *See New York v. Quarles*, 467 U.S. 649, 655 (1984) (standard for custody); *see also United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (handcuffs are a "hallmark" of custody). Nonetheless, the agents did not advise Mr. Liaw of his rights until after he was transported to an FBI office over two hours later. *See* Simons Decl., Ex. 35 (signed Advice of Rights form bearing time of 8:50

AM). Accordingly, the entire exchange regarding Mr. Liaw's passcodes occurred before he was read *Miranda* warnings.

Furthermore, before he was questioned about the passcodes, Mr. Liaw had invoked his right to counsel by "unequivocally" requesting to speak with his attorney. Liaw Decl. ¶ 8; *see Davis v. United States*, 512 U.S. 452, 459 (1994); *see, e.g.*, *United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012) ("I mean, but can I call [an attorney] now?" was an "unequivocal" invocation); *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) (defendant "unequivocally" invoked by stating "I think I should get a lawyer"); *United States v. Seppala*, No. 16 Crim. 436, 2017 WL 5633167, at *3 (S.D.N.Y. Nov. 22, 2017) (defendant "unequivocally" invoked by asking "Do I have an opportunity to call an attorney?"); *Kamyab v. Uribe*, No. 08 Civ. 5557, 2009 WL 1520022, at *15–16 (C.D. Cal. May 29, 2009) ("Can I call my lawyer?" is an "unequivocal request for counsel").

The agent nonetheless questioned Mr. Liaw about his passcodes. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("interrogation" is "any words or actions . . . that [officials] should know are reasonably likely to elicit an incriminating response. . ."). For example:

- After observing Mr. Liaw enter the passcode into his Work Phone, an agent asked Mr. Liaw to confirm that the passcode for the Work Phone was "1111."
- An agent then asked Mr. Liaw if the passcode to his second phone was also 1111 and, after Mr. Liaw told the agent that the passcode for the Personal Phone was "111111," the agent asked that Mr. Liaw to enter the passcode to "prove that it works," and Mr. Liaw complied.

These questions violated the "bright line" rule of *Edwards*, prohibiting interrogation of Mr. Liaw after he invoked his right to counsel. *Montejo v. Louisiana*, 556 U.S. 778, 797 (2009). This conduct also violated *Miranda*'s requirement that Mr. Liaw be advised of his rights prior to custodial interrogation. *See Missouri v. Seibert*, 542 U.S. 600, 604 (2004) ("midstream" *Miranda* warnings "after interrogation and unwarned confession" are ineffective).

**3. Suppression of Derivative Evidence from the Phones Is Necessary Because the Passcodes Disclosure Was Involuntary.**

The remedy for a violation of *Miranda* or *Edwards* is typically the suppression of the statement itself; derivative physical evidence stemming from such a violation is suppressed only where the statement was involuntary. *See United States v. Patane*, 542 U.S. 630, 642 (2004) (Plurality Opinion).[25] To be "voluntary," a statement must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). Voluntariness is analyzed under a "totality of circumstances" test focusing on: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988). Here, each of these factors confirms that Mr. Liaw's statements were involuntary.

*First*, Mr. Liaw's "characteristics" rendered him susceptible to coercion. Mr. Liaw has not had prior interactions with the criminal justice system and is unfamiliar with law. *See Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession more likely involuntary where defendant has "no previous experience with the criminal law"). Moreover, Mr. Liaw's native language is Mandarin. Though he speaks English, his facility with the language cannot be fairly characterized as fluent. Liaw Decl. ¶ 14; *See United States v. Ceballos*, 812 F.2d 42, 49 n.4 (2d Cir. 1987) ("lack of fluency in English" is an "obvious incapacit[y] that critically bear[s] upon voluntariness"); *see also United States v. Garibay*, 143 F.3d 534, 537 (9th Cir. 1998) ("In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, we consider, as one factor, any language difficulties encountered by the defendant during custodial interrogation."). These two factors together strongly support a finding of involuntariness. *See, e.g.*, *United States v. Mahmood*, 415

[25] *But see Djibo*, 151 F. Supp. 3d at 310 (*Patane* plurality opinion does not apply to disclosure of passcodes because *Patane* applies to physical, not digital, fruits given that, "as the *Riley* court held, a cell phone is not just a physical object containing information. . .").

F. Supp. 2d 13, 19 (D. Mass. 2006) (defendant's "language difficulty" and "utter inexperience with the [United States] legal system" weighed in favor of involuntariness).

