**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | |
| | : | No. 26 Crim. 100 (ER) |
| YIH-SHYAN "Wally" LIAW,<br>RUEI-TSANG "Steven" CHANG, and<br>TING-WEI "Willy" SUN, | : | |
| Defendants. | : | |

**YIH-SHYAN "WALLY" LIAW'S REPLY MEMORANDUM OF LAW**
**<u>IN FURTHER SUPPORT OF HIS PRETRIAL MOTIONS</u>**

Nelson A. Boxer
Guy Petrillo
David Hoffman
Eliza Simons
Petrillo Klein + Boxer LLP
655 Third Avenue
New York, NY 10017
(212) 370-0330

Jason Liang
Liang Ly LLP
601 South Figueroa Street
Los Angeles, CA 90017
(213) 262-8000

November 3, 2026

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ARGUMENT .......... 4

I. The Indictment Should Be Dismissed for Improper Venue. .......... 4

A. The Government's Own Disclosure Defeats Its Claim That the Intermediary Wires Serve as a Basis for Venue in This District. .......... 4

B. The Government's New Strained Venue Theory Fails. .......... 8

C. Mr. Liaw's Constitutional Right to Criminal Venue is Properly Considered at the Pretrial Stage and the Indictment Alleges No Essential Conduct Elements in This District That Were Foreseeable to Mr. Liaw. .......... 9

D. The Supplemental Substantial Contacts Limitation Applies in Support of Dismissal. 12

II. The Indictment Fails to State a Conspiracy to Smuggle Goods from the United States.14

III. The Court Should Order a Bill of Particulars. .......... 16

IV. The Court Should Suppress the Contents of Mr. Liaw's Electronic Accounts and Phones Because the Warrants Were Not Supported by Probable Cause. .......... 18

A. The Opposition's Arguments Do Not Cure the Defects in Probable Cause. .......... 18

B. Mr. Liaw's Examples of the Mischaracterizations and Unfounded China References Illustrate a Pattern That Infects the Warrant Applications. .......... 23

C. The Good Faith Exception Does Not Apply. .......... 24

V. The Court Should Suppress the Contents of Mr. Liaw's Phones. .......... 26

A. The Government Violated Mr. Liaw's Sixth Amendment Rights by "Deliberately Eliciting" His Passcodes. .......... 27

B. The Government Violated Mr. Liaw's Fifth Amendment Rights by Compelling Disclosure of His Passcodes. .......... 31

C. The Government Violated Mr. Liaw's Fourth Amendment Rights by Exceeding the Devices Warrant's Scope. .......... 35

D. No Exceptions to the Exclusionary Rule Apply. .......... 37

1. Inevitable Discovery .......... 37

2. Foregone Conclusion .......... 41

3. Good Faith .......... 43

VI. To the Extent the Court Provides the Full Indictment to the Jury, the Court Should Strike Surplusage. .......... 44

VII. The Court Should Unseal Grand Jury Records. .......... 45

CONCLUSION .......... 46

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arizona v. Roberson*,
486 U.S. 675 (1988) .......... 43

*Cahill v. Rushen*,
501 F. Supp. 1219 (E.D. Cal. 1980) .......... 29

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) .......... 15, 16, 18

*Davis v. United States*,
512 U.S. 452 (1994) .......... 32

*Faretta v. California*,
422 U.S. 806 (1975) .......... 28

*Fisher v. United States*,
425 U.S. 391 (1976) .......... 41, 42

*Franks v. Delaware*,
438 U.S. 154 (1978) .......... 25

*Friends of the E. Hampton Airport, Inc. v. Town of East Hampton*,
841 F.3d 133 (2d Cir. 2016) .......... 15

*Giannullo v. City of New York*,
322 F.3d 139 (2d Cir. 2003) .......... 40

*Herring v. United States*,
555 U.S. 135 (2009) .......... 44

*Illinois v. Gates*,
462 U.S. 213 (1983) .......... 22

*In re 650 Fifth Ave. & Related Props.*,
830 F.3d 66 (2d Cir. 2016) .......... 37, 39

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335 (11th Cir. 2012) .......... 42

*Lynumn v. Illinois*,
372 U.S. 528 (1963) .......... 35

*Maine v. Moulton*,
474 U.S. 159 (1985) .......... 29, 44

*Maryland v. Garrison*,
480 U.S. 79 (1987) .......... 19, 21

*Massiah v. United States*,
377 U.S. 201 (1964) .......... 27

*Michigan v. Harvey*,
494 U.S. 344 (1990) .......... 28

*Montejo v. Louisiana*,
556 U.S. 778 (2009) .......... 28

*Nix v. Williams*,
467 U.S. 431 (1984) .......... 28, 37

*Oregon v. Elstad*,
470 U.S. 298 (1985) .......... 43

*Ortiz v. Stambach*,
137 F.4th 48 (2d Cir. 2025) .......... 33

*Patterson v. Illinois*,
487 U.S. 285 (1988) .......... 28

*Sec. & Exch. Comm'n v. Huang*,
2015 WL 5611644 (E.D. Pa. Sept. 23, 2015) .......... 43

*U.S.A. v. Danaher*,
2020 WL 7264454 (C.D. Cal. Dec. 9, 2020) .......... 42

*United States v. Akhavan*,
2020 WL 2555333 (S.D.N.Y. May 20, 2020) .......... 18

*United States v. Austin*,
496 F. Supp. 3d 815 (S.D.N.Y. 2020) .......... 28

*United States v. Ayala*,
646 F. Supp. 3d 1191 (N.D. Cal. 2022) .......... 39

*United States v. Barrett*,
153 F. Supp. 3d 552 (E.D.N.Y. 2015) .......... 17

*United States v. Bauer*,
No. 25 Crim. 79, 2025 WL 2532670 (N.D. Cal. Sept. 2, 2025) ............ 33

*United States v. Bendann*,
180 F.4th 147 (4th Cir. 2026) ............ 33

*United States v. Bertini*,
2023 WL 8258334 (S.D.N.Y. Nov. 29, 2023) ............ 24

*United States v. Bezmalinovic*,
962 F. Supp. 435 (S.D.N.Y. 1997) ............ 9, 10, 11

*United States v. Big Apple Bag Co.*,
306 F. Supp. 2d 331 (E.D.N.Y. 2004) ............ 24

*United States v. Booker*,
561 F. Supp. 3d 924 (S.D. Cal. 2021) ............ 30, 40, 42

*United States v. Booth*,
2024 WL 911854 (2d Cir. Mar. 4, 2024) ............ 7

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ............ 16

*United States v. Brown*,
125 F.4th 1186 (D.C. Cir. 2025) ............ 32, 44

*United States v. Cabrales*,
524 U.S. 1 (1998) ............ 9

*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000) ............ 26

*United States v. Capers*,
627 F.3d 470 (2d Cir. 2010) ............ 33

*United States v. Chalmers*,
410 F. Supp. 2d 278, 286 (S.D.N.Y. 2006) ............ 33

*United States v. Chi Tong Kuok*,
671 F.3d 931 (9th Cir. 2012) ............ 15

*United States v. Cioffi*,
668 F. Supp. 2d 385 (E.D.N.Y. 2009) ............ 39

*United States v. Clark*,
683 F. Supp. 3d 97 (D. Mass. 2023) ........ 31, 40

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) ........ 12

*United States v. Cordero*,
668 F.2d 32 (1st Cir. 1981) ........ 8

*United States v. Cruz*,
840 F. Supp. 3d 162 (E.D.N.Y. 2026) ........ 34

*United States v. Davis*,
689 F.3d 179 (2d Cir. 2012) ........ 12

*United States v. Djibo*,
151 F. Supp. 3d 297 (E.D.N.Y. 2015) ........ 40

*United States v. Dupigny*,
2019 WL 2327697 (S.D.N.Y. May 30, 2019) ........ 10

*United States v. Durand*,
767 F. App'x 83 (2d Cir. 2019) ........ 39

*United States v. Eisenberg*,
784 F. Supp. 3d 579 (S.D.N.Y. 2025) ........ 7, 9

*United States v. Eng*,
971 F.2d 854 (2d Cir. 1992) ........ 39

*United States v. Failla*,
1993 WL 547419 (E.D.N.Y. Dec. 21, 1993) ........ 18

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) ........ 19

*United States v. Fox*,
721 F.2d 32 (2d Cir. 1983) ........ 43

*United States v. Fridman*,
974 F.3d 163 (2d Cir. 2020) ........ 42

*United States v. Gagnon*,
373 F.3d 230 (2d Cir. 2004) ........ 22

*United States v. George*,
975 F.2d 72 (2d Cir. 1992) ........................................................................................ 44

*United States v. Gogic*,
770 F. Supp. 3d 529 (E.D.N.Y. 2025) ....................................................................... 32, 34, 41

*United States v. Gotti*,
42 F. Supp. 2d 252 (S.D.N.Y. 1999) ........................................................................ 24

*United States v. Gray*,
2024 WL 1526368 (S.D.N.Y. Apr. 9, 2024) ........................................................... 32, 41

*United States v. Greenfield*,
831 F.3d 106 (2d Cir. 2016) ...................................................................................... 42

*United States v. Griffith*,
2020 WL 4369650 (S.D.N.Y. July 29, 2020)............................................................ 10

*United States v. Hanratty*,
2024 WL 4892742 (S.D.N.Y. Nov. 26, 2024)........................................................... 17

*United States v. Hawit*,
2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ............................................................. 17

*United States v. Heath*,
455 F.3d 52 (2d Cir. 2006) ........................................................................................ 37

*United States v. Henry*,
447 U.S. 264 (1980) ........................................................................................ 28, 30, 31

*United States v. Ho*,
984 F.3d 191 (2d Cir. 2020) ........................................................................................ 7

*United States v. Hubbell*,
530 U.S. 27 (2000) ..................................................................................................... 41

*United States v. Jerez*,
108 F.3d 684 (7th Cir. 1997) ...................................................................................... 34

*United States v. Jimenez*,
419 F. Supp. 3d 232 (D. Mass. 2020)......................................................................... 32

*United States v. Jimenez*,
824 F. Supp. 351 (S.D.N.Y. 1993) ............................................................................. 24

*United States v. Jordan*,
846 F. Supp. 895 (D. Nev. 1994)........................................................................................ 9

*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009)................................................................................. 18

*United States v. Kim*,
246 F.3d 186 (2d Cir. 2001) ................................................................................................ 7

*United States v. Kirk Tang Yuk*,
885 F.3d 57 (2d Cir. 2018) .................................................................................................. 12

*United States v. Lange*,
834 F.3d 58 (2d Cir. 2016) .................................................................................................. 13

*United States v. Lauria*
70 F.4th 106 (2d Cir. 2023)........................................................................................... 38, 39

*United States v. Leon*,
468 U.S. 897 (1984) ............................................................................................... 24, 25, 26

*United States v. Lira*,
2022 WL 17417129 (S.D.N.Y. Dec. 5, 2022)..................................................................... 10

*United States v. Ma*,
2006 WL 708559 (S.D.N.Y. Mar. 21, 2006)....................................................................... 18

*United States v. Madeoy*,
652 F. Supp. 371 (D.D.C. 1987)......................................................................................... 17

*United States v. Maffei*,
2019 WL 1864712 (N.D. Cal. Apr. 25, 2019).............................................................27, 31, 36

*United States v. Mendez*,
2026 WL 1021408 (S.D. Cal. Apr. 15, 2026) ..................................................................... 34

*United States v. Murgio*,
209 F. Supp. 3d 698 (S.D.N.Y. 2016) ................................................................................. 17

*United States v. O'Donoghue*,
2026 WL 2110788 (D.D.C. July 22, 2026) ............................................................................ 9

*United States v. Oruche*,
2008 WL 612694 (S.D.N.Y. Mar. 5, 2008).......................................................................... 16

*United States v. Patane*,
542 U.S. 630 (2004) .......... 33

*United States v. Patchiav*,
2026 WL 638678 (E.D.N.Y. Mar. 7, 2026) .......... 43