*Second*, the circumstances of Mr. Liaw's interrogation were inherently coercive. Armed agents, at 6 AM, broke down Mr. Liaw's front door with a battering ram, shocked him from his sleep, pointed guns at him, and handcuffed him in his pajamas. Simons Decl., Ex. 41 (video) at 7:01; *cf. Kaupp v. Texas*, 538 U.S. 626, 630–32 (2003) ("removal from one's house in handcuffs on a January night with nothing on but underwear" is necessarily coercive). Moreover, the agents did not *Mirandize* Mr. Liaw until hours later. *See Ortiz v. Stambach*, 137 F.4th 48, 68 (2d Cir. 2025) (coercion suggested because defendant "was neither *Mirandized* nor provided with a Spanish interpreter during the 40 minutes he spent alone" with the detective).

*Third*, the agents' conduct was misleading. *See United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) ("[M]isleading statements pose a serious constitutional problem . . ."). An agent told Mr. Liaw that he would be able to call his attorney later, but this was illusory. The agents did not subsequently permit Mr. Liaw an opportunity to call his counsel; rather, they used his request to obtain his passcode by handing him his Work Phone and observing him open it with his passcode—thereafter asking him to confirm the passcode that they believed he entered and questioning him about the passcode to his Personal Phone.

The "totality of circumstances" accordingly demonstrates that Mr. Liaw's "will was overborne by the agent's conduct." *Anderson*, 929 F.2d at 99. The evidence from the phones should therefore be suppressed. *See, e.g.*, *United States v. Bauer*, No. 25 Crim. 79, 2025 WL 2532670, at *18 (N.D. Cal. Sept. 2, 2025) (suppressing where defendant "was asleep" when armed officers arrested him at home, handcuffed him, took his phone, "had not advised him of his rights," and informed him that they had a warrant for his phone in a way that "gave the impression that the

warrant also required him to provide his password, which was not so"); *see also United States v. Mendez*, No. 24 Crim. 2430, 2026 WL 1021408, at *8 (S.D. Cal. Apr. 15, 2026) (suppressing where the defendant disclosed "his passcode directly after asking for, and being denied, the opportunity to speak with an attorney" because the defendant was "under the impression that he had to" consent).

**MOTION TO UNSEAL AND DISCLOSE GRAND JURY RECORDS OR, ALTERNATIVELY, FOR *IN CAMERA REVIEW***

Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E), Mr. Liaw moves for disclosure of the grand jury record—specifically, the evidence presented to or summarized for the grand jury and transcripts of grand jury testimony regarding that evidence—or, at minimum, *in camera* review of those materials.

## I. Legal Standard

Pursuant to Fed. R. Crim. P. 6(e)(3)(E), a "court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter: (i) preliminarily to or in connection with a judicial proceeding" and "(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." To obtain relief, the movant must demonstrate a "particularized need" for disclosure that is (1) necessary to avoid a "possible injustice in another judicial proceeding;" (2) "greater than the need for continued secrecy;" and (3) "structured to cover only material so needed." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979). The court has "substantial discretion" in determining whether grand jury materials should be released. *See id.* at 223; *see also In re Petition of Craig*, 131 F.3d 99, 103 (2d Cir. 1997) ( "[A] court's power to order disclosure of grand jury records is not strictly confined to instances spelled out in [Rule 6(e)]."). This "standard applies equally to a defendant's request for the court to conduct *in*

*camera* inspection of grand jury transcripts." *United States v. Laster*, No. S1 6 Crim. 1064, 2007 WL 3070599, at *1 (S.D.N.Y. Oct. 19, 2007).

## II. A Particularized Need to Disclose Grand Jury Materials Exists Here Because The Flawed Basis for Probable Cause in the Warrant Applications is Highly Likely to Have Permeated the Probable Cause Determination For the Indictment.

The need here for the requested grand jury materials is concrete, not speculative, because it is likely that the same flawed evidence underlying the Liaw SCA Warrant and [redacted] was presented to the grand jury.[26] The Indictment quotes several communications that are plagued by the same infirmities described in Section I.C of Mr. Liaw's Motion to Suppress. Paragraph 13 of the Indictment extrapolates from a communication between Mr. Liaw and [redacted] an unfounded reference to China where none exists. Ind. ¶ 13. The underlying communication, however, does not support the claimed reference to China. *See* Simons Decl., Ex. 36. Paragraph 19(a) of the Indictment turns a message about expedition into purported evidence of criminal intent. Mr. Liaw's statement, "We need to speed these up before May 13!," simply recognized an impending BIS regulatory deadline and encouraged completion of lawful transactions before new licensing restrictions took effect.[27] Far from evidencing evasion, the message reflects an effort to act in line with an impending regulatory change. *See* Simons Decl., Ex. 37. Paragraph 20 miscasts an exchange among Mr. Liaw, Mr. Chang, and [redacted] as an effort to defeat a compliance hold, when in fact, the discussion concerned shipping "incoterms" (international commercial terms) and forwarder requirements for favorable Thailand tax benefits, and Super Micro's acceptance of those terms. *See* Simons Decl., Ex. 38. The celebratory messages that followed reflected resolution of that logistics issue, not concealment of unlawful conduct. *See*

---

[26] Mr. Liaw reserves the right to renew or supplement the Motion to Dismiss the Indictment should the court grant disclosure of grand jury materials, based on the contents of those materials.