*United States v. Payne*,
99 F.4th 495 (9th Cir. 2024) .......... 32

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018) .......... 32

*United States v. Powell*,
634 F. Supp. 3d 48 (E.D.N.Y. 2022) .......... 30

*United States v. Raymond*,
2023 WL 7005341 (D.D.C. Oct. 24, 2023) .......... 36, 39, 40

*United States v. Reed*,
773 F.2d 477 (2d Cir. 1985) .......... 9, 14

*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996) .......... 25

*United States v. Reyes*,
934 F. Supp. 546 (S.D.N.Y. 1996) .......... 28

*United States v. Rommy*,
506 F.3d 108 (2d Cir. 2007) .......... *passim*

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993) .......... 29

*United States v. Satterfield*,
417 F. Supp. 293 (S.D.N.Y. 1976) .......... 44

*United States v. Seppala*,
2017 WL 5633167 (S.D.N.Y. Nov. 22, 2017) .......... 32

*United States v. Shvartsman*,
722 F. Supp. 3d 276 (S.D.N.Y. 2024) .......... 32, 41

*United States v. Smith*,
706 F. Supp. 3d 404 (S.D.N.Y. 2023) .......... 42

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003) ........ 11

*United States v. Thomas*,
955 F.2d 207 (4th Cir. 1992) ........ 39

*United States v. Tzolov*,
642 F.3d 314 (2d Cir. 2011) ........ 9

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013) ........ 40, 43

*United States v. Vilar*,
2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ........ 20

*United States v. Wagner*,
989 F.2d 69 (2d Cir. 1993) ........ 22

*United States v. Williams*,
2019 WL 4454250 (W.D.N.Y. Apr. 25, 2019) ........ 19, 22

*United States v. Ying Lin*,
270 F. Supp. 3d 631 (E.D.N.Y. 2017) ........ 14, 15

*Wood v. Ercole*,
644 F.3d 83 (2d Cir. 2011) ........ 32

**Statutes**

18 U.S.C. § 554 ........ 1, 14, 15, 16

**Rules**

Fed. R. Crim. P. 12(b)(3) ........ 9

**Regulations**

15 C.F.R. § 736.2 ........ 16

15 C.F.R. §§ 742.6 ........ 16

15 C.F.R. §§ 764.2 ........ 16

**Other Authorities**

[redacted] ...... 6

[redacted] .................................................................................................... 6

[redacted] .................................................................................................... 6

[redacted] ...... 6

[redacted] .................................................................................................... 6

[redacted] .................................................................................................... 6

[redacted] .................................................................................................... 6

## INTRODUCTION

The government's brief in opposition, *see* ECF No. 65 ("Opposition" or "Opp."), to Mr. Liaw's pretrial motions ("Motions" or "Mot.")[1] underscores the pleading defects in the Indictment and that the evidence seized from Mr. Liaw's phones and electronic accounts, as well as the evidence sized in reliance on these seizures, must be suppressed as the fruit of unconstitutional searches.

*Improper Venue*. Before the Court, on April 1, 2026, consistent with the Indictment, the government represented that the basis for venue is that payments from [redacted] to Super Micro Taiwan "transited through financial institutions in the Southern District of New York." Ind. ¶ 4. Now, in response to Mr. Liaw's motion to dismiss, the government has disclosed that those payments, which used [redacted] as an intermediary bank, did not transit through this District. Opp. at 13 n.1. Scrambling for an alternative basis for venue, the government now clings to a benign text message mentioning [redacted] that Mr. Liaw sent to Steven Chang during a single 36-hour period during which he was in New York between 2024 and 2026 (the time frame of the alleged conspiracies) and urges the Court to determine the issue of venue at trial. The communication that the government points to cannot sustain venue and, given governing precedent and the judicial resources that are at stake, the Court need not and should not await a Rule 29 motion at trial to decide what is already clear: the venue requirement is not met in this case and the Indictment should be dismissed.

*Count II—Failure to State a Claim*. In its attempt to rebut the submitted textual and constitutional arguments in support of an interpretation of 18 U.S.C. § 554 that limits its

---

[1] All capitalized terms not otherwise defined herein have the meaning ascribed to them in the Motions. Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes, citations, and quotations are omitted, and all alterations within cited opinions are adopted.

application to items that are *per se* illegal, the government ignores all statutory construction—*e.g.*, the use of the word "such" in the statute's second clause—and instead relies on cases outside the Second Circuit. *See* Opp. at 20–26 (collecting cases). But those cases did not analyze the textual question presented here and are, therefore, unpersuasive. The government's decision to dodge—not confront—the defense's textual and constitutional arguments highlights why the Court should dismiss Count II.

*Bill of Particulars*. The government's primary contention is that it need not supply particulars to the defense because it has produced voluminous discovery. Opp. at 31. But that enormous volume—much of it in Chinese and Thai—is precisely why the defense needs particulars to guide its review and avoid unfair surprise at trial. The need is especially acute for coconspirators: the Indictment leaves their number and locations unclear, describing "a rotating cast of third-party brokers" operating "elsewhere in Southeast Asia." Ind. ¶ 12. Likewise, Mr. Liaw should have notice of which of the tens of subsections in the cited regulations he is accused of violating. *See id.* ¶ 32.

*Suppression of Warrant Returns*. The Opposition deepens the showing that the Warrants were fundamentally flawed. Its arguments fail to address the core problems: [redacted]'s opaque disclosures, the dubious reliability of the documents on which the Warrants were based, and the absence of meaningful independent corroboration. The Opposition also sidesteps Mr. Liaw's contention that the Warrant Affidavits blurred the lines between his conduct and that of alleged coconspirators, and, in seeking the Devices Warrant, embellished the record with accusations unsupported by the documents cited. The Warrants thus relied on misstatements and failed to provide the Magistrate Judges with sufficient information to assess the totality of the circumstances. Had the full picture been presented, the Warrants would not have been supported

by probable cause. Once the mischaracterized evidence and misleading statements are stripped from the applications, the government's invocation of the good faith exception also collapses.

*Suppression of Phones*. The Opposition misstates law and fact, seeking to justify the unjustifiable accessing of Mr. Liaw's Phones via passcode. *See* Opp. 60–69. For example, it ignores (but does not dispute) that, before interrogation, Mr. Liaw asked to retrieve his attorney's phone number "*and call him*"—at which time the agents promised falsely that he would be given an opportunity to call his attorney later. Liaw Decl. ¶ 8 (emphasis added). Because agents deliberately elicited Mr. Liaw's telephone passcodes two days after indictment, they obtained access to his devices in violation of his Sixth Amendment right to counsel. Their questions also led to compelled statements—disclosure of the passcodes—prior to the administration of *Miranda* warnings and after Mr. Liaw said he wished to call counsel, violating the Fifth Amendment. In addition, the search of the Phones' contents exceeded the Devices Warrant's scope by compelling disclosure of the passcodes where the Warrants authorized only biometric unlocking. The Opposition's mischaracterization and disregard of events does not cure these problems, *see* Opp. 60–69, and the government's invocation of the "inevitable discovery," "foregone conclusion," and "good faith" exceptions—without submitting any supporting evidence by affidavit—fails to carry its burden to establish any of these doctrines.

## ARGUMENT

### I. The Indictment Should Be Dismissed for Improper Venue.

#### A. The Government's Own Disclosure Defeats Its Claim That the Intermediary Wires Serve as a Basis for Venue in This District.

The Indictment must be dismissed because, based on its recent disclosures, the government has effectively conceded that there were no wires that passed through the Southern District of New York. The inquiry ends there. After Mr. Liaw moved to dismiss, the government disclosed that the [redacted] servers that sent and received wires from [redacted] to Super Micro Taiwan are "[redacted]." Simons Reply Decl., Ex. 40 (Oct. 20, 2026 Gov't Letter); Opp. at 13 n.1. In response, the defense requested comparable information concerning other relevant banks' processing infrastructure, correspondent accounts, and their processing, routing, settlement, or other activity in this District. *See id.*, Ex. 41 (Oct. 22, 2026 Defense Letter). The government produced its notes from recent calls with various banks that processed wires for payments to and from [redacted] *See id.*, Exs. 42–45. As the government's notes confirm, none of these intermediary banks had servers located in the Southern District of New York that processed, let alone could have processed, the subject wire transmissions. We asked the government to provide information regarding [redacted] and [redacted]. *See id.*, Ex. 46 (October 29, 2026 Defense Letter). The government stated that it has not contacted those banks and declined to provide any information regarding whether they intend to do so. *See id.*, Ex. 47 (October 30, 2026 Gov't Letter).

At the start of discovery, the government produced spreadsheets from several banks showing wire transactions sent to and from [redacted] Four of the spreadsheets appear to show New York addresses affiliated with the flow of funds from (1) [redacted], (2) [redacted]; (3) [redacted]; and (4) [redacted]

[redacted]. The government's later disclosures and publicly available information, however, establish that none of these institutions processed the relevant wire transfers in this District, foreclosing any argument that these banks and their New York addresses can support an overt act in furtherance of the alleged conspiracies.

[redacted]. The government acknowledged that the wire transfers at issue did not pass through [redacted]'s New York servers. *See id.*, Ex. 40 (Oct. 20, 2026 Gov't Letter). Indeed, the government's call notes state that "[redacted]" *Id.*, Ex. 43. While the government's October 20 letter claims that the [redacted] accounts at issue "[redacted]" *id.*, Ex. 40, its call notes explain that "[redacted]" outside of the Southern District of New York. *Id.*, Ex. 43.

[redacted] [redacted] did not process the [redacted]-to-Super Micro Taiwan wire transfers that form the basis of the government's venue theory. *See* Ind. ¶ 4. Additionally, the [redacted] spreadsheet shows that there were no relevant transfers that passed through correspondent banks in New York, but instead went through non-SDNY [redacted] branches, such as [redacted] and [redacted]. *See* Simons Reply Decl., Ex. 48 at col. AC ([redacted] Spreadsheet). And the spreadsheet references wires that passed through [redacted], *id.* at col. AX, which it is now known did not process wires in this District.

[redacted]. Likewise, [redacted]'s spreadsheet shows wires from other companies to [redacted], not [redacted] to Super Micro Taiwan, *see* Simons Reply Decl., Ex. 49 at cols. J–K, rows 2–63, and, in any event, publicly available information demonstrates that the data

centers supporting [redacted]'s wire-processing systems are located outside this District.[2] [redacted]. As for [redacted], it had no role in processing the [redacted]-to-Super Micro Taiwan wire transfers nor did [redacted] New York process the wire transfers flowing from other companies to [redacted]; those transactions were processed by [redacted] and [redacted]. *See id.*, Ex. 50 at cols. R–T, rows 4–5, 19; cols. X–AA, row 11. Publicly available information shows that the U.S. data centers supporting [redacted]'s and [redacted]'s wire-processing operations are located outside the Southern District of New York[3] and the government produced a spreadsheet reflecting [redacted]-related transactions through accounts with [redacted], evidencing that no wires passed through banks located in New York. *Id.*, Ex. 51. The government's call notes with [redacted] [redacted] confirm that these payments transited through [redacted], which is a member of [redacted] [redacted]. *see id.*, Ex. 45. But as the [redacted] representative told the government, [redacted] *Id.*, Ex. 52.[4]

---

[2] *See* [redacted]

[3] Publicly available data shows [redacted] data centers located in Texas, Alabama, Minnesota, and North Carolina. [redacted] (last accessed Nov. 3, 2026) (two Texas data centers); [redacted] Alabama data center); [redacted] (Shoreview, Minnesota data center); [redacted] (discussing a [redacted] data center in [redacted]). Publicly available data shows [redacted]'s data centers are located in New Jersey and overseas. *See* [redacted] (two [redacted]s New Jersey data centers); [redacted] (last accessed Nov. 3, 2026) (identifying [redacted] data centers in the UK).