[27] *See Framework for Artificial Intelligence Diffusion,* 90 Fed. Reg. 4,544 (Jan. 15, 2025).

Simons Decl., Ex. 39. In light of these mischaracterizations of communications in the Indictment and the above-discussed mischaracterizations of communications presented in the Warrant Affidavits, as well as the omission in those affidavits to describe the incentives for [redacted] and its executives to cooperate, a strong likelihood exists that similarly misleading information was presented to the grand jury.

Importantly, the Devices Warrant, executed one day after the Indictment was returned, is predicated on the same factual allegations as contained in the Indictment and incorporates the Indictment as Exhibit 1, *see* Simons Decl., Ex. 2 at USAO_000917–938, repeatedly citing directly to it. The core factual narrative in Paragraphs 13 and 14 of the Devices Warrant is expressly sourced to and cross-referenced against Indictment Paragraphs ¶¶ 1–2, 10–26. Therefore, access to the requested grand jury materials will illuminate whether a flawed evidentiary record was presented concerning the Devices Warrant as well.

## III. The Disclosure Sought Will Not Harm the Secrecy of the Grand Jury Proceedings and is No Greater than Necessary to Avoid Injustice.

Here, the balance favors disclosure because the grand jury proceedings have presumably ended, and virtually none of the reasons justifying secrecy are present. *Douglas Oil*, 441 U.S. at 218–19; *see also In re Grand Jury*, 583 F.2d 128, 130–31 (5th Cir. 1978) ("After a grand jury's investigation has terminated, most of the reasons for grand jury secrecy are no longer applicable and the others are less compelling. The indicted will not flee; the investigation has not been impeded; witnesses cannot be bribed or intimidated; it is less likely that an innocent person will suffer injury to his reputation."). The government has given no signal that it intends to file a superseding indictment, suggesting that the grand jury is not being used to develop new charges against Mr. Liaw, whose arrest has been widely reported in the media. Moreover, the government's representation at the June 11 status conference that discovery is essentially

complete, apart from the rolling productions from subpoenas *already issued*, indicates that the evidence-gathering phase of the case is winding down. Together, these facts support an inference that the grand jury's evidence-gathering and charging functions in this matter have concluded (or are concluding), a factor courts look to when assessing whether the secrecy interests protected by Rule 6(e) are diminished.

Further, grand jury secrecy interests are well protected because the requested disclosure is carefully circumscribed to the materials necessary to determine whether an injustice has occurred. *See Del Cole v. Rice*, No. 11 Civ. 5138, 2013 WL 12316374, at *5 (E.D.N.Y. Nov. 6, 2013) (permitting disclosure of all grand jury materials where the "[t]he misconduct alleged relates to the entirety of the grand jury proceedings, including both factual and legal issues."). The request here seeks only those materials that will reveal whether the documents presented to the grand jury were mischaracterized in the same manner as they were to the Magistrate Judge who issued the Liaw SCA Warrant. It does not seek materials unrelated to that inquiry, such as grand jury subpoenas, the government's legal instructions to the grand jury, or the vote of the grand jury or any individual juror. Accordingly, because the request is confined to discrete categories of material rather than the entirety of the grand jury record, it satisfies the third *Douglas Oil* factor.

In sum, the unsealing of the evidence presented to the Grand Jury and testimony regarding that evidence is necessary to assess the grand jury's determination of probable cause for the Indictment and the subsequent determination of probable cause for the Devices Warrant.

## CONCLUSION

For all the reasons set forth above, the Court should dismiss the Indictment's charges against Mr. Liaw, or alternatively, dismiss Count II. In the alternative, the Court should order the government to provide a bill of particulars, strike surplusage from the Indictment, and suppress the evidence seized from Mr. Liaw's iCloud account, Google account, and phones.

Dated: New York, New York
September 15, 2026

Respectfully Submitted,

*/s/ Nelson A. Boxer*

Nelson A. Boxer
Guy Petrillo
David Hoffman
Eliza Simons
PETRILLO KLEIN + BOXER LLP
655 Third Avenue
New York, NY 10017
(212) 370-0338
nboxer@pkbllp.com

-and-

Jason L. Liang
LIANG LY LLP
601 South Figueroa Street
Los Angeles, CA 90017
jliang@lianglyllp.com

*Attorneys for Yih-Shyan "Wally" Liaw*