[4] The government's discovery also includes a [redacted] spreadsheet identifying nine [redacted] related wire transfers, Simons Reply Decl., Ex. 53 ([redacted] Spreadsheet), which do not show any transaction that passed through a Southern District of New York correspondent bank. And the government's October 20, 2026,

As its correspondent-wire venue theory unravels, the government appears poised to pivot to a new position: that the mere opening or servicing of accounts in this District is enough to establish venue. *See* Opp. at 13 n.1; *see also* Simons Reply Decl., Ex. 40 (October 20, 2026 Gov't Letter) ("[redacted]."). However, the opening and existence of correspondent accounts does not reduce the significance of the absence of relevant wire processing in the District. That the "[redacted]" and the fact that "[redacted]" is insufficient as a matter of law to support venue in this case, *see* Simons Reply Decl., Ex. 44, because that is quintessential ministerial conduct that is not a basis for venue. *See* Mot. at 9; *United States v. Eisenberg*, 784 F. Supp. 3d 579 (S.D.N.Y. 2025) (opening and servicing an account in this District not sufficient as an "act in furtherance of scheme to defraud" to establish venue for wire fraud). The government cites *United States v. Booth*, *see* Opp. at 12, where evidence that correspondent banks in Manhattan served as credit and debit parties permitted an inference that the funds passed through Manhattan. No. 22-1823, 2024 WL 911854, at *1 (2d Cir. Mar. 4, 2024). In contrast, the disclosures here establish that wire processing occurred outside of the Southern District of New York.[5]

notes from its conversation with a representative from [redacted] confirm that [redacted]. *See id.*, Ex. 42.

[5] *United States v. Ho*, 984 F.3d 191, 205–06 (2d Cir. 2020), addressed whether transfers processed through U.S. correspondent banks were transfers "to" or "from" the United States. *See* Opp. at 12. That ruling did not identify the judicial district in which a particular banking act occurred. And *United States v. Kim*, 246 F.3d 186, 192–93 (2d Cir. 2001), does not dispense with the need to locate the alleged acts supporting venue: the government itself describes *Kim* as involving acts occurring in Manhattan that were foreseeable to the defendant and within his control. Opp. at 14 n.3.

Because the government's recent disclosures effectively concede that the wires it proffered to the Court, Mot. at 13 (citing Tr. 6:12–13 (April 1, 2026)), as establishing venue were not processed in this District, the Court should dismiss the Indictment.

**B. The Government's New Strained Venue Theory Fails.**

The government now pivots to an alternative theory, namely, that venue lies because Mr. Liaw "exchanged messages" about an "upcoming October 2024 trip" to visit [redacted] executives. *See* Opp. at 14. Mr. Liaw spent less than two days in New York for a business meeting unrelated to the subject of this case, *see* Simons Reply Decl., Ex. 54 at USAO_R12_00000258 (outlining Mr. Liaw's meeting schedule), and, while there, exchanged messages regarding a company-approved business trip to visit several customers in Southeast Asia, that included a meeting in Thailand with the CEO of [redacted]. Simons Reply Decl., Ex. 55 (original); Ex. 56 (machine translated). A communication sent or received while Mr. Liaw happened to be in New York for an entirely unrelated purpose, concerning the planning of a business trip that mentioned a company allegedly involved in the charged scheme, did not further any of the alleged conspiracies.

The authority cited by the government undermines its new venue theory. The defense does not dispute that a communication sent or received in a particular district can, in certain instances, support venue. But that principle only applies where the communication furthers the charged conspiracies. Opp. at 14–15. The cited communications did not. *Compare United States v. Rommy*, 506 F.3d 108, 124 (2d Cir. 2007) (rejecting venue challenge where disputed phone calls did not result from "chance use of a telephone," as defendant had deliberately chosen New York as the smuggling destination and knew people in New York who could further his scheme) (citing *United States v. Cordero*, 668 F.2d 32, 44 (1st Cir. 1981) (Breyer, J.)). Because the government

now cites only communications that did not further the alleged conspiratorial conduct, it has not in the Indictment or by its latest proffer established venue.

**C. Mr. Liaw's Constitutional Right to Criminal Venue is Properly Considered at the Pretrial Stage and the Indictment Alleges No Essential Conduct Elements in This District That Were Foreseeable to Mr. Liaw.**

The government argues that the Indictment's boilerplate allegation of conduct "in the Southern District of New York, and elsewhere" is sufficient, and that remaining venue questions should be reserved for the jury. *See* Opp. at 10–11. But proper venue in a federal criminal prosecution is not a mere technicality; it is a constitutional guarantee that the Federal Rules contemplate may be challenged pretrial, *see* Fed. R. Crim. P. 12(b)(3), and there is a substantial body of case law in which courts have adjudicated—and granted—pretrial dismissal of criminal indictments because venue in the charging district was improper. *See United States v. Cabrales*, 524 U.S. 1 (1998) (Ginsburg, J.); *United States v. Reed*, 773 F.2d 477 (2d Cir. 1985) (appellate review of merits of district court's granting of pretrial motion to dismiss for lack of venue); *United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997); *United States v. O'Donoghue*, No. 24 Crim. 566, 2026 WL 2110788 (D.D.C. July 22, 2026); *United States v. Jordan*, 846 F. Supp. 895, 897–98 (D. Nev. 1994).

The Court should not accept conclusory allegations of venue, or on-the-fly new theories of venue. Rather, the Court should identify the *locus delicti* of the charged offense by examining "the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 7–8. The government's contention that Mr. Liaw "conflat[es] the law on venue for conspiracy and substantive charges," Opp. at 11, misses the point: the venue analysis for conspiracy offenses is guided by the same foundational principles applicable to substantive offenses, namely, that "[v]enue is proper only where the acts constituting the offense—the crime's

'essential conduct elements'—took place." *United States v. Tzolov*, 642 F.3d 314, 318–20 (2d Cir. 2011); *Eisenberg*, 784 F. Supp. 3d at 612–13 (wires passing through Southern District of New York were not "essential conduct elements" in furtherance of wire fraud). The relevant question, therefore, is where the alleged criminal *conduct* occurred. The Indictment alleges a scheme carried out entirely outside of the Southern District of New York, *see* Mot. at 9, and the Indictment's recitation of "in the Southern District of New York and elsewhere" does not render the Indictment immune from pretrial review.[6]

The government's response to Mr. Liaw's bill of particulars motion further demonstrates Mr. Liaw's point. *See* Opp. at 30–32. There, the government avers that the "21-page speaking Indictment does much more than recite the statutory language" and is replete with "detailed factual allegations" regarding the alleged conspiracies, "including descriptions of co-conspirators, overt acts committed in furtherance of the charged crimes, numerous examples of specific communications that the Government will rely upon to prove its case . . . and the approximate times and locations where the conduct took place." *Id.* at 30–31. Notwithstanding what the government sees as copious detail, there are no "detailed factual allegations" in the Indictment alleging conduct in furtherance of the charged conspiracies in the Southern District of New York.

With respect to the ministerial role of the New York correspondent banks, *see* Mot. at 9,

[6] The government's contention that the cases it cites hold that "a general allegation that *conduct* occurred, in part, in the Southern District of New York" suffices for venue, *see* Opp. 10–11 (emphasis added), sweeps too broadly. Those cases hold that it is enough to allege that the *criminal offense* was committed herein the SDNY. *United States v. Dupigny*, No. 18 Crim. 528, 2019 WL 2327697, at *4 (S.D.N.Y. May 30, 2019) ("[T]he Superseding Indictment alleges that [the defendant] committed the *offenses* 'within the Southern District of New York and elsewhere'. . . . That general allegation is sufficient to support venue at this stage") (emphasis added); *United States v. Griffith*, No. 20 Crim. 15, 2020 WL 4369650, at *2 (S.D.N.Y. July 29, 2020) ("The indictment alleges that [the defendant] conspired to violate the IEEPA 'in the Southern District of New York, the [DPRK], and elsewhere. . . .'"); *United States v. Lira*, 2022 WL 17417129, at *1 (S.D.N.Y. Dec. 5, 2022) ("[T]he government need only allege that *criminal conduct* occurred within the venue") (emphasis added). The problem here is that it is now clear that the Indictment cannot allege relevant venue conduct (*i.e.*, acts in in furtherance of charged conspiracies) in the SDNY.

the government sidesteps *Bezmalinovic*. There, the defendant did not commit acts in furtherance of the alleged scheme in the Southern District of New York; the only contact with the District was that after the defendant deposited checks into an account with his bank in the Eastern District of New York, his bank sent the proceeds to a branch in Manhattan for clearing and processing, and that the bank's headquarters was located in Manhattan. *See* 962 F. Supp. at 436. The court found venue lacking. Here, the connection to this District is even more attenuated than in *Bezmalinovic*, because Mr. Liaw did not send or receive the wire transfers between the two non-New York based entities—one in [redacted]), and the other in Taiwan (Super Micro Taiwan). *See* Mot. at 9–10.

The government must also establish that the acts it alleged in this District as a basis for venue were reasonably foreseeable to Mr. Liaw. *See Rommy*, 506 F.3d at 123; *United States v. Svoboda,* 347 F.3d 471, 483 (2d Cir. 2003). It argues that Mr. Liaw is "a sophisticated businessperson who co-founded a U.S.-based public company that generates billions of dollars in revenue from sales to overseas customers who transact in U.S. dollars" and, therefore, it is foreseeable to him that when a Thai company pays a Taiwanese company the money flows through the United States. Opp. at 13. First, the government repeatedly asks the Court to rely on its mantra that Mr. Liaw is a "sophisticated businessperson." *See* Opp. at 13 & n.2, 16, 64. Mr. Liaw is an engineer by education and training; there is no evidence in the record whatsoever that Mr. Liaw is sophisticated in the minutiae of wire transfers or in "business" writ large. Second, the venue sufficiency against which reasonable foreseeability is tested is not Super Micro's use of the U.S. financial system, but instead is the presence of non-ministerial banking activity in the Southern District of New York that is foreseeable to Mr. Liaw. Super Micro Taiwan's receipt of U.S. dollars by international payment does not establish Mr. Liaw's reasonable foreseeability of conduct in the

Southern District of New York. Nor do discussions of server orders, Opp. at 13, establish familiarity with the payment routes selected after those orders were placed.

The Second Circuit makes clear that, for venue to lie, it must be reasonably foreseeable "to *each defendant* charged with the conspiracy that a qualifying overt act would occur in the district where the prosecution is brought." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018) (emphasis added). In other words, the court must "have some sense of venue having been freely chosen by the defendant." *Id.* (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)). Here, even were the court to determine that an intermediary wire passed through a correspondent bank in this District and that it constitutes a foreseeable (a "qualifying") overt act to a member of the alleged conspiracies, it still must be alleged and proven that the overt act was reasonably foreseeable to Mr. Liaw. *Kirk Tang Yuk*, 885 F.3d at 71–76 (assessing reasonable foreseeability individually to four defendants). The facts that the *Kirk Tang Yuk* court found sufficed to establish that the SDNY was foreseeable—for example, that one coconspirator told another coconspirator, who was carrying cocaine, that he was in New York while they discussed their "issues related to their drug trafficking conspiracy" or that the defendant urged his coconspirator who was in SDNY "to move quickly and bring his remaining cocaine and any sales proceeds from New York to Florida," *id.* at 73–75—stand in stark contrast to what the government now contends supports venue against Mr. Liaw.

### D. The Supplemental Substantial Contacts Limitation Applies in Support of Dismissal.

The government's assertion that the substantial contacts limitation does not apply at the motion to dismiss phase when the Indictment contains a conclusory recitation of venue is incorrect. Opp. at 15. That limitation provides for a "supplemental inquiry," Opp. at 15, where "the defendant argues that his prosecution in the contested district will result in a hardship to him,

prejudice him, or undermine the fairness of his trial." *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012) (cleaned up). Mr. Liaw has made precisely that argument. *See* Mot. at 10–12.

The government exaggerates the court's holding regarding the substantial contacts test in *Kirk Tang Yuk*. *See* Opp. at 15. While it is correct that the court in *Kirk Tang Yuk* found that "when an overt act in furtherance of a criminal conspiracy has been committed in the district" the substantial contacts "inquiry has no relevance," it did not make a *per se* ruling, and instead so held in a case where it found that overt acts that occurred in the district were reasonably foreseeable to each defendant. *Id.* Moreover, the defendants there failed to raise the substantial contacts test in the district court—an issue the court sidestepped—but in doing so, it did not eliminate the applicability of the substantial contacts test in a conspiracy case:

> Notably, we have found it "questionable whether the substantial contacts test should be applied" on appeal where the defendant fails to raise it in the district court, because the substantial contacts inquiry "is made only if the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of the trial." *United States v. Lange*, 834 F.3d 58, 75 (2d Cir. 2016) (internal quotation marks omitted). It is unnecessary to resolve the question whether waiver of a venue objection moots the "substantial contacts" inquiry entirely, however, because [the defendant's] co-conspirators' overt acts in the Southern District of New York are sufficient to create "substantial contacts" between [the defendant] and that district.

*Id.* at 75 n 6. Of course, an overt act in furtherance is a prerequisite to a conspiracy, but if any such act were to be sufficient to establish venue against a particular defendant, the substantial contacts test, which is referred to as a "supplemental inquiry," would be moot. No court has so held.

Here, on allegations very different from the phone calls and the narcotics conspiracy alleged in *Kirk Tang Yuk*, Mr. Liaw contends that, even if there were any intermediary wires that passed through correspondent banks in this District, those wires could not constitute a foreseeable overt act from Mr. Liaw's perspective, and the court would then apply the substantial contacts

analysis, and Mr. Liaw would face substantial hardship if he were prosecuted in this District. *See* Mot. at 10–13 (each factor articulated in *United States v. Reed*, 773 F.2d at 481, supports a ruling that substantial contacts analysis warrants dismissal).

## II. The Indictment Fails to State a Conspiracy to Smuggle Goods from the United States.

Count II charges Mr. Liaw with conspiring to smuggle goods from the United States. *See* Ind. ¶¶ 33–36. The charged "object of the conspiracy" is a violation of 18 U.S.C. § 554. *See* Ind. ¶ 34. Section 554 provides:

> Whoever (1) fraudulently or knowingly exports or sends *from the United States*, or attempts to export or send from the United States, *any merchandise, article, or object contrary to any law or regulation of the United States*, or (2) receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of *such merchandise, article or object*, prior to exportation, knowing the same to be intended for *exportation contrary to any law or regulation of the United States*, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 554(a) (numbering, emphasis added). Count II fails to state an offense because a GPU is not an "object contrary to any law." The government's response is unpersuasive.

The government does not address the defense's textual and constitutional reasons for reading Section 554 to reach only items that, unlike GPUs, are *per se* illegal. *See* Mot. at 13–17; *see also United States v. Ying Lin*, 270 F. Supp. 3d 631, 634 (E.D.N.Y. 2017) (Section 554 offense requires "knowingly exporting an illegal item. . . ."). Rather, it offers a single conclusory sentence: "As the plain language of the statute indicates, the crux of an offense under § 554(a) is that the actual or intended exportation or sending from the United States of the items at issue is 'contrary to any law or regulation of the United States.'" Opp. at 20. It supplies no textual analysis supporting that purported "plain language" interpretation. *Id.* at 17–26.

The government instead cites appellate decisions outside of the Second Circuit, which upheld Section 554 convictions involving items that were not *per se* illegal. *Id.* at 21–26

(collecting cases). But except for one Ninth Circuit case addressed in Mr. Liaw's moving brief, none of the government's cited cases analyzes whether Section 554 reaches such items because in none of those cases did the defendant(s) raises the issue. *See* Mot. at 15 n.4 (discussing *United States v. Chi Tong Kuok*, 671 F.3d 931, 945 (9th Cir. 2012)). And those courts' failure to address the issue *sua sponte* is neither surprising nor dispositive. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *see also Friends of the E. Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 153 (2d Cir. 2016) ("[A] *sub silentio* holding is not binding precedent.").

The defense is aware of only two cases that have analyzed the issue. In *Chi Tong Kuok*, the Ninth Circuit held that "contrary to any law" is an "adverbial clause modifying the verbs 'exports' and 'attempts to export,' not an adjectival clause modifying the noun 'merchandise'"—so the exportation, not the object, must be illegal. 671 F.3d at 945. By contrast, *Ying Lin* held that the phrase "contrary to any law" modifies the nouns "merchandise, article, or object," not the verbs "exports" or "attempts to export"—so the object itself must be illegal. *See* 270 F. Supp. 3d at 634. The Opposition offers no reason why the Ninth Circuit's reading is superior, and it is not. For example, because there is no comma between the words "contrary" and "object," the phrase "contrary to any law or regulation" modifies the nouns "merchandise, article, or object," not the verbs "exports or sends." *See id.* Similarly, because the statute's second clause refers to "*such* merchandise, article or object," the modifier "contrary to any law or regulation" modifies "merchandise, article or object" in the first clause, not "exports or sends." *See id.* ("contrary to law" is "imported into the second clause with the phrase 'such merchandise, article, or object'").

The Opposition does not refute this natural reading of this text. Accordingly, given that Section 554 applies only to items that are *per se* illegal—which a Nvidia GPU is not—the Court should dismiss Count II.

**III. The Court Should Order a Bill of Particulars.**

The government's core contention is that a bill of particulars is not required because the defense "has received voluminous Rule 16 discovery in this case. . . ." Opp. at 31. But the immense volume of discovery—much of it in Mandarin and Thai—is precisely why particulars are necessary. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (particulars especially necessary where "mountains of documents" leave defense counsel "unguided"); *see, e.g.*, *United States v. Oruche*, No. 07 Crim. 124, 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008) (ordering particulars where government produced "8000 pages" of foreign-language linesheets).

Regulatory Subsections. The government argues that it need not identify the specific regulatory subsections Mr. Liaw allegedly violated because the Indictment "track[s] the statutory language of the charged crimes." Opp. at 32. It also points to Commerce Department license determinations identifying the servers' Export Control Classification Numbers and says the Indictment makes clear that "the scheme to export was unlawful because no license was obtained. . . ." *Id.* at 33 (emphasis omitted). Neither argument is responsive to Mr. Liaw's motion.

Count I alleges a conspiracy under the Export Control Reform Act to violate 15 C.F.R. §§ 736.2, 742.6, and 764.2. *See* Ind. ¶ 32. Each regulation contains numerous subsections. *See, e.g.*, 15 C.F.R. § 764.2(a)-(k). Even if the Indictment "make[s] plain" that shipping controlled servers to China with "no license" is an alleged violation, Opp. at 33, the defense has requested specification whether that is the *sole* regulatory basis for Count I. Mot. at 19-22. The government should not be permitted to exploit the Indictment's silence to add new theories unknown to the

defense at trial. *See, e.g.*, *United States v. Murgio*, 209 F. Supp. 3d 698, 720 (S.D.N.Y. 2016) (ordering identification of laws, regulations, or duties allegedly violated); *United States v. Madeoy*, 652 F. Supp. 371, 374 (D.D.C. 1987) (ordering identification of specific regulations within voluminous C.F.R. provisions). Mr. Liaw is entitled to know the particular regulations that he allegedly violated.

*Diverted Servers*. The government next argues that it need not identify the GPUs and servers allegedly diverted to China and Hong Kong because it "is not required to provide notice of, nor does it need to prove, every act in furtherance of the conspiracy, let alone each substantive violation alleged." Opp. at 34. To be sure, the government may not need to prove every shipment, but it must identify those shipments upon which it relies, so Mr. Liaw can find related materials in the enormous production and prepare a defense. *See, e.g.*, *United States v. Hanratty*, No. 24 Crim. 153, 2024 WL 4892742, at *9 (S.D.N.Y. Nov. 26, 2024) (ordering identification of each asset listing the government intended to prove "was fraudulent"); *United States v. Hawit*, No. 15 Crim. 252, 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (ordering identification of transactions the government would seek to prove "were tainted by an unlawful conspiracy"). The defense should not have to guess which of the thousands of servers sold to [redacted] are the basis for the government's case.

*Unindicted Coconspirators*. The government argues that no bill is required because it identified the five anonymized coconspirators in the Indictment and "produced substantial discovery that identifies other co-conspirators. . . ." Opp. at 35. This response ignores both the defense's argument and the six factors courts consider in deciding whether to order identification of coconspirators. *See* Mot. at 23-25 (citing *United States v. Barrett*, 153 F. Supp. 3d 552, 572 (E.D.N.Y. 2015)). Five names are insufficient because the Indictment hints at many more than

five coconspirators, some scattered across the globe. *See, e.g.*, Ind. ¶ 12 (servers were "routed" to Chinese purchasers through "a rotating cast of third-party brokers" located "elsewhere in Southeast Asia"); *id.* ¶ 23 (defendants conspired with "others" so [redacted] "could pass additional audits and inspections. . ."). Given the enormous foreign-language discovery, Mr. Liaw needs those names to guide his review and preparation of a defense. *See, e.g.*, *United States v. Akhavan*, No. 20 Crim. 188, 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (granting bill of particulars because "the indictment suggests that the co-conspirators represented several distinct organizations"); *United States v. Kahale*, 789 F. Supp. 2d 359, 372 (E.D.N.Y. 2009) (granting bill where the conspiracy's "geographic scope" included potentially "unknown international locations"). Identification is necessary to prevent unfair surprise. *See United States v. Failla*, No. 93 Crim. 94, 1993 WL 547419, at *7 (E.D.N.Y. Dec. 21, 1993) ("The request for the names of unindicted co-conspirators is a fairly common request and one that is generally granted. . .").[7]

## IV. The Court Should Suppress the Contents of Mr. Liaw's Electronic Accounts and Phones Because the Warrants Were Not Supported by Probable Cause.

### A. The Opposition's Arguments Do Not Cure the Defects in Probable Cause.

The government responds to Mr. Liaw's motion to suppress with a collection of hindsight-based explanations that are not supported by a declaration on personal knowledge and that do not excuse the (a) deficiencies in the Warrant Affidavits' presentation of the [redacted] informants' accounts and (b) facially irregular documents underlying the Warrants' probable cause showings. Opp. at 42–49. The issue presented is whether the totality of the known circumstances was made

[7] The two opinions the government provides in support of its argument are distinguishable. In *United States v. Chalmers*, the court denied identification of coconspirators based on "potential harm to the Government's investigation." 410 F. Supp. 2d 278, 286 (S.D.N.Y. 2006). The government makes no such claims here. And in *United States v. Ma*, the court denied identification where the defendant was accused of "murder, robbery, [and] heroin trafficking. . . ." No. 03 Crim. 734, 2006 WL 708559, at *2, 14 (S.D.N.Y. Mar. 21, 2006). In this case, there is no danger to unindicted coconspirators from identification.

known to the reviewing Magistrate Judges, and whether the information supplied by the [redacted] criminal informants and the patchwork documentation the government apparently received were sufficiently reliable and independently corroborated to serve as grounds for probable cause—issues that are distinct from whether the government can generate hindsight explanations for flaws in the underlying information presented.

The government's explanations rely upon information that were not known to the affiants when the Warrant Affidavits were sworn and, indeed, appear to have been learned long after the Warrants were executed. But the validity of a warrant application must be assessed based on the information presented to the magistrate judge and the facts known to law enforcement at the time the warrant issued. *See Maryland v. Garrison*, 480 U.S. 79, 85 (1987) ("[W]e must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted . . . . [E]vidence that emerge[s] after the warrant is issued have no bearing on whether or not a warrant was validly issued."); *see also United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) ("All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath."); *United States v. Williams*, No. 17 Cr. 78, 2019 WL 4454250, at *7 (W.D.N.Y. Apr. 25, 2019) (disregarding information that was unsworn and information provided orally to the reviewing magistrate judge).

More particularly, with respect to the [redacted]-provided documents that formed the basis for the Warrants, the government asserts that, at the time it sought the Liaw SCA Warrant, it did not possess the complete chat communications that it repeatedly quoted in the Liaw SCA Warrant. Opp. at 44–45. That concession only further undermines the presentation made in the Warrant Affidavits. If the government relied on a handful of messages selected and provided by informants who were seeking significant benefits from the government, without possessing the complete

underlying communications or any reliable source to independently corroborate the information provided, that fact was not explained to the Magistrate Judge in the Liaw SCA Warrant Affidavit. This omission carried through to the Devices Warrant and [redacted], which each substantially repeated the allegations in the Liaw SCA Warrant Affidavit. *See* Mot. 36–37. By the time of the Devices Warrant, the government argues that it had received the complete text conversations, not just excerpted screenshots, and had before it the very irregularities it attempts to explain away. Nonetheless, the government repeated its reliance on those communications without disclosing the dating discrepancies to the Magistrate Judges. An inference is available, accordingly, that these omissions were knowing or, at a minimum, reckless. *See United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *26 (S.D.N.Y. Apr. 4, 2007) ("one recklessly disregards the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations.") (collecting authorities).

The government also points to "banner dates," reverse-ordered screenshots, subsequently produced native files, and the Warrant Affidavits' description of the communications as "excerpts." Opp. 45–48. The government's "banner date" explanation only introduces further confusion. If the phone screen recording merely captured the informant scrolling through messages on a phone, why would the date displayed at the top remain fixed while messages purportedly sent at later dates remain below? The government contends that this is merely a feature of how the screen recording was taken, Opp. at 45, but provides no support for that explanation. Nor does it explain the party who controls the date stamp or the protocol for change in the date stamps.

According to the government, the screenshots of chats between Mr. Willy Sun and [redacted] are reliable though, as is acknowledged, they were produced in the wrong order and allegedly make

sense once the pages are rearranged and the dates are disregarded. *See* Opp. at 47. The Magistrate Judges were made aware of none of this. They were not told that purported business records, *see* Simons Decl. Exs., 11 & 12, were received in a manner that revealed a mangled chronology. They were not told that the communications cited could only be understood if the dates stamped on the communications were ignored so as to avoid their incongruity.

The government suggests that it is of no moment that its Warrant Affidavits relied on informant-produced chat communications, purportedly certified as authentic business records, where the communications were organized in reverse chronological order, the dates displayed on the messages do not mean what they appear to mean, and there was no independent corroboration of the reliability of the communications. It bases this position on its proffer that with the benefit of more complete productions, the time stamps can be reconciled. And the government argues that its production of the "native versions" of the challenged chat communications is dispositive.[8] Opp. at 48. But the government improperly evaluates probable cause through the lens of hindsight. *See Garrison*, 480 U.S. at 85. Accepting the government's proffer, for argument purposes, the relevant question is not whether following issuance of the Warrants based on the Affidavits actually presented, subsequent evidence was produced that confirms that the Affidavits were not false, but rather whether (a) the evidence as actually presented in the Warrant Affidavits was reliable and (b) known to be irregular. The Fourth Amendment requires more than hope on the part of the government that a warrant based on evidence of dubious reliability will be sorted out later, following more investigation.

[8] The government suggests that if the defense continues to question the reliability of the screen shot messages, it can provide the Court with the native files of those chats, which the government produced in discovery. Opp. at 48. But the government did not produce such native files to the defense. It produced image files of Short Message Reports, stripped of any associated metadata. As the government is aware, a native file is the original electronic file extracted from a device and includes metadata that may bear on the file's provenance. If the government in fact possesses such native files, they should be produced to the defense.

In attempting to explain away the irregularities in the [redacted]-provided documents, the government never addresses its failure to corroborate [redacted]'s allegations through independent sources. *See* Mot. at 31–32; *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation."). Instead, the government suggests that the communications provided by [redacted] were corroborated by information obtained during a December 2025 proffer with [redacted] and through video surveillance. Opp. at 44–45. But the proffer information came from the same source that supplied the documents in the first place. Information provided by a cooperating witness may be consistent with that witness's account, but it does not independently verify it or establish the [redacted] informants' "track record of providing reliable information." *Cf. United States v. Wagner*, 989 F.2d 69, 72–74 (2d Cir. 1993).

The government argues that the mere use in the Warrant Affidavits of terms such as "VSD" and "proffer" adequately informed the Magistrate Judges of information bearing on the credibility of the [redacted] informants. *See* Opp. at 42–43. A generic explanation of a VSD does not substitute for facts specific to the [redacted] informants that would allow for an assessment of their reliability. *Illinois v. Gates*, 462 U.S. 213, 241–44 (1983). Nor does the government's citation to the term "proffer" enlighten. Opp. at 43 n. 8. The Warrant Affidavits do not describe the terms of the proffer. *Williams*, 2019 WL 4454250, at *9 (criminal informant unreliable where magistrate judge lacked information regarding "why [the informant] provid[ed] information to law enforcement, what (if anything) he was receiving in return for providing information," or the basis for the informant's information). In particular, [redacted]'s incentives and potential benefits from its cooperation with the government were not explicated. Opp. at 43–44. Even now, notably, the

government does not explain whether these informant executives have avoided prosecution. And if, as the government contends, there was "nothing to disclose to the magistrate judges in [this] regard," Opp. at 44, the question of why the senior executives voluntarily provided a trove of material implicating themselves and their company without any self-interested reason remains unexplained to the Magistrate Judges. The Warrant Affidavits did not supply an answer.

**B. Mr. Liaw's Examples of the Mischaracterizations and Unfounded China References Illustrate a Pattern That Infects the Warrant Applications.**

The Warrant Affidavits erroneously attribute criminal conduct to Mr. Liaw that is unsupported by the documents relied on in the Affidavits. The Warrant Affidavits repeatedly conflate Mr. Liaw's conduct with that of his alleged coconspirators, and graft unsupported allegations of wrongdoing onto otherwise innocuous communications. *See* Mot. at 41–42. In response, the government identifies several messages cited in the Warrants in which Mr. Liaw discussed an audit of [redacted], and then, just as the Warrants did, appends phrases such as "for which Chang and Sun arranged dummy servers" and "for which dummy servers were used," after describing Mr. Liaw's messages. *See* Opp. at 50. But nothing in Mr. Liaw's communications mentions dummy servers. Rather, just as it did in the Warrants, the government supplies that criminal nexus only through its own characterization, assuming the very point it did not demonstrate in the Warrant Affidavits.

The government argues that Mr. Liaw relies on "isolated examples" of mischaracterized communications and that Mr. Liaw's position fails to account for the requirement that probable cause be assessed based on the totality of the circumstances set forth in the affidavit. Opp. at 52–52. But that is precisely Mr. Liaw's point. The Warrant Affidavits did not present the Magistrate Judges with a fair and accurate totality of circumstances because they omitted important context about Mr. Liaw's communications, Super Micro's operations, and Mr. Liaw's

responsibilities within the company. Mot. at 40–45. Those omissions laid the basis for the Warrant Affidavits' distorted portrayal (using selectively quoted statements) when, viewed in context, the underlying evidence to which they cited showed a different, non-inculpatory picture as to Mr. Liaw.

The government's reliance on *Gotti* and *Jimenez* is accordingly misplaced. *See* Opp. at 53 (citing *United States v. Gotti*, 42 F. Supp. 2d 252, 280 (S.D.N.Y. 1999); *United States v. Jimenez*, 824 F. Supp. 351, 361 (S.D.N.Y. 1993)). Those decisions stand for the unremarkable proposition that a defendant is not entitled to a *Franks* hearing merely because he disagrees with an affiant's interpretation of evidence that was accurately presented to the issuing judge. *See Gotti*, 42 F. Supp. 2d at 279-80; *Jimenez*, 824 F. Supp. at 361. They do not hold that an affiant may describe documents or communications in a manner untethered from the underlying evidence. To the contrary, courts have distinguished between permissible interpretive inferences and assertions that are unsupported by the source materials themselves. *See United States v. Bertini*, No. 23 Crim. 61, 2023 WL 8258334, at *5–*6 (S.D.N.Y. Nov. 29, 2023) (cited at Mot. at 42); *United States v. Big Apple Bag Co.*, 306 F. Supp. 2d 331, 336–37 (E.D.N.Y. 2004) (cited at Mot. at 46–47). That is precisely why the court in *Jimenez* drew the line that it did: "it is one thing to say that an affiant falsely or recklessly stated facts from which he thereafter drew conclusions. It is quite another thing to say that the conclusions drawn from the facts fairly stated were falsely and recklessly made." 824 F. Supp. at 361. Mr. Liaw's challenge falls into the latter category.

**C. The Good Faith Exception Does Not Apply.**

The government argues that Mr. Liaw "has not, and cannot, establish any" of the four circumstances in which the good faith exception does not apply. Opp. at 54 n. 13 (citing *United*

*States v. Leon*, 468 U.S. 897, 922 (1984)). The government is wrong. *Leon* does not apply here because, as described, the affiants knowingly or recklessly manufactured the defects by withholding information material to probable cause (first *Leon* circumstance), and, once that tainted material is excised, the affidavits are too bare to support an objectively reasonable belief in probable cause (third *Leon* circumstance).

*Leon* protects evidence "innocently obtained by officers who rely on warrants later found invalid due to a magistrate's error." *United States v. Reilly*, 76 F.3d 1271, 1281 (2d Cir. 1996). "It is an entirely different matter when the officers are themselves ultimately responsible for the defects in the warrant." *Id.* Indeed, *Leon* itself made clear that suppression "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for reckless disregard of the truth." 468 U.S. at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). "[T]he good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts." *Reilly*, 76 F.3d at 1273. An officer who acts knowingly or with reckless disregard for the truth by omitting material information or presenting misleading information to the magistrate cannot, by definition, possess an objectively reasonable belief in the validity of the warrant that issues from those misrepresentations or omissions.

Here, as set forth above and in Mr. Liaw's moving brief, the Warrant Affidavits omitted critical details regarding [redacted]'s VSD and proffer sessions while relying entirely on communications supplied by [redacted]. Mot. at 33–39. Those communications contained undisclosed date, time, and content discrepancies, as well as chronological impossibilities. The Warrant Affidavits then compounded those deficiencies by attributing the conduct of Mr. Liaw's

alleged coconspirators to him and by placing unwarranted inculpatory constructions on otherwise unremarkable business communications in which he participated. Because the first exception applies "where the issuing magistrate has been knowingly misled," the same reckless omissions and misstatements that entitle Mr. Liaw to suppression (or, at a minimum, to a *Franks* hearing) render the good faith doctrine unavailable,

The third *Leon* circumstance—"an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"—likewise defeats the applicability of the good faith exception. *Leon*, 468 U.S. at 923. The inquiry is not whether the Warrant Affidavits were voluminous—they were—but whether, once the deliberately or recklessly misleading material is set aside, the remaining narrative supported an objectively reasonable finding of in probable cause. *United States v. Canfield*, 212 F.3d 713, 717–718 (2d Cir. 2000). Here, as established in Mr. Liaw's moving brief, Mot. at 45–47, given the undisclosed incentives of [redacted]'s executives to cooperate, and once stripped of the unsupported criminal gloss added to ordinary-course business communications of Mr. Liaw, the Affidavits' reliance on facially irregular, selectively excerpted chats does not constitute a "residue of independent and lawful information sufficient to support probable cause," *id.*, and the good faith doctrine exception does not salvage the Warrants.

**V. The Court Should Suppress the Contents of Mr. Liaw's Phones.**

The government does not dispute by sworn declaration the facts set forth in Mr. Liaw's Declaration. At dawn on March 19, 2026, armed FBI agents broke down Mr. Liaw's door with a battering ram. Simons Decl., Ex. 31 at 5:11. Agents handcuffed and arrested him at 6:15 AM. *Id.* at 7:01. An agent told Mr. Liaw that the FBI had a warrant to seize and search his Phones. *See* Simons Decl., Ex. 33 at 9:42. After Mr. Liaw was told that he would be taken to the FBI's office

and presented at the courthouse, Mr. Liaw asked to retrieve his attorney's phone number from his Work Phone and call his attorney. Liaw Decl. ¶ 8. An agent responded that Mr. Liaw could call later and handed him the Work Phone to retrieve the attorney's number. *Id.*; *see* Simons Decl., Ex. 27. Surrounded by agents, Mr. Liaw entered the Work Phone passcode, 1111. *See* Liaw Decl. ¶ 8. An agent asked Mr. Liaw to confirm that the passcode was 1111, and that agent wrote down the passcode upon confirmation. *Id.* The agent also wrote the attorney's phone number on a Post-It Note. *Id.* The agent asked whether the Personal Phone used the same passcode. Liaw Decl. ¶ 9. Mr. Liaw responded that its passcode was 111111. *See id.*; Simons Decl., Ex. 34. The agent handed Mr. Liaw the Personal Phone and directed him to enter 111111 to "prove that it worked;" Mr. Liaw complied and the Personal Phone opened. Liaw Decl. ¶ 9. All of this took place before the agents read Mr. Liaw his *Miranda* warnings, which ultimately only took place after the agents transported Mr. Liaw to an FBI office. *See* Simons Decl., Ex. 35 (advice-of-rights form signed at 8:50 AM). At no point (including while in the FBI office) was Mr. Liaw given the opportunity to call counsel, notwithstanding his request to do so when arrested and the agents' promise—a fact supporting an inference that the promise was pretextual. Liaw Decl. ¶ 12.

In these circumstances, suppression of the Phones' contents is required under the Sixth Amendment, as well as the Fourth and Fifth Amendments. *See* Mot. 49–66.

**A. The Government Violated Mr. Liaw's Sixth Amendment Rights by "Deliberately Eliciting" His Passcodes.**

Once Mr. Liaw was indicted, here, two days before the search of his person and home, Mr. Liaw's right to counsel under the Sixth Amendment attached and agents could not initiate questioning absent a clear, knowing, and intelligent waiver of counsel. *See Massiah v. United States*, 377 U.S. 201, 206 (1964). By asking questions about Mr. Liaw's passcodes, the agents transgressed this prohibition. *See United States v. Maffei*, No. 18 Crim. 174, 2019 WL 1864712,

at *10 (N.D. Cal. Apr. 25, 2019) (Sixth Amendment violated where agent approached defendant after indictment and "stat[ed] 'that he was there to get the passcode for the phones'"). Mr. Liaw's request to retrieve counsel's telephone number from his Work Phone and call him—while un-*Mirandized*—was not a waiver of his Sixth Amendment right. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (Sixth Amendment waiver must be "voluntary, knowing, and intelligent"); *see also Patterson v. Illinois*, 487 U.S. 285, 294 (1988) (*Miranda* warnings are the "constitutional minimum" for a Sixth Amendment waiver); *Faretta v. California*, 422 U.S. 806, 835 (1975) (defendant must waive Sixth Amendment "clearly and unequivocally"). Accordingly, all evidence from the Phones must be suppressed. *See Nix v. Williams*, 467 U.S. 431, 441–43 (1984); *see, e.g.*, *United States v. Reyes*, 934 F. Supp. 546, 550 (S.D.N.Y. 1996) ("[V]iolation of *Massiah* requires suppression of all derivative evidence gleaned through exploitation of the Government's wrongdoing.").

The government argues first that, while it "agrees that the defendant's Sixth Amendment rights had attached," suppression is unwarranted "because [1] he had not invoked that right to counsel when he entered his passcode into the Work Phone and then [2] voluntarily answered the agents' questions." Opp. at 60. These responses are absurd. After indictment, "the defendant's right to assistance of counsel is self-executing and need not be invoked." *United States v. Austin*, 496 F. Supp. 3d 815, 822 (S.D.N.Y. 2020).[9] And voluntariness is a Fourth and Fifth Amendment issue—not a Sixth Amendment issue. *See United States v. Henry*, 447 U.S. 264, 272 (1980) ("potential for compulsion" was "not relevant to the inquiry under the Sixth Amendment"); *see,*

[9] The government cites *Michigan v. Harvey,* 494 U.S. 344, 345 (1990), for the proposition that a defendant must invoke the right to counsel to trigger Sixth Amendment protections. *See* Opp. at 55. That is incorrect. In *Harvey*, the Supreme Court stated that, after indictment, the Sixth Amendment covers "statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." 494 U.S. at 345. Once the right to counsel attaches post-indictment, a defendant need not invoke the right to counsel; rather, the "the State must prove a voluntary, knowing, and intelligent relinquishment of the Sixth Amendment right to counsel." *Id.*

*e.g., Cahill v. Rushen*, 501 F. Supp. 1219, 1225 (E.D. Cal. 1980) ("Since 'coercion' is not a Sixth Amendment question, 'voluntariness' simply plays no part in the test of admissibility."). The relevant question is whether the agents deliberately elicited the passcodes. *See Rommy*, 506 F.3d at 135 (unlike the Fifth Amendment inquiry, which focuses on the "perceptions of the suspect," the Sixth Amendment focuses on officers' "intentional effort"). The violation here, as a matter of law, was due to the agent's questions, not anything Mr. Liaw did or perceived.

The government also contends that "[t]he Sixth Amendment is not violated by the merely fortuitous receipt of incriminating statements." Opp. at 60 (quoting *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993)). But "luck or happenstance" is not what took place here. *Maine v. Moulton*, 474 U.S. 159, 176 (1985). Rather, the agents asked two questions—seeking both Phones' passcodes—that were prohibited by the Sixth Amendment. They asked Mr. Liaw: (1) to confirm the passcode that they believed that they had seen him enter into the Work Phone (and then wrote it down); and (2) to disclose whether his Personal Phone had the same passcode as the Work Phone (and followed this request by instructing him to enter the Personal Phone passcode to prove that it worked). The agents were not merely listening with respect to either Phone.

1. With respect to the Work Phone, the Opposition ignores that Mr. Liaw asked for an opportunity to speak to counsel when he asked to retrieve counsel's phone number, preferring to skip over his request to call counsel in this part of the undisputed chronology. *See* Opp. at 60 (listing only four "uncontested" facts); *see also infra* Section V.B (discussing Opp. at 65). It was only after Mr. Liaw requested access to the Work Phone to speak to counsel that the agents told him falsely that he could retrieve the number for later use and began asking him questions about the passcode. They were not permitted to ask those questions under the Sixth Amendment. *See,*

*e.g.*, *Henry*, 447 U.S. at 274 (government violates the Sixth Amendment by "intentionally creating a situation likely to induce" incriminating statements without counsel).

The government also relies on Mr. Liaw's "voluntarily" opening of the Work Phone in the agents' "plain view." *See, e.g.*, Opp. at 65. But it was a physical impossibility that, while being presided over by the agents, Mr. Liaw could have opened the Work Phone outside of their view; he had no realistic way of shielding the screen. *Cf. United States v. Booker*, 561 F. Supp. 3d 924, 932 (S.D. Cal. 2021) ("plain view" irrelevant where the agent "made clear that Mr. Booker did not have the option to refuse to place his phone on the table and thus reveal his passcode").

Finally, the government contends that asking Mr. Liaw to confirm the Work Phone's passcode sought no "incriminating information beyond" what he had "already volunteered through his plain-view actions." Opp. at 61 (citing *Rommy*, 506 F.3d at 134). But Mr. Liaw did not make any statements requiring clarification—a limited exception that may apply under Fifth Amendment jurisprudence but not under the Sixth Amendment where no spontaneous, unprompted statements have been offered by the accused. *See Rommy*, 506 F.3d at 135–36. Mr. Liaw volunteered nothing: he opened the Phone to obtain counsel's number while surrounding agents peered at his screen. Confirming the passcode was not akin to a limited request "to spell a name, clarify a date, or explain an abbreviation" from a defendant who is already speaking voluntarily; it expanded the encounter by rendering it verbal and solidifying surreptitiously obtained information. *Rommy*, 506 F.3d at 134; *see United States v. Powell*, 634 F. Supp. 3d 48, 56 (E.D.N.Y. 2022) (clarifying questions cannot "expand the scope of volunteered statements").

2. The agents also deliberately elicited the Personal Phone passcode. After Mr. Liaw retrieved counsel's number from the Work Phone, no circumstance was presented calling for the agents to ask questions about the Personal Phone. Yet the agents asked for its passcode and

required Mr. Liaw to enter it to "prove that it works"—quintessential deliberate elicitation. *See Henry*, 447 U.S. at 271 ("deliberate elicitation" is "certainly" established by "affirmative interrogation"). The government responds that the agent merely asked whether both Phones used the same passcode and that Mr. Liaw "could have replied, 'No,' but he instead volunteered the Personal Phone passcode." Opp. at 61. Not under the Sith Amendment: an indicted defendant's theoretical ability to disregard a question does not excuse the government's intentional asking of that question to obtain an incriminating response. *See Rommy*, 506 F.3d at 135 (Sixth Amendment focuses on officers' "intentional effort," not suspect's "perceptions"); *see also Maffei*, 2019 WL 1864712, at *10 (suppressing contents of phone because officer's statement that he was "here to get the passcode" constituted deliberate elicitation in violation of Sixth Amendment). After all, the agent "could have" refrained from asking for the passcode in violation of the Sixth Amendment.

### B. The Government Violated Mr. Liaw's Fifth Amendment Rights by Compelling Disclosure of His Passcodes.

The government violated Mr. Liaw's Fifth Amendment rights by compelling him to disclose his passcodes without *Miranda* warnings and after he invoked his right to counsel, in violation of *Edwards*. *See, e.g.*, *United States v. Clark*, 683 F. Supp. 3d 97, 108 (D. Mass. 2023) (suppressing where the agent's "interrogation regarding [defendant's] passcodes violated *Miranda*" because the defendant had already requested counsel and government did not show voluntariness). The government response has no merit.

*Testimonial and Incriminating*. The government argues, without citation, that the Phone passcodes were not subject to Fifth Amendment protection because they were "neither testimonial nor incriminating." Opp. at 61. This argument is easily dispatched. The weight of authority, within and outside the Second Circuit, recognizes that compelling a defendant to "turn over [an]

alphanumeric passcode" is "an act that is generally accepted to be protected by the Fifth Amendment because it requires an individual to divulge the contents of his mind . . . ." *United States v. Payne*, 99 F.4th 495, 510–13 (9th Cir. 2024); *see, e.g.*, *United States v. Brown*, 125 F.4th 1186, 1204 (D.C. Cir. 2025); *United States v. Gogic*, 770 F. Supp. 3d 529, 538 (E.D.N.Y. 2025); *United States v. Gray*, No. 21 Crim. 713, 2024 WL 1526368, at *2 (S.D.N.Y. Apr. 9, 2024); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 316 (S.D.N.Y. 2024); *United States v. Jimenez*, 419 F. Supp. 3d 232, 233 (D. Mass. 2020). Courts have resoundingly rejected this argument.[10]

*Invocation of Right to Counsel*. The government next argues that Mr. Liaw alleges only that he "asked his wife to call his attorney" and was "thinking of" Super Micro's General Counsel. Opp. at 65 (quoting Liaw Decl. ¶ 8). It contends that "[a]sking to retrieve a phone number was not an 'unequivocal' invocation of the right to counsel." *Id.* But the government's argument ignores the very next sentence of Mr. Liaw's undisputed declaration: "I then asked the FBI officer if I could have my cell phone, so I could get [the attorney's] number *and call him*." Liaw Decl. ¶ 8 (emphasis added). Mr. Liaw's explicit request triggered *Edwards*'s "bright line" prohibition on questioning. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (invocation need not be phrased "with the discrimination of an Oxford don"); *see, e.g.*, *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) ("I think I should get a lawyer" was unequivocal); *United States v. Seppala*, No. 16 Crim. 436, 2017 WL 5633167, at *3 (S.D.N.Y. Nov. 22, 2017) ("Do I have an opportunity to call an attorney?" was unequivocal). The government violated *Edwards* by seeking both passcodes after Mr. Liaw asked to call counsel. *See, e.g.*, *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 311 (S.D.N.Y. 2018) ("[A]sking a suspect to enter his phone passcode after the suspect has requested an attorney is an *Edwards* violation requiring suppression of the contents of the phone.").

---

[10] This position is also inconsistent with the government's decision to seek authority only for a "Biometric Unlock" in the Devices Warrant. *See, e.g.*, Simons Decl., Ex. 2 at 42 n.4 (citing *Payne*, 99 F.4th at 513).

Voluntariness. The government suggests three grounds on which the phone evidence should not be suppressed, even if it violated *Miranda* and *Edwards*, all based on arguments that Mr. Liaw's disclosures were voluntary. *See United States v. Patane*, 542 U.S. 630, 642 (2004) (plurality opinion). None satisfies the government's burden to prove voluntariness. *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010).

1. The government relies principally on *United States v. Bendann*, a recent Fourth Circuit case that it calls "instructive." *See* Opp. at 62–63 (citing 180 F.4th 147, 152 (4th Cir. 2026)). In *Bendann*, after the defendant invoked his rights to silence and counsel, agents tried to execute a biometric warrant by holding his phone to his face. *See* 180 F.4th at 152. When FaceID failed, the defendant "voluntarily, perhaps even reflexively," entered his passcode. *Id.* at 157. The agent "didn't hold the phone up for long, she didn't say anything, and Bendann entered his passcode within seconds." *Id.* After seeing that the first four digits matched the month and day of his birthday, the agent confirmed his birthday with another agent; overhearing them, the defendant disclosed the full passcode. *Id.* at 153. On those facts, the Fourth Circuit held that the defendant's will was not "so overborne that he would have felt compelled to enter his passcode." *Id.* at 157.

Key facts distinguish *Bendann* from this case; the government ignores them all. Bendann was *Mirandized* and a native English speaker; Mr. Liaw was neither. *Id.* at 152; *see Ortiz v. Stambach*, 137 F.4th 48, 68 (2d Cir. 2025) (coercion suggested where the defendant "was neither *Mirandized* nor provided with a Spanish interpreter"). The agent also told Bendann that a "warrant authorized her to seize his biometric data, specifically his face and hands, to unlock electronic devices." *Id.* at 152. Here, agents said only that they had a warrant for the Phones, without disclosing its biometric limitation, creating the false impression that Mr. Liaw was required to provide passcodes. *See, e.g.*, *United States v. Bauer*, No. 25 Crim. 79, 2025 WL 2532670, at *18

(N.D. Cal. Sept. 2, 2025) (suppressing where agents "gave the impression that the warrant also required him to provide his password, which was not so"). Next, Bendann entered his passcode "reflexively" while the agent remained silent; Mr. Liaw disclosed his passcodes in response to questions and because agents created the conditions under which he believed that doing so was the only way he would be able to contact counsel. *See United States v. Mendez*, No. 24 Crim. 2430, 2026 WL 1021408, at *8 (S.D. Cal. Apr. 15, 2026) (suppressing where the defendant disclosed "his passcode directly after asking for, and being denied, the opportunity to speak with an attorney" because the defendant was "under the impression that he had to" consent). Thus, *Bendann* favors suppression.

2. The government argues that the "totality of circumstances" was not objectively coercive because the agents were "polite" and allowed Mr. Liaw to dress, wash, and "even eat two eggs and a cookie that his wife had prepared." Opp. at 64. However, as the bodycam videos of Mr. Liaw's shell-shocked demeanor demonstrate, *see* Simons Decl., Ex. 31 at 5:22-9:30; *id.* Ex. 33 at 5:42-11:58, the arrest atmosphere—including the bashing in of his door at 6 AM and presence of seventeen armed agents—was inherently intimidating. *See United States v. Cruz*, 840 F. Supp. 3d 162, 180 (E.D.N.Y. 2026) (thirteen armed agents executing a warrant at 6 AM were "*indicia* of domination and control" cutting in favor of *Miranda* violation); *cf. United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) (noting "the special vulnerability of those awakened in the night by a police intrusion at their dwelling place").[11]

[11] The government argues that the agents never "misrepresented the situation in order to encourage the defendant to enter the passcode." Opp. at 63 (quoting *Gogic*, 770 F. Supp. 3d at 541). The agents, however, conveyed falsely that Mr. Liaw's entry of his phone passcode was the pathway to his attorney, a pathway the government then ignored. *Compare Gogic*, 770 F. Supp. 3d at 535-36 ("After Mr. Gogic retrieved the number, the agents allowed him to make a call . . . .").

3. The government also argues that Mr. Liaw was not susceptible to intimidation because he "is an intelligent, middle-aged man who co-founded a Fortune 500 company. . ." Opp. at 64. But it identifies no sophistication with the criminal justice system—the relevant inquiry. *See Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession more likely involuntary where defendant has "no previous experience with the criminal law"). Expertise in servers is not expertise in navigating an arrest. The government further points to Mr. Liaw's English-language business communications with [redacted]'s executives as proof that he "unquestionably speaks and understands English sufficiently." *Id.* But communicating in English about server sales with non-Mandarin-speaking executives at [redacted] does not show an ability to discuss criminal procedure with agents. *See* Liaw Decl. ¶ 14 (Mr. Liaw can converse about familiar subjects in English but needs to converse in Mandarin about "unfamiliar" topics). Indeed, the videos of Mr. Liaw's arrest show that communication was difficult. *See* Simons Decl., Ex. 31 at 5:22–9:30; *id.* Ex. 33 at 5:42–11:58.

**C. The Government Violated Mr. Liaw's Fourth Amendment Rights by Exceeding the Devices Warrant's Scope.**

The government offers three unconvincing responses regarding the agents' failure to comply with the "Biometric Unlock" provision of the Devices Warrant.

*First*, the government argues, shockingly, that although the Devices Warrant expressly authorized agents to attempt on-site access by compelling the display of biometric features, it did not prohibit agents from seizing the Phones for later access "using typical law enforcement methods, including based on statements that the defendant had made." Opp. at 68. But the Warrant Affidavit was clear. It requested authority "to allow law enforcement agents to compel the Subject Persons to display any physical biometric characteristics" but expressly stated: "*This authority is not to compel the Subject Persons to provide a numeric passcode*." Simons Decl., Ex. 2 at 43

(emphasis added). Because the affidavit sought only biometric access and disclaimed authority to compel passcodes, the Devices Warrant authorized only a "Biometric Unlock." *Id.* at 64. The agents exceeded the Warrant's scope by demanding Mr. Liaw's passcodes. *See Maffei*, 2019 WL 1864712, at *4 (suppressing where government demanded phone passcodes when the "text of the application . . ., and therefore the signed warrant provided, only the authority to compel defendant to provide a biometric key").

*Second*, the government argues that the Devices Warrant's authorization to "seize and retain" the Phones for later imaging permitted agents to disregard its limits on how the Phones could be accessed. Opp. at 68–69. But Mr. Liaw challenges the search of his Phones, not their seizure or retention. The government is also off the mark when it contends that the cases cited in the moving brief all involved phones seized "outside the scope of a valid warrant." *Id.* at 69 (citing Mot. at 54–55). As noted in the moving brief, *see* Mot. at 56–57, where (as here) a warrant authorizes only biometric unlocking, compelling an arrested subject to unlock a phone by passcode exceeds its scope—even if the warrant permits seizure and retention. *See Maffei*, 2019 WL 1864712, at *4; *see also United States v. Raymond*, No. 21 Crim. 380, 2023 WL 7005341, at *10 (D.D.C. Oct. 24, 2023) (suppressing where agents went "decidedly beyond the scope of the warrant" by "compel[ing] not just biometrics but also Defendant's entry of his passcodes").

*Third*, the government asserts in one sentence that "law enforcement did not compel the defendant to enter his passcode into the Work Phone, and the subsequent statements he made to law enforcement similarly were voluntary." Opp. at 69. This statement ignores the relevant undisputed facts and certainly fails to satisfy the government's burden to show voluntariness. *See* Mot. at 56–59.

**D. No Exceptions to the Exclusionary Rule Apply.**

Sprinkled throughout the Opposition are curt assertions that—even if the agents violated Mr. Liaw's rights by securing his passcodes—the (1) "inevitable discovery," (2) "foregone conclusion," and (3) "good faith" exceptions to the exclusionary rule apply. They do not.

**1. Inevitable Discovery**

The government raises inevitable discovery only with respect to the Personal Phone—not with respect to the Work Phone. *See* Opp. at 67–68. Under the "inevitable discovery" exception, evidence obtained illegally is not excluded "if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006). The government argues that the Personal Phone should not be suppressed because, even without having unlawfully obtained the passcode, law enforcement would have opened the Personal Phone through (1) trying variations of the similar Work Phone passcode or (2) standard hacking tools for phones. *See* Opp. at 68. This argument fails for three reasons.

*<u>First</u>*, inevitable discovery does not apply where the government has not initiated an alternative means of obtaining the evidence before the suppression motion. *See Nix*, 467 U.S. at 448 (evidence must have been discoverable "without reference to the police error or misconduct"). The government cannot invoke the exception by proposing alternative investigative techniques only in response to a constitutional challenge. *See In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 103 (2d Cir. 2016) (alternative means must have been "at least to some degree, imminent, if yet unrealized at the time of the unlawful search").[12]

[12] In the paradigmatic case, the Supreme Court applied inevitable discovery where the police unconstitutionally elicited from a defendant the location of a victim's body because a search party was already engaging in a grid search that would certainly have converged on the body. *See Nix*, 467 U.S. at 446-48.

The Second Circuit's decision in *United States v. Lauria* is illustrative. *See* 70 F.4th 106, 123–25 (2d Cir. 2023). There, the government obtained cell-site location data through a warrant based on a materially false affidavit. *Id.* at 112–20. The district court found a Fourth Amendment violation but applied inevitable discovery because the government "could have obtained a lawful warrant" by correcting the application. *Id.* at 123–24. The Second Circuit reversed, holding that "the means by which the evidence would inevitably be discovered" must be "independent from the means by which the evidence was actually—and unlawfully—discovered." *Id.* at 123. Thus, "the investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in actual discovery was exposed." *Id.* The question is not whether the government "*could have* obtained" the evidence lawfully, but whether it "certainly *would have* discovered" it through an independent lawful means. *Id.* at 124 (emphasis in original).

This timing requirement defeats the government's argument. It does not contend that, before Mr. Liaw moved to suppress, it tried to open the Personal Phone by guessing the passcode or using forensic software. It argues only that it theoretically could have done so. And because the government already had unlawfully obtained the passcode, it had no reason to pursue those alternatives. In fact, by April 2026, the government had imaged the Phones, produced their contents to the defense, and even offered to return the Phones to defense counsel—demonstrating that the government had no intention of pursuing alternative methods of accessing the Phones. *See* Opp. at 6. Its argument, therefore, suffers the same "fundamental flaw" identified in *Lauria*: it assumes that, "*once alerted to defects in [its procedure]*," the government "could easily have corrected or supplemented" its methods. 70 F.4th at 124 (emphasis in original). But the question is whether the government "would have" opened the Phone lawfully absent the suppression motion, not whether it "could have." *Id.* Because the government took no such steps before the

suppression motion, it cannot invoke those methods now. *See id.* (rejecting inevitable discovery where "the record [was] bereft of any evidence" that the government sought new warrants before the suppression motion); *see, e.g.*, *Raymond*, 2023 WL 7005341, at *12 (rejecting inevitable discovery because "no separate avenues of investigation [] were occurring at the same time when the officers illegally searched Defendant's phones").

*Second*, applying inevitable discovery here would undermine constitutional protections. *See, e.g.*, *United States v. Eng*, 971 F.2d 854, 860 (2d Cir. 1992) (warning against allowing inevitable discovery to "swallow[] the exclusionary rule"). The Devices Warrant prohibited access by passcode, yet agents disregarded that limit. Allowing the government to invoke inevitable discovery after violating the Warrant's express terms would reduce the warrant requirement to a nullity. *Cf. United States v. Ayala*, 646 F. Supp. 3d 1191, 1197 (N.D. Cal. 2022) (rejecting inevitable discovery where agents searched outside the warrant's scope). The inevitable discovery doctrine is not a constitutional redo. *See United States v. Cioffi*, 668 F. Supp. 2d 385, 399 (E.D.N.Y. 2009) ("No court has ever endorsed the view that it would allow the government to retroactively cure a Fourth Amendment violation. . . ."); *see also United States v. Thomas*, 955 F.2d 207, 210 (4th Cir. 1992) (the exception cannot rest on "[i]f we hadn't done it wrong, we would have done it right").

*Third*, the government has not even tried to satisfy its burden to show that it would have accessed the Personal Phone without having been told the passcode by Mr. Liaw. Contrary to the government's claim, *see* Opp. at 67 ("only" a preponderance), the inevitable discovery exception applies only if the government shows a "certitude" that it would have discovered the evidence. *In re 650 Fifth Ave.*, 830 F.3d at 102-03.[13] This is a "fact-intensive inquiry." *United States v. Durand*,

[13] This "certitude" standard stems from the inherent difficulty in "using the preponderance-of-the-evidence standard to prove inevitability," which creates "a problem of probabilities" because "even if each event in a series is

767 F. App'x 83, 88 (2d Cir. 2019) (Summary Order). The government, which has submitted no evidence in support of its position, falls far short of this standard. *See Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (a brief "is not evidence at all"). It cannot simply assert that agents would have guessed the Personal Phone passcode. Opp. at 68. Nor does the claim that FBI forensic tools would have hacked the Phone hold water. *Id.* In fact, courts have rejected such claims even when the government provided detailed technical declarations (and testimony) describing the hacking software and its application to the specific phone. *See, e.g.*, *Raymond*, 2023 WL 7005341, at *12 (no inevitable discovery because "wholly speculative" that hacking tool "would have <u>*ever*</u> gained access to either phone's contents, and even then precisely what would have been forensically imageable") (emphasis in original); *Clark*, 683 F. Supp. 3d at 110 (rejecting inevitable discovery where FBI agent admitted that FBI presently lacked tools to hack into iPhone); *Booker*, 561 F. Supp. 3d at 934–35 (rejecting inevitable discovery because government made "unwarranted assumptions" as to whether hacking tool was "sufficiently reliable" and there was a "non-negligible possibility" that the government would never crack the passcode); *United States v. Djibo*, 151 F. Supp. 3d 297, 310–11 (E.D.N.Y. 2015) (rejecting inevitable discovery where hacking method was "unsupported by documentary evidence" and claims about likelihood of cracking phone conflicted with concessions in other cases). The government has offered no evidence to support its claim of inevitable discovery.

---

individually more likely than not to happen, it still may be less than probable that the final event will occur." *United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013).

**2. Foregone Conclusion**

The government argues that, even if accessing the Phones with Mr. Liaw's passcodes violated his Fifth Amendment rights, the Phones' contents should not be suppressed under the "foregone conclusion" exception. Opp. at 61–62.[14] This argument fails.

*First*, the foregone conclusion exception does not apply to compelled disclosure of a cellphone passcode. *See Shvartsman*, 722 F. Supp. 3d at 316–24. The exception arises from the Fifth Amendment's act of production doctrine, which permits a subpoena recipient to withhold documents where production itself would "tacitly concede" their existence, the recipient's possession or control, and the recipient's belief that the produced papers match the subpoena. *Fisher v. United States*, 425 U.S. 391, 410 (1976). If the government already knows those "communicative elements," production becomes "not of testimony but of surrender." *Id.*

Neither the Supreme Court nor the Second Circuit has extended the foregone conclusion exception beyond the act of production context. *See Shvartsman*, 722 F. Supp. 3d at 316. Moreover, given the Supreme Court's clear articulation that the government can constitutionally compel a defendant "to surrender the key to a strongbox," but cannot compel them to "tell[] an inquisitor the combination to a wall safe," *United States v. Hubbell*, 530 U.S. 27, 43 (2000), multiple courts in this Circuit have rejected extending the exception to cellphone passcodes. *See Shvartsman*, 722 F. Supp. 3d at 320 ("precedential, practical, and purposive considerations" foreclose treating passcode disclosure as a foregone conclusion); *Gogic*, 770 F. Supp. 3d at 539 (declining to extend the exception to passcodes because doing so would erase "the longstanding doctrinal distinction between the key and the combination to a safe"); *Gray*, 2024 WL 1526368,

---

[14] It is unclear whether the Opposition argues that the "foregone conclusion" exception applies to excuse the government's Fourth and Sixth Amendment violations as well. Opp. at 61–62. Any such argument would fail because the foregone conclusion exception is exclusively a Fifth Amendment doctrine. *See Fisher*, 425 U.S. at 401.

at *3 (forgone conclusion exception does not apply to passcodes because the iPhone is the "modern-day equivalent of a wall safe"); *see also Booker*, 561 F. Supp. 3d at 935 n.2 (similar); *U.S.A. v. Danaher*, No. 10 Crim. 150, 2020 WL 7264454, at *4 (C.D. Cal. Dec. 9, 2020) (similar). Against these authorities, the government's reliance on the "one court in this District" that has concluded otherwise is unpersuasive. *See* Opp. at 61–62 (citing *United States v. Smith*, 706 F. Supp. 3d 404, 408 (S.D.N.Y. 2023)).[15]

*Second*, even if the exception applies to cellphone passcodes, the government has not established its threshold requirements: it must show with "reasonable particularity" that it knows the existence, control, and authenticity of the documents sought. *See United States v. Fridman*, 974 F.3d 163, 174 (2d Cir. 2020). Although the government need not identify every document, it cannot speculate about documents that might exist. *See United States v. Greenfield*, 831 F.3d 106, 116 (2d Cir. 2016) ("[T]he Government must know, and not merely infer, that the sought documents exist."). The exception rests on the premise that, when the documents' existence and location are already known, production "adds little or nothing to the sum total of the Government's information." *Fisher*, 425 U.S. at 411.

This is not an instance where access to Mr. Liaw's Phones would have "add[ed] little or nothing" to the government's case—as illustrated by the government's vigorous pursuit of the Phones' data. At most, the government knew of a few messages (with [redacted] cooperators) on Mr. Liaw's Phones as of March 19, 2026. It could not claim knowledge with "reasonable particularity"

[15] As the government acknowledges, *see* Opp. at 61 n.14, *Smith* goes farther even than other courts that have applied the "foregone conclusion" exception to passcodes because it relieves the government of showing that it knows with a "reasonable particularity" the contents of the phone. *See* 706 F. Supp. 3d at 408 ("[I]f the Government can independently show the phone belonged to the defendant and that the defendant knew the password, the foregone conclusion doctrine applies. . . ."); *compare In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1349 (11th Cir. 2012) (foregone conclusion doctrine only applicable if government knows "what, if anything, was hidden behind the encrypted wall"). Thus, even if the Court were to find the foregone conclusion exception applicable, the Court should not adopt *Smith*'s extreme interpretation, which is inconsistent with the traditional requirement that the government know that the subject documents exist. *See Fisher*, 425 U.S. at 410.

of all communications, across multiple non-Super Micro messaging platforms (*e.g.*, WeChat and WhatsApp), in the 310 GBs on the Personal Phone and 172 GBs on the Work Phone. *See United States v. Fox*, 721 F.2d 32, 37–38 (2d Cir. 1983) (knowledge of some information from "the face of Fox's tax returns does not mean that the government now knows enough to eliminate any possibility that Fox's production would constitute an incriminating testimonial act"). Nor has the government offered evidence to meet its burden about what it knew was on the Phones as of March 19. *See, e.g.*, *Sec. & Exch. Comm'n v. Huang*, No. 15 Civ. 269, 2015 WL 5611644, at *3 (E.D. Pa. Sept. 23, 2015) (exception inapplicable because "the SEC proffers no evidence rising to a 'reasonable particularity' [of] any of the documents it alleges reside in the passcode protected phones").

**3. Good Faith**

The government argues that the agents' "good faith" excuses their violations of Mr. Liaw's Fifth Amendment rights. *See* Opp. at 67 (even if the agents violated *Miranda* their "indisputable good faith" bars suppression of the Phones' contents); *see also id.* at 63 ("politely asking" for passcodes was not a "'deliberate, reckless, grossly negligent' attempt" to violate *Miranda*). This argument is unpersuasive.

*First*, "[t]he good faith doctrine was designed not to cure police misconduct, but to rectify situations where police reasonably relied on a warrant issued in error by a magistrate judge." *United States v. Patchiav*, No. 23 Crim. 99, 2026 WL 638678, at *7 (E.D.N.Y. Mar. 7, 2026). It therefore does not apply to *Miranda* or *Edwards* violations. *See Oregon v. Elstad*, 470 U.S. 298, 317 (1985) ("We do not imply that good faith excuses a failure to administer *Miranda* warnings. . . ."); *see also Arizona v. Roberson*, 486 U.S. 675, 687 (1988) (officer violated *Edwards*

despite not knowing the suspect had requested counsel).[16] The Opposition's own authorities concern officers' reliance on erroneously issued or recalled warrants. *See* Opp. at 63–64, 67 (citing *Leon*, 468 U.S. at 922; *Herring v. United States*, 555 U.S. 135, 144 (2009)). They do not support applying good faith to Fifth Amendment violations.

*Second*, even if the exception applied, the government cannot carry its burden to show good faith. *See United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992). On March 18, 2026, an agent sought authority for a biometric unlock while expressly stating that the FBI did not seek authority "to compel the Subject Persons to provide a numeric passcode." Simons Decl., Ex. 2 at 43. The next day, after receiving precisely that Warrant, agents nevertheless questioned Mr. Liaw to disclose his passcodes and used them to open his Phones, violating his Fourth, Fifth, and Sixth Amendment rights. That is not good faith. *See Leon*, 468 U.S. at 920 (exception applies when an officer obtains a warrant in objective good faith "*and act[s] within its scope*") (emphasis added).

## VI. To the Extent the Court Provides the Full Indictment to the Jury, the Court Should Strike Surplusage.

The government represents that it "does not intend to provide the jury with a version of the Indictment, or any reading of the charges therein, that contains anything beyond the statutory allegations." Opp. at 69. Accordingly, Mr. Liaw maintains his motion, *see* Mot. at 25–26, only to the extent that the Court, under its practices, intends to provide the jury with a copy of an unredacted Indictment.

[16] The good faith exception also does not apply where agents act outside of the express restrictions of a warrant. *See, e.g.*, *Brown*, 125 F.4th at 1206 (good faith exception inapplicable where agents did not comply with warrant requirement to warn the defendant that he was "free to refuse the request" to open his phone). Nor does it apply to Sixth Amendment violations. *See Moulton*, 474 U.S. at 180; *see, e.g.*, *United States v. Satterfield*, 417 F. Supp. 293, 297 (S.D.N.Y. 1976) (*Massiah* violated even though "all government agents and officers involved conducted themselves in an exemplary fashion").

## VII. The Court Should Unseal Grand Jury Records.

The Opposition supplies no cogent basis to deny the motion to unseal grand jury records. Initially, the government contends that unsealing grand jury materials is inappropriate because, based on the totality of circumstances, the communications cited in the Indictment supplied "overwhelming proof of establishing the defendant's involvement in the charged conspiracies. . . ." Opp. at 74. However, the government's conclusory assertion fails for the reasons stated with respect to the warrant applications: the Indictment adds references to China and smuggling into Mr. Liaw's innocuous communications by conflating his conduct with that of alleged coconspirators. *See supra* Section IV. The same problems that infected the decision to issue the Warrants likely infected the grand jury's deliberations and decision to indict. Mot. at 66–69.

Next, the government argues that the Court should not unseal grand jury records because, [a]s the defendant knows from the discovery produced to date, including the search warrants relating to additional investigative subjects and offenses, the Government's investigation remains ongoing." *Id.* However, the Warrants that the government produced are from January and March 2026. *See* Simons Decl., Exs. 1–3. The grand jury subpoenas to third parties have also been outstanding since February and March 2026. The fact that the government's trial team continues to receive returns from the Warrants (from its "taint" team) and rolling grand jury subpoena productions from third parties does not render the investigation ongoing when there has been no new investigative conduct in months. This form over substance argument cannot defeat the defense's motion.

## CONCLUSION

For all the reasons set forth above, and in Mr. Liaw's opening brief, the Court should dismiss the Indictment's charges against Mr. Liaw. In the alternative, the Court should order the government to provide a Bill of Particulars, strike surplusage from the Indictment, and suppress the evidence seized from Mr. Liaw's iCloud account, Google account, and phones.

Dated: New York, New York
November 3, 2026

Respectfully Submitted,

Nelson A. Boxer
Guy Petrillo
David Hoffman
Eliza Simons
PETRILLO KLEIN + BOXER LLP
655 Third Avenue
New York, NY 10017
(212) 370-0338
nboxer@pkbllp.com

-and-

Jason L. Liang
LIANG LY LLP
601 South Figueroa Street
Los Angeles, CA 90017
jliang@lianglyllp.com

*Attorneys for Yih-Shyan "Wally" Liaw*